No. 24-3768

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| OPAWL – BUILDING AAPI FEMINIST LEADERSHIP, ET AL., | : | |
| Plaintiffs-Appellees, | : | On Appeal from the United States District Court |
| | : | for the Southern District of Ohio |
| v. | : | Eastern Division |
| | : | |
| DAVE YOST, ET AL., | : | District Court Case No. |
| Defendants-Appellants. | : | 2:24-cv-3495 |
| | : | |

---

## MOTION FOR STAY PENDING APPEAL

---

DAVE YOST
Attorney General of Ohio

T. ELLIOT GAISER
Ohio Solicitor General
 *Counsel of Record
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
KATIE ROSE TALLEY
TRANE J. ROBINSON
Deputy Solicitors General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Appellants
  Ohio Attorney General Dave Yost and
  Ohio Secretary of State Frank LaRose*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ........................................................................... 1

STATEMENT ................................................................................. 2

ARGUMENT .................................................................................. 5

  I.    Defendants are likely to succeed on appeal in reversing or narrowing the injunction. .......................................................................... 8

      A.    The Defendants are likely to prevail on the merits because the district court's reasoning diverges from Supreme Court precedent. ........................................................................... 8

          1.    Defendants are likely to succeed on the merits because noncitizens may be constitutionally excluded from the mechanics of democratic self-government. ................................... 8

          2.    The District Court's reasoning does not justify its injunction. ..... 11

      B.    Defendants are likely to prevail on the merits at least in narrowing the overbroad injunction. .................................................. 16

          1.    The injunction blocks constitutional applications of Ohio law...... 16

          2.    The injunction reaches non-parties. ............................................20

  II.    The remaining factors favor a stay of the injunction as the election looms. ..................................................................................22

CONCLUSION................................................................................. 25

CERTIFICATE OF COMPLIANCE................................................... 26

CERTIFICATE OF SERVICE .......................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abbott v. Perez,*
    585 U.S. 579 (2018)...........................................................................22

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
    591 U.S. 430 (2020) ....................................................................... 13

*Allen v. Milligan,*
    599 U.S. 1 (2023) ..............................................................................6

*Ambach v. Norwick,*
    441 U.S. 68 (1979)............................................................................9

*Arizona v. Biden,*
    31 F.4th 469 (6th Cir. 2022).....................................................16, 21

*Auburn Police Union v. Carpenter,*
    8 F.3d 886 (1st Cir. 1993) .............................................................. 15

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006)........................................................................20

*Bluman v. Fed. Election Comm'n,*
    800 F. Supp 2d 281 (D.D.C. 2011).....................................9, 10, 11, 12

*Bluman v. Fed. Election Comm'n,*
    565 U.S. 1104 (2012) ..................................................................... 10

*Buckley v. Valeo,*
    424 U.S. 1 (1976)............................................................................. 1

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ....................................................................... 11

*Cabell v. Chavez-Salido,*
    454 U.S. 432 (1981)..........................................................................9

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .......................................................................20

*California v. Texas*,
   141 S. Ct. 2104 (2021) .................................................................. 18, 20

*Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics &*
*Election Pracs.*,
   No. 23-cv-00450, 2024 WL 866367 (D. Me. Feb. 29, 2024) ........................... 15

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) .................................................................... 15

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) ................................................................... 1, 2

*Crookston v. Johnson*,
   841 F.3d 396 (6th Cir. 2016) .......................................................... 5

*Democratic Nat'l Comm. v. Wis. State Leg.*,
   141 S. Ct. 28 (2020) .................................................................. 7

*Dep't of Homeland Sec. v. New York*,
   140 S. Ct. 599 (2020) ................................................................. 21

*Foley v. Connelie*,
   435 U.S. 291 (1978) ................................................................... 9

*Gill v. Whitford*,
   585 U.S. 48 (2018) .................................................................... 16

*Gregory* v. *Ashcroft*,
   501 U.S. 452 (1991) ................................................................... 2

*Grupo Mexicano De Desarrollo v. Alliance Bond Fund*,
   527 U.S. 308 (1999) ................................................................... 16

*Harper v. Virginia State Bd. of Elections*,
   383 U.S. 663 (1966) ................................................................... 11

*L.W. v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) .......................................................... 21

*Labrador v. Poe*,
   144 S. Ct. 921 (2024) ............................................................16, 21, 22

*Lindenbaum v. Realgy, LLC,*
13 F.4th 524 (6th Cir. 2021) ............................................................................. 19

*Little v. Reclaim Idaho,*
140 S. Ct. 2616 (2020) ................................................................................. 7, 23

*Maryland v. King,*
567 U.S. 1301 (2012) ...........................................................................................22

*Massachusetts v. Mellon,*
262 U.S. 447 (1923) ........................................................................................ 16

*Merrill v. Milligan,*
142 S. Ct. 879 (2022) ........................................................................................6

*Merrill v. People First of Ala.,*
141 S. Ct. 25 (2020) ..........................................................................................6

*Moody v. NetChoice, LLC,*
144 S. Ct. 2383 (2024) ...............................................................................13, 18

*Munro v. Socialist Workers Party,*
479 U.S. 189 (1986) .....................................................................................1, 13

*Murphy v. NCAA,*
584 U.S. 453 (2018) ....................................................................................17, 21

*Nixon v. Shrink Missouri Gov't PAC,*
528 U.S. 377 (2000) ..................................................................................... 1, 24

*Nken v. Holder,*
556 U.S. 418 (2009) ..................................................................................... 5, 23

*Norton Outdoor Adver., Inc. v. Vill. of St. Bernard,*
99 F.4th 840 (6th Cir. 2024) ............................................................................. 19

*Planned Parenthood Cincinnati Region v. Taft,*
444 F.3d 502 (6th Cir. 2006)........................................................................20, 22

*Plyler v. Doe,*
457 U.S. 202 (1982) ........................................................................................ 12

*Priorities USA v. Nessel*,
   978 F.3d 976 (6th Cir. 2020) ............................................................ 5

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) .................................................................. 1, 2, 6, 7

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   589 U.S. 423 (2020) ................................................................... 5, 7

*Russell v. Lundergan-Grimes*,
   784 F.3d 1037 (6th Cir. 2015) ........................................................ 22

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ..................................................................... 16

*Sugarman v. Dougall*,
   413 U.S. 634 (1973) ...................................................................... 9

*Thompson v. Dewine*,
   959 F.3d 804 (6th Cir. 2020) ......................................... 6, 7, 22, 23

*United States ex rel. Turner v. Williams*,
   194 U.S. 279 (1904) ..................................................................... 12

*United States v. Arthrex, Inc.*,
   594 U.S. 1 (2021) ........................................................................ 17

*United States v. Raines*,
   362 U.S. 17 (1960) ...................................................................... 17

*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020) .................................................................... 17

*United States v. Stevens*,
   559 U.S. 460 (2010) .................................................................... 18

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. art. I, §2 ........................................................................ 11

U.S. Const. art. I, §3 ........................................................................ 11

U.S. Const. art II, §1 ............................................................................... 11

Ohio Const. art. V, §1 ........................................................................10, 11

Ohio Const. art XV, §4 .......................................................................... 11

18 U.S.C. §611 ....................................................................................... 10

52 U.S.C. §30121 ................................................................................... 10

21-A M.R.S. §1064.................................................................................. 15

Ohio Adm. Code 111:2-4-14 ............................................................. 14, 23

Ohio Rev. Code §3517.121................................................................3, 4, 19, 23

**Other Authorities**

Ali Swenson, *Abortion rights supporters far outraise opponents, out-of-state money flowing to Ohio*, Associated Press (Oct 27, 2023)...............................2

Federalist No. 1.......................................................................................24

Frank LaRose, Press Release, *LaRose to Ohio House: Ban Foreign Influence Over Ohio's Elections* (May 9, 2024) ......................................3

## INTRODUCTION

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Stevens, J., op.).

States may take measures to increase confidence "in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). They need not wait until their "political system sustain[s] some level of damage before the legislature" takes "corrective action." *Id.*

And when a State sets out to preserve confidence in its elections, voter perception matters. If a State leaves a "perception of impropriety unanswered," voters will make "the cynical assumption" that their perception is reality. *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 390 (2000); *Buckley v. Valeo*, 424 U.S. 1, 30 (1976) (per curiam).

Ohio aimed to address one perceived—and widely reported—problem with its recent elections: that large amounts of foreign money had been poured into an issue campaign to amend the Ohio Constitution. Ohio passed a law this year restricting foreign money in its elections, but a District Court enjoined it hours before it would

have taken effect. That injunction even reached applications of the law the District Court found constitutional, and it extended to nonparties.

In our federalist system, "the Framers of the Constitution intended the States to keep for themselves … the power to regulate elections." *Gregory* v. *Ashcroft*, 501 U.S. 452, 461-62 (1991) (quotation omitted). An injunction invalidating a state election law "frustrates the intent of the elected representatives of the people," *Crawford*, 553 U.S. at 203 (Stevens, J., op.) (quotations omitted), and overrides the democratic process. The high bar against enjoining laws rises higher when a federal court enjoins an election law near an election. *See Purcell*, 549 U.S. at 4. The injunction here does not clear the substantial threshold needed to block a state election law 53 days before an election.

Ohio seeks a stay pending appeal. In the alternative, Ohio seeks to stay at least those parts of the injunction that block the law in what the District Court held were constitutional applications and those parts of the injunction that reach nonparties. Because the election is near, Ohio asks that any decision issue by September 20, to leave Ohio time to seek relief in the Supreme Court before November.

## STATEMENT

In Ohio's 2023 election cycle, the media widely reported that foreign nationals contributed millions of dollars to an issue campaign. *See, e.g.,* Ali Swenson, *Abortion*

*rights supporters far outraise opponents, out-of-state money flowing to Ohio*, Associated Press (Oct 27, 2023) (https://www.pbs.org/newshour/politics/abortion-rights-supporters-far-outraise-opponents-out-of-state-money-flowing-to-ohio); *see also* Katz Dec. R.29-3, ¶17–20, PageID#1092–93.  The next year, Ohio's Secretary of State recommended that Ohio update its election laws to combat foreign influence. *See* Frank LaRose, Press Release, *LaRose to Ohio House: Ban Foreign Influence Over Ohio's Elections* (May 9, 2024) (https://www.ohiosos.gov/media-center/press-releases/2024/2024--5-09/).

Ohio's General Assembly and Governor agreed.  Ohio's amended election law would have taken effect on September 1, 2024, but for the District Court's injunction.  The law bans "foreign national[s]" from certain election spending, including spending related to statewide ballot issues.  Ohio Rev. Code §3517.121(B).  The law defines a foreign national to include "an individual who is not a citizen of the United States or national."  *Id.* §3517.121(A)(2)(a).  Other provisions operate on those who might receive money from foreign nationals or aid or abet prohibited spending.  *Id.* §3517.121(C), (D).  Still others set penalties and detail enforcement mechanisms.  *Id.* at §3517.121(F), (G), (H).

Before the law took effect, a group of individuals and associations sued to enjoin enforcement of the law, arguing it contravened the First Amendment.  Op., R.32,

PageID#1149.  The plaintiffs included an organization that includes non-U.S. citizen members, and two individuals who are lawful permanent residents of the U.S.  *Id*. at PageID#1150–54.

On Saturday, August 31, 2024, the District Court preliminarily enjoined portions of Ohio Rev. Code §3517.121.  With one narrow exception, the Court found the law constitutional.  Op., R.32, PageID#1188.  The exception:  the Court decided that lawful permanent residents "have political speech rights," and therefore any restriction on those rights must be constitutionally tailored to advance the State's interests. *Id*. at PageID#1169.  The Court concluded that the law is improperly tailored because the State showed no link between lawful permanent residents and the State's interest in preventing foreign influence over State elections.  *Id*. at PageID#1178.

As a remedy, the Court enjoined Ohio Rev. Code §3517.121(A)(2)(a), the definition of a foreign-national individual, in its entirety.  That is, even though the Court recognized that *most* foreign-national individuals covered by Ohio Rev. Code §3517.121(A)(2)(a) do not have any First Amendment rights to participate in American self-government, it nonetheless enjoined the law as applied to *all* foreign-national individuals.

The defendants sought a stay or partial stay. The District Court denied those requests, reasoning both that the Supreme Court's cases upholding laws excluding noncitizens from political participation do not count because they arose in the equal-protection context, and that the remedy had to "enjoin some likely constitutional applications" because the court had no alternative but to "strike" an entire provision to avoid judicial legislation. Stay Op., R.40, PageID#1259, 1271, 1276.

## ARGUMENT

"To grant a stay," the Court must "balance" four factors: (1) Ohio's "likelihood of showing" its "law is enforceable," (2) "the likelihood and degree of irreparable injury to" Ohio absent a stay, (3) "the prospect that the stay would substantially injure other parties interested in the proceedings," and (4) "the interest of the public in granting the stay." *Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020) (order); *Nken v. Holder*, 556 U.S. 418, 434 (2009). The stay factors are "interconnected considerations," not prerequisites. *Crookston v. Johnson*, 841 F.3d 396, 402 (6th Cir. 2016) (order).

These factors get a tweak favoring a stay in the context of an injunction against enforcement of an election law near an election. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l*

*Comm.*, 589 U.S. 423, 424 (2020) (per curiam) ("*RNC*").  That includes avoiding injunctions of new election regulations on the eve of an election.  *See, e.g.*, *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020) (granting stay); *see id.* at 26 (Sotomayor, J., dissenting).  The caution flag about enjoining state election laws close to an election may be described as raising "the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures."  *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).  "It is one thing for a State on its own to toy with its election laws close to a State's elections.  But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election."  *Id.* at 881.  Thus, in *Milligan*, *Purcell* influenced the Supreme Court to stay a preliminary injunction entered in January of an election year even though Alabama's legislative districts were later held unlawful.  *Allen v. Milligan*, 599 U.S. 1, 10 (2023); *see also* 142 S. Ct. 879 (2022).

The *Purcell* principle should have informed the District Court's consideration of the stay factors.  Instead, it misinterpreted *Purcell* in three respects to hold that it "does not apply here."  R.40, PageID#1276.

*First*, *Purcell* is not confined to State laws "directed at voting" or "voters," *id.* at PageID#1277, but applies to "state[] election procedures" generally, *Thompson v.*

*Dewine*, 959 F.3d 804, 813 (6th Cir. 2020) (per curiam order). Indeed, the Supreme Court and this Court have stayed injunctions of State laws regarding signature requirements for ballot-initiative petitions. *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Thompson*, 959 F.3d at 809. Those laws did not regulate voting rules or voters.

*Second*, the District Court erred by treating the law's recency as a reason to discount *Purcell*. In fact, by wielding *Purcell* to displace Ohio law, the District Court "turn[s] *Purcell* on its head." *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). *Purcell* restricts federal courts, not State legislatures. The Supreme Court could not be clearer: "lower *federal courts* should ordinarily not alter the election rules on the eve of an election." *RNC*, 589 U.S. at 424 (emphasis added).

*Third*, the District Court suggested that staying its injunction would "only increase confusion," contrary to *Purcell*. R.40, PageID#1277. That argument has already failed at the Supreme Court, *Wis. State Leg.*, 141 S. Ct. at 31–32 (Kavanaugh, J., concurring) (staying a "lower court injunction of a state election rule cannot itself constitute a *Purcell* problem"), and it should likewise fail here.

## I.   Defendants are likely to succeed on appeal in reversing or narrowing the injunction.

Lawful permanent residents enjoy some First Amendment rights.  But they do not enjoy the right to spend money on state election campaigns.  The District Court's holding to the contrary will likely fail on the merits.  And even if its holding as to lawful permanent residents survives, the District Court's injunction is still overboard on two axes—one, the injunction reaches applications that the District Court concluded were constitutional; two, the injunction reaches non-parties to the litigation.  The defendants are likely to succeed on one or all three of these problems that infect the injunction.

### A.   The Defendants are likely to prevail on the merits because the district court's reasoning diverges from Supreme Court precedent.

Supreme Court precedent forecasts Ohio's success on the merits and the District Court's contrary holding does not add up.

#### 1.   Defendants are likely to succeed on the merits because noncitizens may be constitutionally excluded from the mechanics of democratic self-government.

The Supreme Court has repeatedly held that noncitizens may be excluded from the mechanics of democratic self-government.  Because the District Court's injunction rested on the opposite conclusion, Defendants are likely to prevail on appeal.

When it comes to activities of democratic self-government, the States are given "wider latitude" to draw lines based on the "special significance of citizenship." *Ambach v. Norwick*, 441 U.S. 68, 75 (1979). That is, the Supreme Court has recognized the "unequivocal legal bond" between the citizen and the nation, and the validity of laws limiting participation in democratic self-governance to those who share that bond. *Id.*; *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1981); *Foley v. Connelie*, 435 U.S. 291, 299 (1978); *Sugarman v. Dougall*, 413 U.S. 634, 648–49 (1973).

Ballot-issue spending "is directly targeted at influencing the outcome of an election," and therefore, it constitutes direct "participation in democratic self-government." *Bluman v. Fed. Election Comm'n*, 800 F. Supp 2d 281, 289 (D.D.C. 2011) (Kavanaugh, J.), *aff'd* 565 U.S. 110 (2012). Indeed, ballot initiatives are perhaps the most democratic form of government because "the people make law for themselves, instead of their elected representatives making it for them." Op., R.32, PageID#1172. Restricting lawful permanent residents' political spending merely excludes them from a process that they had no constitutional right to participate in from the start.

Perhaps the best window to see where the District Court went off course is a First Amendment challenge to the federal law banning most non-citizens from campaign

spending.  *See Bluman*, 800 F. Supp 2d at 289; 52 U.S.C. §30121(a)(1), (b)(2).

Writing for a three-judge panel, then-Judge Kavanaugh dismissed the complaint.  He

wrote:  "It is fundamental to the definition of our national political community that

foreign citizens do not have a constitutional right to participate in, and thus may be

excluded from, activities of democratic self-government."  800 F. Supp. 2d at 288.

The Supreme Court summarily affirmed.  565 U.S. 1104 (2012).

While *Bluman* did not deal with restrictions for lawful permanent residents, who

were not covered by that federal law, its logic points the way to the District Court's

error in enjoining enforcement of Ohio's law, which does ban lawful permanent

residents from contributing money to influence Ohio elections.  *Bluman's* conclusion

that  foreign citizens may be excluded from activities of democratic self-government

rested on several Supreme Court cases upholding laws excluding non-citizens from

activities associated with democratic government.  *See id.* at 287–88 (collecting

cases).  Ohio's law follows the reasoning of *Bluman* and the Supreme Court holdings

it relies upon.

It also fits well within the broader tradition of limiting political participation to

citizens.  Federal and state laws routinely exclude noncitizens from the political

process.  Noncitizens, including lawful permanent residents, cannot vote in federal

or Ohio elections.  18 U.S.C. §611; Ohio Const. art. V, §1.  Lawful permanent

residents cannot hold elected federal or Ohio offices.  U.S. Const. art. I, §2, cl. 2; art. I, §3, cl. 3; art II, §1, cl. 5; amnd XII; Ohio Const. art XV, §4; art. V, §1.  Federal and state law already exclude lawful permanent residents from the most central activities of government.  Viewed through this lens, Ohio law improves on federal law because it better aligns the limits on who can engage in election spending with existing limits on who can vote and hold elected office.

If noncitizens may be prohibited from running or voting for office, they can be barred from participating in funding the machinery connected to voting.  After all, the right to vote, at least in State elections, derives from the First Amendment.  *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 441 (1992); *cf. Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966).

### 2.    The District Court's reasoning does not justify its injunction.

The District Court's injunction rests on a too-narrow view of Supreme Court precedent and a too-broad view of how Ohio must tailor its law.

Start with the lesson of *Bluman* and the Supreme Court cases it synthesized. *Bluman* described its task as confronting "a preliminary and foundational question about the definition of the American political community."  800 F. Supp 2d at 286. On that question, *Bluman* followed a "straightforward principle":  it is "fundamental to the definition of our national political community that foreign

citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government." *Id.* at 288. *Bluman* then explained that, if democratic self-government includes "functions as unrelated to the electoral process as teaching in public schools and serving as police and probation officers," it follows "almost a fortiori" that the First Amendment permits laws restricting foreign citizens from "spending money to influence voters and finance campaigns." *Id.* at 288–89.

The District Court ignored this logic and attempted to distinguish the cases *Bluman* summarized based on their application of the Equal Protection Clause, not the First Amendment. R.32, PageID#1166–67. That is exactly backwards. Supreme Court cases involving aliens not lawfully present have treated the First Amendment as narrower than the Equal Protection Clause's guarantee. *Compare, e.g., United States ex rel. Turner v. Williams,* 194 U.S. 279, 292 (1904), *with, e.g., Plyler v. Doe,* 457 U.S. 202, 210 (1982).

Now consider the District Court's conclusion that Ohio's law is not appropriately tailored. The District Court never should have ventured down this path because noncitizens do not have a constitutional right to participate in the machinery of voting in the first instance. *See Bluman*, 800 F. Supp. 2d at 2878–88 (collecting cases). Still, the District Court's logic fails on this point as well.

12

After establishing that Ohio has a compelling government interest in "defining their political community," the court concluded that the Ohio law is not properly tailored because it (1) does not actually advance the state's interest to a significant extent; (2) sweeps too broadly; and (3) leaves significant influences bearing on the interest unregulated.  R.32, PageID#1171, 1177–78.  Take each conclusion in turn.

The District Court believed that the Ohio law has not linked "prohibiting [lawful permanent resident]s' political speech to preventing foreign influence."  R.32, PageID#1178.  But the link is not hard to fathom, and with an election impending, Ohio deserves the benefit of the doubt.

While the District Court is no doubt correct that lawful permanent residents have more ties to the nation than other foreign nationals—they may reside in the United States indefinitely, may serve in the military, and pay income tax, R.32, PageID#1181—that greater link does not bar Ohio from distinguishing them from citizens for purposes of influence on its elections.  Ohio is "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively."  *Munro*, 479 U.S. at 195.  Ohio's ban is a prophylactic against foreign individuals and corporations pouring money into Ohio's campaigns.  "[F]oreign organizations operating abroad … possess no rights under the First Amendment."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020); *see Moody v. NetChoice,*

13

*LLC,* 144 S. Ct. 2383, 2410 (2024) (Barrett, J., concurring). Ohio's ban cuts off at least one easy circumvention of prohibiting those entities from influencing Ohio elections—channeling foreign organizational money to affiliates who are lawful permanent residents. At the very least, Ohio is entitled to retain its law so close to the 2024 General Election.

The District Court faulted the law because it "sweeps in U.S. citizens who share finances with noncitizens," R.32, PageID#1182, but that concern misread Subsection C of the law. It does not bar a citizen from making expenditures or contributions from an account shared with a lawful permanent resident. Ohio regulations already explain that contributions made from joint accounts are, "[a]bsent evidence to the contrary," treated as contribution "by the person signing or endorsing the joint check or other written instrument." Ohio Adm. Code 111:2-4-14.

Finally, the District Court impugned the law as underinclusive because the definition does not include U.S. corporate entities with foreign ownership, reasoning that "foreign-owned corporations likely pose a much higher risk of undue influence over Ohio politics than [lawful permanent residents]." R.32, PageID#1184–85. But Ohio shaped its law this way because Supreme Court precedent required it, and it is certainly no First Amendment violation when a law includes exceptions that are

themselves required under the First Amendment.  *See, e.g.*, *Auburn Police Union v. Carpenter*, 8 F.3d 886, 901 (1st Cir. 1993).

Consider the precedent Ohio's law navigated.  *Citizens United* observed that a restriction on corporate speech "not limited to corporations or associations that were created in foreign countries or funded predominantly by foreign shareholders … would be overbroad."  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 362 (2010).  Taking this lesson to heart, a federal court in Maine enjoined a law that restricted political contributions from "foreign government-influenced entit[ies]," because the prohibition extended to any entity with "5% or more of the total equity" or "other applicable ownership interests" held by foreign owners.  21-A M.R.S. §1064(1)(E)(2)(a); *see Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, No. 23-cv-00450, 2024 WL 866367, at \*10 (D. Me. Feb. 29, 2024).  The Court reasoned that the 5% threshold would deprive citizen shareholders—potentially 95% of shareholders—of their First Amendment rights. *Id.* at \*42.  Ohio is free to avoid this constitutional problem by targeting foreign contributions from foreign-domiciled corporations and noncitizens.

At bottom, the District Court faulted the logical syllogism of Ohio's law:  Ohio has a compelling interest in preventing noncitizens from pouring money into Ohio's

elections; lawful permanent residents are noncitizens; therefore, Ohio's law could not be tailored any other way.

**B.    Defendants are likely to prevail on the merits at least in narrowing the overbroad injunction.**

In the alternative, the Court should stay the injunction insofar as it applies to foreign nationals other than lawful permanent residents and insofar as it applies to people not parties to the case.  In both ways, the District Court's injunction exceeded the judicial power to provide equitable relief.

**1.    The injunction blocks constitutional applications of Ohio law.**

One way Article III circumscribes remedies is that courts have no power to enjoin laws beyond any constitutional conflict.  Injunctions "must … be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (citation omitted); *Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 319 (1999) (injunctions limited to "relief … traditionally accorded by courts of equity"); *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).  A consequence of this limit on injunctive relief is that federal courts' equity power does not include "the power to excise, erase, alter, or otherwise strike down a statute."  *Seila Law LLC v. CFPB*, 591 U.S. 197, 253 (2020) (Thomas, J., concurring in part and dissenting in part); *see also Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *Arizona v. Biden*, 31 F.4th 469, 483 (6th Cir.

2022) (Sutton, J., concurring). When federal courts speak of "invalidating" a statute, they either mean it as shorthand for enjoining its application—or they misspeak. "Invalidating a statute is not a 'remedy,' like an injunction, a declaration, or damages." *Murphy v. NCAA*, 584 U.S. 453, 488–89 (2018) (Thomas, J., concurring).

When a court determines a law is susceptible of unconstitutional applications, the proper remedy is to enjoin the defendant from enforcing the law in the manner that will infringe the plaintiff's rights. "This approach derives from the Judiciary's 'negative power to disregard an unconstitutional enactment' in resolving a legal dispute." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23–24 (2021) (citation omitted). That is because the judicial power is to "adjudge the legal rights of litigants in actual controversies," *United States v. Raines*, 362 U.S. 17, 21 (1960), not remake the law. "'[C]ourts [in the early Republic] understood judicial review to consist [simply] of a refusal to give a statute effect as operative law in resolving a case' once that statute was determined to be unconstitutional." *United States v. Sineneng-Smith*, 590 U.S. 371, 387 (2020) (Thomas, J., concurring) (citation omitted).

The District Court's approach veered from these principles when it "t[ook] a blue pencil to" the law, much as a legislator might. *Murphy*, 584 U.S. at 489 (Thomas, J., concurring). The injunction is overbroad. It forbids several

17

applications of the law that the Court agreed the First Amendment permits. "Even in the First Amendment context," courts cannot "disregard the requisite inquiry into how a law works in all of its applications." *Moody*, 144 S. Ct. at 2409.

Here, the Court determined the law, given its plainly legitimate sweep, is not overbroad but would be unconstitutional if applied to one class of foreign nationals, namely, lawful permanent residents. R.32, PageID#1187–88 ("much of Section 121 is constitutional"). But the District Court repurposed that singular unconstitutional application into a confusing holding that the law "is overbroad insofar as it sweeps in LPRs." *Id.* at PageID#1188. In its stay opinion, the District Court explained that it was "sever[ing] and strik[ing]" the law's coverage of *all* foreign-national individuals because the *definition* is overbroad. R.40, PageID#1270. But overbreadth doctrine operates at the level of the "law['s] full range of applications," *Moody*, 144 S. Ct. at 2398, not an isolated application. The District Court's misconception on that score led it to choose a remedy that consciously erases the law rather than merely enjoins the application it thought unlawful. And the District Court's reliance on *United States v. Stevens* is misplaced because the law in that case was facially overbroad, 559 U.S. 460, 482 (2010), whereas this law is not.

The District Court was wrong to "nullif[y] Section 121's definition of foreign national individuals." R.32, PageID#1189. Courts do not nullify laws. *California v.*

18

*Texas*, 141 S. Ct. 2104, 2115 (2021).  The Court reasoned that the law must be read as if it did not reach "an[y] individual who is not a United States citizen or national," Ohio Rev. Code §3517.121(A)(2)(a), because that definition includes (what the District Court viewed as) an unconstitutional application to lawful permanent residents.  That started a cascade of remedial consequences:  enjoining enforcement against any foreign-national person, lawful permanent resident "or otherwise," thus gutting all three of the law's operative provisions.  *See id*. §3517.121(B)–(D).  The court purported to deploy "the narrowest remedy available," R.32, PageID#1189, but the injunction instead works a "'wholesale destruction' of a statut[e]." *Norton Outdoor Adver., Inc. v. Vill. of St. Bernard*, 99 F.4th 840, 852 (6th Cir. 2024) (quotation omitted).

The District Court reasoned that enjoining enforcement "against only [lawful permanent residents] would" amount to "effectively re-writ[ing] the statute," because the statute addresses "foreign nationals" broadly, not lawful permanent residents by name. R.32, PageID#1190.  That logic falls into the trap of viewing the remedy as deciding what words to expurgate from the statute.  But courts "do not change statutes," *Lindenbaum v. Realgy, LLC*, 13 F.4th 524, 528 (6th Cir. 2021), although they (sometimes) enjoin their enforcement.  Under Article III, an injunction is proper only "insofar as it prohibits unconstitutional applications of the

19

statute." *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 517 (6th Cir. 2006); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006).  The District Court's constitutional conclusions should have led it to enjoin only enforcement against lawful permanent residents.  As the Court acknowledged, it enjoined likely constitutional applications of the law.  R.32, PageID#1190.  In taking a "provisions-over-applications" approach to injunctive relief, R.40, PageID#1271, the Court misapprehended its power and duty to enjoin only the unconstitutional applications of a statute while leaving the many constitutional applications in force.  Therefore, as an alternative to fully staying the injunction pending appeal, the Court should stay the injunction insofar as it applies to foreign nationals other than lawful permanent residents.

### 2.    The injunction reaches non-parties.

A second way Article III limits the equitable relief federal courts may grant is by generally containing injunctions to the parties in the case.  "[T]he usual rule" is "that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).  Consequently, a valid Article III remedy "operate[s] with respect to specific parties," not with respect to a law "in the abstract."  *Texas*, 593 U.S. at 672 (quotation omitted).  A "court may not issue an equitable remedy 'more burdensome to the defendant than necessary to

20

[redress]' the plaintiff's injuries." *Labrador*, 601 U. S. at 923 (Gorsuch, J., concurring) (quoting *Califano*, 442 U.S. at 702).

These limits on remedies arise from the nature of the judicial power, which is, "fundamentally, the power to render judgments in individual cases." *Murphy*, 584 U.S. at 488 (Thomas, J., concurring). That is why injunctions "must operate in a party-specific and injury-focused manner." *L.W. v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023). Indeed, a court "exceeds the norms of judicial power" to "enjoin government action" "beyond the injuries of a particular plaintiff." *Id.*; *see Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of a stay). When a judge grants relief to the parties only, however, it reinforces the separation of powers and democratic accountability. Indeed, "prohibiting" "statewide injunctions may turn out to be the right rule as a matter of law." *Labrador*, 601 U. S. at 931 (Kavanaugh, J., concurring). Once "a court has remedied a claimant's injury, it is fair to ask what controversy remains for a court to adjudicate or remedy." *Arizona*, 31 F.4th at 483 (Sutton, J., concurring).

The District Court did not consider limiting its relief to the parties before it. But it should have. In this way, too, the injunction is overbroad even if this Court concludes that it has merit as applied to lawful permanent residents.

\*

21

Particularly in this context, because "[t]he Constitution entrusts to the States the primary role in carrying out elections," *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1050 (6th Cir. 2015), federal courts should be shy to disrupt more than necessary. Ohio is likely to succeed in narrowing the injunction's scope. *Cf. Taft*, 444 F.3d at 517.

## II.    The remaining factors favor a stay of the injunction as the election looms.

For the above reasons, Defendants are likely to prevail on the merits either through complete reversal or through narrowing the preliminary injunction. That likely success points the way on the other stay factors.

*Irreparable harm.* A State suffers irreparable harm when a federal court prevents it "from conducting … elections pursuant to a statute enacted by" its legislature. *Abbott v. Perez*, 585 U.S. 579, 602 (2018); *see id.* at n.17. Indeed, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation omitted); *see Labrador*, 144 S. Ct. at 923 (Gorsuch, J., concurring); *Thompson*, 959 F.3d at 812. "Right now, the [district court's judgment] … disables [Ohio] from vindicating its sovereign interest in the enforcement of [campaign] requirements that are likely consistent with the First

Amendment." *Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring in the grant of stay).

*Harm to other party*. Enforcing the law will not cause constitutional injury to those covered by the Ohio law because it applies to foreign nationals who lack a First Amendment right to participate in the process of American democratic self-government. Nor will it harm the citizen plaintiffs. As to Plaintiff Quilligan, the citizen married to a foreign national with commingled household funds, the law poses no certain and immediate risk of harm. "Absent evidence to the contrary," Ohio law treats contributions from a joint account as made "by the person signing or endorsing the joint check or other written instrument." Ohio Adm. Code 111:2-4-14. A spousal citizen may freely exercise her First Amendment rights in compliance with Ohio law by simply signing the contribution check. And especially if the Court stays the injunction to the extent that it prevents the State from enforcing Ohio Rev. Code §3517.121 against foreign nationals who are not lawful permanent residents, that holding essentially stipulates to the lack of constitutional injury to plaintiffs.

*Public interest*. There "is always a public interest in prompt execution" of the law absent constitutional infirmity. *Nken*, 556 U.S. at 436. Indeed, "giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest." *Thompson*, 959 F.3d at 812.

If Ohio is required to run its election under the District Court's injunction, and thus without the benefit of its elected representatives' high-profile response to widely reported foreign spending to influence what ballot initiatives insert into Ohio's constitution, many voters may question the integrity of the election. *See Nixon*, 528 U.S. at 390. Surely it is in the public interest to assure Ohio's citizens that the election results will be the product of democratic self-government—of citizen's "reflection and choice"—rather than the "accident and force," Federalist No. 1 (A. Hamilton), of foreign influence licensed by a federal court's universal injunction.

## CONCLUSION

The Court should stay the preliminary injunction pending appeal; stay it insofar as it applies to foreign nationals other than lawful permanent residents; or stay it insofar as it reaches non-parties.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General
  *Counsel of Record*
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
KATIE ROSE TALLEY
TRANE J. ROBINSON
Deputy Solicitors General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Appellants*
  *Ohio Attorney General Dave Yost and*
  *Ohio Secretary of State Frank LaRose*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this motion complies with the type-volume requirements and contains 5,184 words. *See* Fed. R. App. P. 27(d)(2)(A).

I further certify that this motion complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font..

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September, 2024, this motion was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

**ATTACHMENTS**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

OPAWL – Building AAPI Feminist
Leadership, *et al.*,

      Plaintiffs,

    v.

Dave Yost, in his official capacity
as Ohio Attorney General, *et al.*

      Defendants.

Case No. 2:24-cv-3495

Judge Michael H. Watson

Magistrate Judge Kimberly Jolson

### OPINION AND ORDER

Ohio Attorney General Dave Yost and Secretary of State Frank LaRose

("Defendants") move for an order staying enforcement of the preliminary

injunction that this Court issued against a portion of Ohio Revised Code Section

3517.121 ("Section 121").  ECF No. 34.

That law prohibits "foreign nationals" from directly or indirectly making

political expenditures or contributions, Ohio Revised Code § 3517.121(B), and

persons (natural and non-natural) from receiving the same, *id.* § 3517.121(C).

Section 121 defines "foreign nationals" to include:

> (a) In the case of an individual, an individual who is not a United States
> citizen or national;
>
> (b) A government of a foreign country or of a political subdivision of a
> foreign country;
>
> (c) A foreign political party;
>
> (d) A person, other than an individual, that is organized under the laws
> of, or has its principal place of business in, a foreign country.

*Id.* § 3517.121(A)(2).

The Court preliminarily enjoined Defendants from enforcing Section 121 in connection with only one of those definitional provisions.  *See generally* O&O, ECF No. 32.  Section 121(A)(2)(a) reaches all noncitizen individuals, including lawful permanent residents ("LPRs") also known as green-card holders.  But the Court found that LPRs, as a class, do not likely present a sufficient risk of foreign influence.  The Court thus concluded that Section 121(A)(2)(a)) is likely not sufficiently tailored to the State's interest in preventing foreign influence and so is likely unconstitutional under the First Amendment.  Consistent with this conclusion, the Court enjoined all enforcement of Section 121 based on that (and only that) definitional provision.[1]  The Court also concluded its remedy was the narrowest possible; anything narrower would involve rewriting the statute.

Defendants, in their motion to stay, primarily argue that the Court was wrong on the merits.  Specifically, Defendants reassert their arguments that (1) Section 121 should be reviewed under rational basis review and (2) Section 121 is sufficiently tailored to a sufficiently important government interest, no matter the applicable level of scrutiny.  To these arguments, Defendants add in the alternative that the Court's injunction is too broad.

The Court already considered and rejected these arguments when it partially granted Plaintiffs' motion for a preliminary injunction.  Elaborating on its reasoning, the Court does so again.  Defendants' motion is **DENIED**.

---

[1] Defendants can enforce Section 121 in accordance with the other definitional provisions.

## I.    STANDARD OF REVIEW

Defendants correctly set out the standard of review:

> When considering a motion for stay pending appeal, the Court considers "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay."  These factors are not each prerequisites to a stay pending appeal but are "interconnected considerations" to be balanced by the reviewing court.

Mot. 3, ECF No. 33 (quoting *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006)).  This standard should be familiar.  It is the same standard the Court applied in partially granting Plaintiffs' motion for a preliminary injunction.  *Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020).

## II.    DISCUSSION

**A.    Defendants are unlikely to succeed on appeal.**

**1.    The Sixth Circuit is unlikely to apply rational basis review to Section 121 in its entirety.**

Defendants present nothing new on this score.  They over-read *Bluman v. Fed. Election Comm'n* as standing for the proposition that foreign nationals—including those lawfully residing here—lack a First Amendment right to political speech.  Mot. 3–4, ECF No. 32 (citing 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012)); *see also* Reply 1–3; ECF No. 37.  Laws restricting foreign national political speech, Defendants purport, thus receive rational basis review.

Defendants' interpretation of *Bluman* relies on two things: out-of-context cases and an out-of-context quotation.  Putting the cases and the quotation back

Case No. 2:24-cv-3495                                    Page 3 of 23

in their context, neither support the application of rational basis review to laws restricting the political speech of resident foreign nationals (let alone LPRs).[2]

Defendants invoke the "political function exception" cases as proof that rational basis review applies here.  Those cases all arise in the Equal Protection context; none arise in the First Amendment context.  This difference is crucial, though Defendants elide it.  The "political function exception" cases prove only the limited proposition that resident foreign nationals lack a right to equally access certain public employment.  But although there is a right to equal protection of the law, there is no fundamental right *to access public employment* in the first place.  By contrast, the right to engage in political speech is fundamental; laws that implicate it trigger strict scrutiny.  *See generally Buckley v. Valeo*, 424 U.S. 1 (1976).  And the Supreme Court has extended this right to resident foreign nationals.  *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).  So, cases on laws restricting resident foreign national public employment (which implicate the right to equal protection of the laws but no other) do not lower the standard of scrutiny for laws restricting resident foreign national political speech (which implicate a free-standing fundamental right guaranteed by the First Amendment).[3]

Nor does *Bluman* lower the standard by its own force.  Defendants misconstrue the following line: "foreign citizens do not have a constitutional right

---

[2] For more on this point see O&O 24–31, ECF No. 32.
[3] Furthermore, the activities in the political function cases have little expressive value.

to participate in, and thus may be excluded from, activities of democratic self-government." *Bluman*, 800 F. Supp. 2d at 288.  *Bluman* makes this statement for one purpose only: to identify the Government's compelling state interest. *See id.* ("It follows, therefore, that the United States has a compelling interest for purposes of First Amendment analysis . . . .").  Yet Defendants try to use it for a distinct purpose, for which it cannot be used: to identify the applicable standard of scrutiny.

*Bluman* explicitly ducked the standard of scrutiny question.  *Bluman* declined the FEC's invitation to apply rational basis review, instead opting to "assume for the sake of argument" that banning political spending by resident foreign nationals triggers strict scrutiny.  *Bluman*, 800 F. Supp. 2d at 285–86. The point here is not just that *Bluman* lacks the precedential effect Defendants implicitly ascribe it (though that is also true, as discussed below).  The point is that Defendants misconstrue the line on which they fixate.  If, as Defendants say, *Bluman* concluded that resident foreign nationals do not have political speech rights, then it could have just dismissed plaintiffs' claim on that basis.  Why bother with strict scrutiny analysis at all?  There is only one possible explanation: *Bluman* recognized that resident foreign nationals may have political speech rights warranting strict scrutiny but concluded that a ban narrowly tailored to the interest of preventing foreign influence over domestic political processes would constitutionally overcome any speech rights resident foreign nationals may have.

*Bluman*'s discussion of issue advocacy further reinforces this Court's reading.  If *Bluman*'s "essential holding" is that "by definition" foreign nationals lack political speech rights under the First Amendment, Mot. 4, ECF No. 34, then *Bluman* would unavoidably support a ban on foreign nationals' issue advocacy. Yet *Bluman* emphatically denies that it supports a ban on issue advocacy.  800 F. Supp. 2d at 284.  In response to the "concern that Congress might bar [foreign nationals] from issue advocacy and speaking out on issues of public policy," the *Bluman* court clarified that its "holding does not address such questions, and . . . should not be read to support such bans."  *Id.* at 292.  Why not?  Again, there is only one explanation: the *Bluman* court recognized that resident foreign nationals may have a First Amendment right to engage in political speech. *Bluman* acknowledges that, even though a law targeting express advocacy overcomes non-LPR foreign nationals' political speech right, that right might still shield their issue advocacy.

Even if Defendants' reading of *Bluman* were correct, it would not bind this Court (much less the Sixth Circuit).  As the Court explained in its prior Opinion, the binding effect of summary affirmances by the U.S. Supreme Court "extend[s] no further than the precise issues presented and necessarily decided."  *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983).  *Bluman* was summarily affirmed, 65 U.S. 1104 (2012), and expressly declined to decide what level of scrutiny applies.  *See Bluman*, 800 F. Supp. 2d at 285–86.  And, even if *Bluman* had held that temporary resident foreign nationals lack First Amendment rights (which it

did not), the rights of LPRs were not at issue in *Bluman*.  *Id.* at 292 ("[W]e do not here decide whether Congress could constitutionally extend the current statutory ban to lawful permanent residents . . . .").  *Bluman* therefore has no precedential effect on the appropriate level of scrutiny.

Other cases—which the Court discussed in its Opinion, but which Defendants mostly ignore[4]—do have precedential effect on the appropriate level of scrutiny, however.  *See, e.g.*, *Bridges*, 326 U.S. at 148.  *Bridges* involved an Australian citizen lawfully residing in the U.S. who published literature affiliated with the Communist Party of the United States and in support of Communist candidates.  *Id.*  The Supreme Court held that "[f]reedom of speech and of press is accorded aliens residing in this country," and the Australian citizen's communist political speech was therefore "entitled to that protection."  *Id.*  Defendants' reading of *Bluman* is in stark tension with this "well settled" point of law.  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring in part); *see also* O&O 30, ECF No. 32 (questioning whether the Supreme Court would abrogate this point of law with a summary affirmance).

---

[4] In their Reply, Defendants acknowledge Plaintiffs' argument that restrictions on resident foreign national political speech receive heightened scrutiny because they are part of "the people" protected by the First Amendment, under *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).  Reply 2–3, ECF No. 37.  Rather than refute this premise, Defendants retreat to the position that the Court's injunction is too broad.  *Id.*

Even if resident foreign nationals lack political speech rights, their political speech might still be protected by U.S. citizen's right to hear their speech.[5]  *See* O&O 26–27, ECF No. 32 (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 335, 350–51, 354, 367, 369 (2010)); *Citizens United*, 558 U.S. at 351 ("[T]he First Amendment generally prohibits the suppression of political speech based on the speaker's identity."); *Suster v. Marshall*, 149 F.3d 523, 533 (6th Cir. 1998) (applying strict scrutiny to affirm a preliminary injunction of a campaign expenditure limitation where one plaintiff's injury was based on "First Amendment right to receive information" as a voter); *Abrams v. United States*, 250 U.S. 616, 630–31 (1919) (Holmes, J. dissenting).

In sum, Defendant's argument for rational basis review is unlikely to persuade the Sixth Circuit.  It rests on a strained—one might say "selective"[6]— reading of *Bluman* and the "political function exception" cases.  And that reading crashes against "well settled" Supreme Court precedent without any precedential effect of its own.

---

[5] In their Reply, Defendants acknowledge that *Citizens United* "extensively discussed the right of the public to hear the 'voices and viewpoints' of all kinds of speakers."  Mot. 3, ECF No. 37.  Again, Defendants do not dispute the validity of this premise.  Instead, based on *Bluman*, Defendants argue *Citizens United* is entirely consistent with a ban on foreign political spending.  The Court agrees, as should be obvious from the partial nature of its injunction.  But here is where the Court disagrees: a ban on foreign political spending is inconsistent with the *Citizens United* right to hear voices and viewpoints if the ban fails strict scrutiny.  *Bluman* offers Defendants no refuge; the law it faced survived strict scrutiny.

[6] *See* O&O 40–41, ECF No. 32 (discussing the constitutional concerns Representative Seitz voiced about extending Section 121 to LPRs based on *Bluman*) (quoting Jasrasaria Decl. 25:12–25:18, ECF No. 16-7, PAGEID # 905–06).

Case No. 2:24-cv-3495                                    Page 8 of 23

2.    **Section 121's bar on LPR political speech is unlikely to survive heightened scrutiny.**

Defendants take issue with how the Court frames its tailoring analysis.  On their view, the tailoring inquiry is not whether the law prevents foreign influence but whether the law limits participation in an activity closely related to democratic self-government.  *See* Mot. 4–6, ECF No. 34.  Their view depends on another selective reading of *Bluman*, fixed on the underlined in the following quotation:

> [T]he United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process.

800 F. Supp. 2d at 288.  No doubt "limiting participation . . . in . . . democratic self-government" is part of the interest *Bluman* identified.  But, as this quote makes clear, the interest *Bluman* identified is in limiting participation *that carries a risk of foreign influence*.  A law does not further the compelling interest identified in *Bluman* unless it prevents foreign influence.

That rule follows directly from language in *Bluman*.  That is the import of the "and in thereby preventing foreign influence" in the quotation above.  The rest of *Bluman* reinforces this reading.  Every time *Bluman* refers to the Government's compelling interest after its initial formulation (quoted above), it mentions "preventing foreign influence."  The same is not true for "limiting foreign participation"; sometimes the court describes the interest as only "preventing

foreign influence."[7]  And when "limiting foreign participation" does get mentioned, it is always alongside "preventing foreign influence."[8]  All in all, at a minimum, "preventing foreign influence" is an essential aspect of the compelling government interest recognized in *Bluman*.  It is so essential that a law limiting resident noncitizen participation can be narrowly tailored to that interest only if the law thereby prevents foreign influence.

Many lines from *Bluman* would be senseless if the rule were otherwise.  For example, in response to the argument that the federal ban is not narrowly tailored because it permits foreign nationals to spend on ballot initiatives, the *Bluman* court reasoned that "Congress could reasonably conclude that the *risk of undue foreign influence* is greater in the context of candidate elections than it is in the case of ballot initiatives."  800 F. Supp. 2d at 291.  That is, *Bluman* focused its narrow tailoring analysis on the risk of foreign influence, not the degree of connection to democratic self-government.  Notably, *Bluman* maintained this focus for ballot initiatives—the quintessential activity of democratic self-

---

[7] *See, e.g.*, *Bluman*, 800 F. Supp. 2d at 289 n.3 ("Here, the government's interest is in *preventing foreign influence* over U.S. elections." (emphasis added)); *id.* at 290 ("The compelling interest that justifies Congress in restraining foreign nationals' participation in American elections—*namely, preventing foreign influence* over the U.S. government—does not apply equally to minors, corporations, and citizens of other states and municipalities." (emphasis added)).

[8] *See id.* at 288 ("[T]he government may bar foreign citizens (at least those who are not lawful permanent residents of the United States) from participating in the campaign process *that seeks to influence* how voters will cast their ballots in the elections" (emphasis added)); *id.* at 291 ("Congress's carve-out for lawful permanent residents makes the statute more narrowly tailored to the precise interest that it is designed to serve—namely, minimizing foreign participation in *and influence over* American self-government" (emphasis added)).

government.  If narrow tailoring turned instead on the degree of connection to democratic self-government (as Defendants would have it), then *Bluman* would have determined that the federal ban is underinclusive insofar as it permits foreign national spending on ballot initiatives.  But it did not; it found that excluding ballot initiatives "does not undermine the validity of the statutory ban on contributions and expenditures."  *Id.*  From *Bluman* it therefore follows that courts should focus the First Amendment narrow tailoring inquiry on the risk of foreign influence, as this Court did in its prior opinion and as it does again here.

None of Defendants' other criticisms deter the Court from focusing on the risk of foreign influence.  Defendants find it "ironic" that the plaintiffs in *Bluman* argued that federal law was *underinclusive* because it did not apply to LPRs but that this Court found Section 121 *overinclusive* for that exact same reason.  Mot. 5 n.1, ECF No. 32.  The true irony is that Defendants continue to push the theory that including LPRs makes Section 121 more narrowly tailored, even though *Bluman* specifically rejected it.  800 F. Supp. 2d at 291 (intimating that "Congress's carve-out for lawful permanent residents makes the statute more narrowly tailored to the precise interest that it is designed to serve . . . .").  The Court finds Defendants' theory just as unconvincing as it did before and as the court did in *Bluman*.

Defendants conclude their criticism of the Court's foreign-influence-focused frame with a baffling non sequitur: "under the Court's analysis, it is doubtful that a State's ban on voting by lawful permanent residents could be

upheld." **This is simply not true.**[9]  A State ban on LPR voting can straightforwardly be upheld under this Court's analysis—just as a ban on corporate voting can be upheld under *Citizens United*, 558 U.S. 310 (2010) (striking down restrictions on corporate political speech), and a ban on minor-age children voting can be upheld under *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 231–32 (2003) (striking down restrictions on minors' political speech). Defendants' slippery slope argument lacks grease because the First Amendment right to engage in political speech is simply not co-extensive with the right to vote.  *See Bluman*, 800 F. Supp. 2d at 290.

Defendants' perplexing and alarmist aspersions aside, all told, this Court applied the correct method of analysis in partially granting Plaintiffs' motion for a preliminary injunction.  A law restricting political speech must "prevent foreign influence" to be narrowly tailored to the interest identified in *Bluman*.  Having clarified the proper method, the Court now (re)applies it.

LPRs likely present an insufficient risk of foreign influence.  The rights and privileges that the U.S. Federal Government extends to LPRs—most notably, the privilege to serve in the U.S. military—belies any notion that LPRs present an

---

[9] Defendants' motion misrepresents what this Court held.  Defendants seem to believe the Court held (i) "lawful permanent residents have First Amendment rights to political participation" and (ii) "the States' interests in limiting foreign influence cannot apply to them."  The Court held neither.  First, the Court held that LPRs have a First Amendment right to engage in political *speech*; not a separate right to "political participation." Second, the Court held that although the State has a compelling interest in limiting foreign influence (which could theoretically be applied to LPRs), Section 121 is not sufficiently tailored to that end insofar as it extends to LPRs because there is no evidence that LPRs present a risk of foreign influence.

appreciable risk of foreign influence.  *See* O&O at 42–43, ECF No. 32.  And, in any event, Defendants fail to offer a scintilla of evidence that LPRs in fact present such a risk, despite their burden to do so, *Republican Party of Minnesota v. White*, 536 U.S. 765, 774 (2002) (placing the burden of proof on the state), and despite *Bluman*'s remark that LPRs might not be "foreign" at all, 800 F. Supp. 2d at 291 ("[L]awful permanent residents can be viewed as more similar to citizens than they are to temporary visitors.").

In sum, the arguments that Defendants raise in their motion do nothing to sway the Court from its prior conclusion that Section 121 is not likely sufficiently tailored because it prohibits LPR political speech.

### 3.    The scope of the Court's injunction is appropriate because a narrower injunction would require "rewriting" the statute.

Defendants argue in the alternative that the Court's injunction goes too far. Mot. 6–8, ECF No. 34.  The Court should stay its injunction insofar as it applies to all non-LPR individual foreign nationals, Defendants contend, because the Court determined that banning those foreign nationals' political speech is likely constitutional.  The Court might have limited its injunction to LPRs if it could have, but it cannot because of the way the statute is written.

At least in the context of First Amendment overbreadth, courts generally sever provisions, rather than applications.[10]  Courts sometimes sever whole

---

[10] The cases Defendants cite do not set forth a contrary rule.  In fact, none do what Defendants ask the Court to do: enjoin applications (rather than provisions) of an overbroad speech restriction.  Most of the cases Defendants cite enjoin a whole

provisions even when doing so is "overinclusive."  *See, e.g.*, *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (affirming an injunction that encompasses constitutional applications of a statute).  This limit on federal courts' equitable power derives from the "obligation to avoid judicial legislation."  *Id.* at 479; *see also, e.g.*, *Virginia v. Am. Booksellers Assn.*, 484 U.S. 383, 397 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements" (omission in original)).

*United States v. Stevens* illustrates the operation of the provisions-over-applications rule.  559 U.S. 460 (2010).  In *Stevens*, the Supreme Court confronted a First Amendment overbreadth challenge to a statute prohibiting depictions of animal cruelty.  18 U.S.C. § 48.  The Supreme Court agreed that the statute was unconstitutional as applied to hunting magazines (for example) but constitutional as applied to dog fighting videos (for example).  The Supreme Court in *Stevens* enjoined the whole statute (not just its unconstitutional applications), 559 U.S. at 481, notwithstanding the axiom that "[w]hen confronting a constitutional flaw in a statute, [federal courts] try to limit the solution to the

---

provision, as this Court has, s*ee, e.g.*, *Foster v. Dilger*, No. 3:10-cv-41, 2010 WL 3620238, at *23 (E.D. Ky. Sept. 9, 2010), or review a lower court that did so, *see, e.g.*, *United States v. Arthrex, Inc.*, 594 U.S. 1, 23–24 (2021).  Defendants get closer to the mark with *League of Women Voters of Ohio v. LaRose*, No. 1:23-CV-02414, 2024 WL 3495332 (N.D. Ohio July 22, 2024) (enjoining applications of a statute preempted by federal law), and *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017) (staying a preliminary injunction for some applications of an executive order).  But, to say nothing of the many other points of distinction, those cases do not involve First Amendment overbreadth.  That doctrinal context matters for the scope of the injunction (as the Court explains below).

problem," *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th

Cir. 2018) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S.

320, 328–29 (2006)).  It did so because limiting its remedy to only

unconstitutional applications of the statute would require "rewriting" the statute.

*Stevens*, 559 U.S. at 481.

The same is true here.  Section 121(A)(2)(a) defines "foreign national" to

mean, "in the case of an individual, an individual who is not a United States

citizen or national."  The Court concluded, analogous to *Stevens*, that this

definitional provision was likely constitutional as applied to some individuals who

are not citizens or nationals, but not as applied to LPRs.[11]  In other words, "a

substantial number of [Section 121(A)(2)(a)'s applications] are unconstitutional,

judged in relation to the statute's plainly legitimate sweep."  *Id.* at 473 (internal

citation and quotation marks omitted).

And so, just like the provision in *Stevens*, Section 121(A)(2)(a) does not

permit a narrower remedy.  Section 121(A)(2)(a) is not subdivided such that the

Court could sever and strike the part of the definitional provision that reaches

LPRs while leaving the rest intact.  Nor could the Court adopt a limiting

construction excluding LPRs from this definition: the term "not a United States

citizen or national" is not "readily susceptible" to such a construction.  *American*

---

[11] This Court concluded that Section 121's bans are likely constitutional for all defined
"foreign nationals" aside from individual foreign nationals, and it did not enjoin the
statute vis-à-vis those likely unproblematic definitional provisions.

*Booksellers*, 484 U.S. at 397; *see also Boos v. Barry*, 485 U.S. 312, 330 (1988).

Nor is the Court willing to rewrite the definition of individual "foreign national" by

"inserting words or terms necessary in order to separate the constitutional part

from the unconstitutional part." *See Women's Med. Pro. Corp. v. Voinovich*, 130

F.3d 187, 202 (6th Cir. 1997) (quoting *Geiger v. Geiger*, 160 N.E. 28, 33 (1927)

(cleaned up)).  The Court must therefore sever and strike Section 121(A)(2)(a).

To do otherwise would constitute "a serious invasion of the legislative domain."

*Treasury Employees*, 513 U.S. at 479 n.26.

The provisions-over-applications rule has exceptions, to be sure, even in

the First Amendment overbreadth context.  But none apply here.  Courts are

comfortable drawing lines between applications in the overbreadth context when

those lines are "based on settled First Amendment principles" that are "intimately

familiar," *see id.*, like the distinction between a building and a public sidewalk,

*see United States v. Grace*, 461 U.S. 171, 180–183 (enjoining the application of

a statute to the public sidewalks around the Supreme Court but not to the

Supreme Court building itself).  But line-drawing here is not such a simple matter;

it is more like the line-drawing that the Supreme Court avoided in *Stevens* and

*Treasury Employees*, for two reasons.

First, and most fundamentally, the Court cannot be sure that its attempt to

redraft the statute would draw the line in the same place as the Ohio Legislature.

*See Treasury Employees*, 513 U.S. at 479.  Would the Legislature attempt to

reach some subset of LPRs who it believes pose a heightened risk of foreign

influence?  Would it set a net worth threshold to target enforcement on "foreign billionaires"?  Some other criterion?  Would it do so for just LPRs, or other individual foreign nationals too?  Would it set a limit (rather than a ban) on LPR contributions?  On expenditures?  On ballot expenditures?  What would the limit be?  The Court does not know the answers and will not venture to guess.

Second, as these questions show, this line drawing process "would likely raise independent constitutional concerns whose adjudication is unnecessary to decide this case." *Id.* at 479, n.26.  That is because the extent to which a State Legislature may constitutionally limit LPR political speech is a complicated matter of first impression—a far cry from public sidewalk jurisprudence.  *Compare id.* at 479 *with Grace*, 461 U.S. at 180–83.  And, as Plaintiffs point out, if the Court narrowed its injunction any further, then it may have to reach issues that the Court avoided at the preliminary injunction stage (Plaintiffs' highlight their void-for-vagueness arguments).[12]

The provisions-over-applications preference exists for good reason, especially in the First Amendment overbreadth context.  The absence of such a preference would "sharply diminish [the Legislature's] 'incentive to draft a

---

[12] Defendants view Plaintiffs' vagueness arguments as irrelevant to the injunction's scope because baseless complaints could be filed against even citizens.  Reply 8–9, ECF No. 37. This contention is confusing (because the risk of citizens' political speech being chilled by false accusations would tend to support a broader injunction, for starters).  But, all the same, the Defendants' arguments fail to refute the argument that Court would have to address otherwise unnecessary constitutional issues if it narrowed the injunction.

narrowly tailored law in the first place.'" *Stevens*, 559 U.S. at 481 (quoting

*Osborne v. Ohio*, 495 U.S. 103, 121 (1990).  Expounding on this point, Justice

Antonin Scalia once observed:

> The overbreadth doctrine serves to protect constitutionally legitimate speech not merely *ex post*, that is, after the offending statute is enacted, but also *ex ante*, that is, when the legislature is contemplating what sort of statute to enact.  If the promulgation of overbroad laws affecting speech was cost free . . . that is, if no conviction of constitutionally proscribable conduct would be lost, so long as the offending statute was narrowed before the final appeal . . . then legislatures would have significantly reduced incentive to stay within constitutional bounds in the first place . . . . [And] a substantial amount of legitimate speech would be 'chilled' . . . .

*Massachusetts v. Oakes*, 491 U.S. 576, 586 (1989) (Scalia, J., joined by

Blackmun, Brennan, Marshall, and Stevens, JJ., concurring in part and

dissenting in part.).  Injunctions may therefore be justified even though

"convictions of constitutionally proscribable conduct" may be lost.

That medicine is called for here.  Given that some legislators raised

concern about Section 121(A)(2)(a)'s overbreadth but were dismissed, *see* O&O

40–42, ECF No. 32,  courts have reason to be anxious about whether the Ohio

Legislature has enough "incentive to draft a narrowly tailored law in the first

place." *Osborne*, 495 U.S. at 121.  The need to preserve the overbreadth

doctrine's *ex ante* protection accordingly warrants the loss of some "convictions

of constitutionally proscribable conduct" here.  *Oakes*, 491 U.S. at 586.

Even so, the injunctive medicine prescribed here is not especially bitter.

The Court expects that few "convictions of constitutionally proscribable conduct"

will be lost under its injunction.  *Id.*  All non-LPR foreign nationals are still prohibited from spending in candidate elections under federal law.  52 U.S.C. § 30121.  And Defendants may still enforce Section 121 in connection with non-individual foreign nationals.[13]  The only constitutionally proscribable conduct that is not already prohibited under federal law and now cannot be prosecuted under the Court's injunction is individual foreign nationals' political spending on ballot questions (and other persons' receipt of the same).

In fact, the injunctive medicine prescribed here might not be bitter at all. On Plaintiffs' view, no convictions of constitutionally proscribable conduct will be lost.  Plaintiffs maintain that spending on ballot initiatives by foreign nationals is not constitutionally proscribable conduct.  So, according to them, enjoining the prosecution of individual foreign nationals presents no issue.  To be clear, the Court disagrees.  It doubts that the Sixth Circuit will side with Plaintiffs on ballot initiative spending by non-LPR foreign nationals.  As the Court explained in its prior Opinion, banning non-LPR foreign nationals from spending on ballot initiatives is narrowly tailored to the interest of preventing foreign influence.[14]

---

[13] This includes foreign governments, subdivisions of foreign governments, foreign political parties, corporations organized under the laws of a foreign country, and corporations with their principal place of business in a foreign country.  Ohio Rev. Code § 3517.121(A)(2)(b)–(d).  Note also that Section 121 prohibits political spending both "direct[] and indirect[] through any person or entity[.]"  *Id.* § 3517.121(B), (C).

[14] By spending on ballot initiatives, non-LPR foreign nationals could influence voters. *Bluman*, 800 F. Supp. 2d at 288 (expressing concern with foreign national spending that "influence[s] how voters will cast their ballots"); *see also Austin v. Michigan Chamber of Com.*, 494 U.S. 652, 659–60 (1990).  They could also influence candidates.  *See Bluman* 800 F. Supp. 2d at 291 (noting the heightened risk of foreign spending in candidate elections); *Citizens United*, 558 U.S. at 456 (Stevens, J., concurring in part

That said, though unlikely to be accepted, Plaintiffs' argument stands for the possibility that the Court's injunction prevents effectively no "convictions of constitutionally proscribable conduct."

In the end, the Court's injunction does not "extend far beyond the infirmity it identified." Reply 5, ECF No. 37.  It bears repeating that all non-LPR foreign national spending on Ohio politics remains banned under either Federal or Ohio law, except for spending on *Ohio ballot initiatives* by *individual* foreign nationals. Although this spending likely constitutes "constitutionally proscribable conduct," enjoining Defendants from prosecuting it raises the Ohio Legislature's incentive to craft narrowly tailored laws and reaffirms the *ex ante* protections of the overbreadth doctrine.  And, even more important, the Court cannot craft a remedy that would permit such prosecutions without rewriting Section 121(A)(2)(a)—without exceeding its own competencies and invading the Ohio Legislature's domain.

### 4.   Conclusion

Defendants are unlikely to prevail on appeal.  The Sixth Circuit will likely agree with this Court's view of the merits, as explained in this Opinion and its prior Opinion.  Section 121 triggers heightened scrutiny insofar as it applies to resident foreign nationals.  The First Amendment protects their right to political speech, and it protects citizens' right to hear that speech.  Section 121 is mostly

---

and dissenting in part) (discussing evidence that independent expenditures influence candidates).  For more on this point see O&O 33 n.18, 36–39, ECF No. 32.

narrowly tailored to the compelling interest identified in *Bluman*.  But, because LPRs generally do not present a sufficient risk of foreign influence to justify restricting their political speech, Section 121 is not narrowly tailored to that interest insofar as it regulates LPRs.  Section 121(A)(2)(a) therefore violates LPRs' First Amendment rights.

This conclusion compels the Court to sever Section 121(A)(2)(a) in its entirety.  The Court recognizes that this remedy enjoins some likely constitutional applications of Section 121.  But, mindful of the limits on its remedial power and the need to maintain the *ex ante* protections of the First Amendment overbreadth doctrine, the Court denies Defendants' request for a narrower injunction.

## B.     The remaining factors also disfavor a stay.

The Court's conclusion that Defendants are unlikely to prevail on appeal decides the remaining stay criteria (irreparable harm, harm to third parties, and the public interest)—they rise and fall depending on the merits.  *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 (2018); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).

There is one exception: Defendants—for the first time—argue that the Court's injunction "subject[s] the public to a serious risk of voter confusion."  Mot. 9–10, ECF No. 34 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)).  But the *Purcell* principle does not apply here.  That principle applies to "election rules." *See Tennessee Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, 105 F.4th 888, 897 (6th Cir. 2024) (collecting cases).  Unlike every

recognized "election rule," Section 121 is not directed at voting.  *See Boone Cnty. Republican Party v. Wallace*, No. 24-5783, 2024 WL 4048630 (6th Cir Sept. 5, 2024) (reversing a district court's denial of a motion to preliminarily enjoin a campaign finance regulation days *after* this Court partially enjoined Section 121).  Section 121 is not even directed at *voters*.  This Court can hardly imagine how an order on a law directed at nonvoters could "result in voter confusion and consequent incentive to remain away from the polls."  *Purcell*, 459 U.S. at 4–5.

If anything, the *Purcell* principle (broadly construed) weighs against a stay.  HB1—not the Court's injunction—effected a change in the law.  The Court's injunction merely makes Ohio law consistent with the federal law and consistent with *what Ohio law has been*.  Unlike in *Purcell,* here the "status quo is one in which the challenged [law] has not been in effect."  *Republican Nat'l Comm. v. Common Cause Rhode Island*, 141 S. Ct. 206, 206 (2020) (denying application for stay).  The Court would only increase confusion by contradicting itself now with a stay.  *Purcell*, 459 U.S. at 4–5 (noting the "especially" high risk of confusion with "conflicting orders.").

Neither their *Purcell* argument nor any other argument on the remaining stay factors tips the scales in Defendants' favor.

### III.    CONCLUSION

All factors disfavor a stay.  Defendants' motion to stay the Court's

preliminary injunction pending appeal is therefore **DENIED**.

The Clerk shall terminate ECF No. 34 as a pending motion.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**OPAWL – Building AAPI Feminist Leadership, et al.,**

        **Plaintiff,**

    **v.**

**Dave Yost, in his official capacity as Ohio Attorney General, et al.**

        **Defendant.**

**Case No. 2:24-cv-3495**

**Judge Michael H. Watson**

**Magistrate Judge Kimberly Jolson**

### <u>OPINION AND ORDER</u>

This case is about the scope of a State's power to restrict noncitizens from engaging in political speech.  Plaintiffs are two continuing associations with noncitizen donors, two individual noncitizens, and one individual U.S. citizen married to a noncitizen.

Plaintiffs move to enjoin Ohio Attorney General Dave Yost and Secretary of State Frank LaRose ("Defendants") from enforcing a recently enacted Ohio law ("Section 121") that restricts noncitizen political spending.  Plaintiffs argue that the law violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.  Defendants argue that the law violates neither because states may exclude noncitizens from the processes of democratic self-government to prevent foreign influence on the American political process.

The issue of foreign influence is not new.  George Washington, in his famous Farewell Address, warned our nascent democracy about the threat of

"foreign influence."  George Washington, *Washington's Farewell Address 1796*,

Yale Law School Lillian Goldman Yale Library (last visited Aug. 29, 2024).

President Washington exhorted the country to "be constantly awake, since

history and experience prove that foreign influence is one of the most baneful

foes of republican government."  *Id.*

Given Washington's warning, and the similar warnings of his fellow

founding fathers,[1] it should come as no surprise that the First Amendment

permits the Federal Government to guard against "the insidious wiles of foreign

influence," *id.*  Indeed, as the United States Supreme Court affirmed in *Bluman v.

Fed. Election Comm'n*, "[i]t is fundamental to the definition of our national political

community that foreign citizens do not have a constitutional right to participate in,

and thus may be excluded from, activities of democratic self-government."  800

F. Supp. 2d 281, 288 (D.D.C. 2011), *aff'd*, 565 U.S. 1104.

But when President Washington cautioned the country against foreign

influence, did he have noncitizen individuals like Casimir Pulaski and Bernardo

de Galvez in mind?  No; he certainly did not, you might say, because both

Pulaski and Galvez fought heroically for the United States in the Revolutionary

War.  Pulaski died fighting for American independence.

---

[1] *See, e.g.*, Letter from Thomas Jefferson to William Short, October 3, 1801, reprinted in
Andrew A. Lipscomb, The Writings of Thomas Jefferson 10 (284) (1903): 287;
Alexander Hamilton, "Federalist No. 68: The Mode of Electing the President,"
Congress.gov, available at
https://www.congress.gov/resources/display/content/The+Federalist+Papers#TheFeder
alistPapers-68.

Noncitizen American heroes are not a thing of the past.  Congress recognized this when it *rejected* a proposed amendment to include lawful permanent residents ("LPR") in the *federal* prohibition on foreign national campaign spending.   *See* 148 Cong. Rec. H369-01, H448–52.  During that process, one representative shared the story of Alfred Rascon, who earned a Congressional Medal of Honor for his actions as a medic during the Vietnam War while he was a LPR.  *Id.* at 449 (statement of Sen. Silvestre Reyes) went on to become the Director of the Selective Service Commission.  *Id.*

Yet Defendants ask this Court to hold that individual LPRs—who the Federal Government allows to fight and die in the U.S. Armed Forces—present such a high risk of "foreign influence" on Ohio's political processes that Ohio may prohibit them from speaking on Ohio politics.  The Court declines to do so, as a matter of first impression.

Instead, the Court holds that Plaintiffs are likely to succeed on the merits of their First Amendment challenge to Section 121, at least in part.[2]  The provision of Section 121 that extends to LPRs, Ohio Rev. Code § 3517.121(A)(2)(a), is likely unconstitutional.  Because the other preliminary injunction elements are also met, the Court enjoins Defendants from enforcing Section 121 under its current definition of "foreign national" individuals.  However, because that definition is severable from the rest of Section 121, Defendants may enforce all

---

[2] Because Plaintiffs are likely to prevail on First Amendment grounds, the Court will not address Plaintiffs' Equal Protection Clause arguments.

provisions of Section 121 consistent with the other defined categories of "foreign national." *Id.* § 3517.121(A)(2)(b)–(d).  Plaintiffs' motion is thus **GRANTED IN PART**.

## I.    BACKGROUND

**A.    Legal Background**

**1.    The Federal Government restricts foreign national political spending pursuant to 52 U.S.C. § 30121, part of which the Supreme Court has summarily upheld.**

Before turning to the Ohio statute, it helps to look at analogous federal law, because the differences between the two are crucial.

Federal law, specifically the Federal Election Campaign Act ("FECA"), generally prohibits "foreign nationals" from donating or spending money in connection with any U.S. election.  52 U.S.C. § 30121 ("Section 30121").

FECA defines a "foreign national" as a foreign government, a foreign political party, an entity organized or created under a foreign country's laws, an entity with its principal place of business in a foreign country, and foreign citizens. *Id.* § 30121(b) (adopting the definition in 22 U.S.C. § 611).  Importantly for this case, FECA's foreign-citizen definition of "foreign national" expressly excepts individuals admitted as LPRs of the United States (also known as green card holders).  *Id.* § 30121(b)(2) (referencing 8 U.S.C. § 1101(20)).

In plain terms, Section 30121 prohibits so-defined foreign nationals ("Non-LPR Foreign Nationals") from "directly or indirectly" making an expenditure or

contribution[3] (of money "or other thing of value") in connection with any U.S. election or promising to do so (expressly or impliedly). *Id.* § 30121(a)(1). Section 30121 also prohibits any "person" from "soliciting, accepting, or receiving" a contribution from a Non-LPR Foreign National. *Id.* § 30121(a)(2).

Section 30121(a) is constitutional according to binding U.S. Supreme Court precedent. The Supreme Court summarily affirmed a three-judge federal district court panel decision that upheld the prohibition on Non-LPR Foreign Nationals making candidate-campaign-related contributions and expenditures,[4]

---

[3] The words 'expenditure' and 'contribution' are terms of art. *Buckley v. Valeo*, 424 U.S. 1, 16–23, 25, 44–45 (1976) (parsing the distinction and discussing its significance). Contributions involve giving money to another entity for it to spend—be it a candidate's campaign, a political action committee, a political party, a charitable nonprofit, or just an individual. Expenditures involve spending money ones' self to directly advocate for the success or failure of something up for election (purchasing a television advertisement to support a candidate for the Ohio state house would be a paradigmatic example of an expenditure).

   Expenditures can be split into sub-categories, including: independent expenditures (juxtaposed against coordinated expenditures), and electioneering communications. Independent expenditures expressly advocate for a certain clearly identified election outcome but not in coordination with a candidate or a party; coordinated expenditures are made in coordination with a candidate or party, as their name suggests. Electioneering communications similarly advocate for a clearly identified election outcome, but they do so close in time to the election.

[4] The *Bluman* district court interpreted the independent expenditure ban to apply only express advocacy and not issue advocacy. *Id.* at 288–89. Express advocacy refers to advocacy that uses "magic words" like "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," and "reject" to promote a clearly identified objective (classically, electing a candidate). *Buckley v. Valeo*, 424 U.S. 1, 40–44, 44 n.5 (1976); *see also Wisconsin Right to Life, Inc. ("WRTL") v. FEC*, 551 U.S. 449, 454 (2007) (defining express advocacy that is "susceptible of no other interpretation than as an appeal to vote for or against a specific candidate"). Issue advocacy, however, refers to advocacy that takes a position on an issue but does not identify a particular candidate to elect (or any other similar specific objective). *Bluman v. F.E.C.*, 800 F. Supp. 2d at 284. This construal of FECA means that even Non-LPR Foreign Nationals remain free

---

holding Section 30121(a) was narrowly tailored to the Government's compelling interest in preventing foreign influence over the U.S. political process.  *See generally Bluman v. F.E.C.*, 800 F. Supp. 2d 281 (D.D.C. 2011) (Kavanaugh, J.), *summ. aff'd*, 565 U.S. 1104 (2012).

### 2.    Ohio's Revised Code Section 121 is broader than the federal law.

Ohio Governor Mike DeWine signed HB 1 into law on June 2, 2024.  That bill enacts Section 121 of Ohio Revised Code Chapter 3517.  It is set to take effect September 1, 2024.

Section 121 consists of eight divisions (A through H).  Division A defines certain statutory terms.  Divisions B, C, and D spell out the conduct that the section prohibits.  Division E reclassifies Ohio's prior ban on Non-LPR Foreign National campaign spending as a violation of Section 121.[5]  Division F specifies

---

under the federal regulation to engage in "speaking out about issues or spending money to advocate their views about issues," but not about specific candidates.  *Id.*  As to the parameters of express advocacy, the district court defined the term, as *WRTL* had, as an expenditure for "express campaign speech" or its "functional equivalent," meaning that it "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."

[5] Division E reads: "Any complaint that alleges a violation of division (W) of section 3517.13 of the Revised Code shall be treated as instead alleging a violation of this section."  Ohio Rev. Code § 3517.121(E).  Division W of Section 13, in turn, reads:

> (1) No foreign national shall, directly or indirectly through any other person or entity, make a contribution, expenditure, or independent expenditure or promise, either expressly or implicitly, to make a contribution, expenditure, or independent expenditure in support of or opposition to a candidate for any elective office in this state, including an office of a political party.

the penalties for violating the section, and Divisions G and H create enforcement mechanisms.

Division A defines "foreign national" as any of the following: (a) "an individual who is not a United States citizen or national"; (b) "[a] government of a foreign country or of a political subdivision of a foreign country:; (c) "[a] foreign political party"; (d) "[a] person, other than an individual, that is organized under the laws of, or has its principal place of business in, a foreign country."  Ohio Rev. Code § 3517.121(A)(2).

At least two aspects of this definition are noteworthy.  One, Ohio's definition *includes* LPRs, unlike federal law.  *Compare Id.* § 3517.121(A)(2)(a) *with* 52 U.S.C. § 30121(b) ("'[F]oreign national' means . . . an individual who is not a citizen of the United States or a national of the United States . . . *and who is not lawfully admitted for permanent residence*[.]" (emphasis added)).  Two,

_____

(2) No candidate, campaign committee, political action committee, political contributing entity, legislative campaign fund, state candidate fund, political party, or separate segregated fund shall solicit or accept a contribution, expenditure, or independent expenditure from a foreign national.  The secretary of state may direct any candidate, committee, entity, fund, or party that accepts a contribution, expenditure, or independent expenditure in violation of this division to return the contribution, expenditure, or independent expenditure or, if it is not possible to return the contribution, expenditure, or independent expenditure, then to return instead the value of it, to the contributor.

(3) As used in division (W) of this section, "foreign national" has the same meaning as in section 441e(b) of the Federal Election Campaign Act.

This provision is nearly identical to Section 121 in effect.  The only difference is that Section 121 extends to lawful permanent residents, but section 13, by incorporating the federal definition of "foreign national," does not.

Case No. 2:24-cv-3495                                        Page 7 of 53

Ohio's definition excludes corporations that are both organized under U.S. law and have their principal place of business in the U.S.—even if those corporations have foreign ownership.

Turning to the substantive prohibitions, Division B governs "foreign nationals."  That Division reads:

No foreign national shall, directly or indirectly through any person or entity, do any of the following:

(1) Make a contribution, expenditure, or independent expenditure in support of or opposition to a candidate . . . ;

(2) Make a contribution, expenditure, or independent expenditure in support of or opposition to a statewide ballot issue or question, regardless of whether the ballot issue or question has yet been certified to appear on the ballot;

(3) Make a disbursement for the direct cost of producing or airing an electioneering communication;

(4) Make a contribution . . . to the maximum extent permitted by law and by the constitutions of the United States and of this state, to a continuing association;

(5) Promise, either expressly or implicitly, to make a contribution, expenditure, independent expenditure, or disbursement described in division (B)(1), (2), (3), or (4) of this section.

Ohio Rev. Code § 3517.121(B).[6]

Thus, Sub-divisions 1, 3, and 5 prohibit conduct already prohibited by federal law.  *Compare id. with* 2 U.S.C. § 441e(a)(1).  The only effect these Sub-

_____

[6] For the definitions of "contribution," and "expenditure," and "independent expenditure" see Ohio Rev. Code § 3517.01(C)(5), (6), (17); *see also*, *supra*, note 3.

divisions have, then, is to extend the prohibition to LPRs and subject violators to the penalties and enforcement mechanisms created by Divisions F, G, and H.

Sub-divisions 2 and 4, by contrast, prohibit conduct permissible under federal law.  Specifically, those Sub-divisions extend the federal prohibition on foreign national campaign spending to prevent not only candidate-related-spending but also ballot initiative campaigns.  And, again, Sub-divisions 2 and 4 extend to LPRs, while federal law does not.

Division C also regulates conduct, but it operates on various kinds of legal persons, regardless of whether they fall under Ohio's definition of "foreign nationals."  That Division reads:

> No individual, candidate, campaign committee, political action committee, political contributing entity, legislative campaign fund, state candidate fund, political party, separate segregated fund, or committee created to support or oppose a ballot issue or question and, to the maximum extent permitted by law and by the constitutions of the United States and of this state, no continuing association[7] shall, directly or indirectly through any other person or entity, knowingly do either of the following:
>
> (1) Solicit, accept, or receive any funds from a foreign national for any purpose described in division (B) of this section;
>
> (2) Make a contribution, expenditure, or independent expenditure using any funds the person knows were received from a foreign national for any purpose described in division (B) of this section.

Ohio Rev. Code § 3517.121(C).

Sub-division 1 mostly echoes federal law.  *Compare id. with* 52 U.S.C. § 30121(a)(2).  The only significant difference is, again, that Section 121 includes

---

[7] For the definition of "continuing association" see Ohio Rev. Code § 3517.01(C)(4).

LPRs in the definition of "foreign national," while federal law excludes them.  Sub-division 2 has no analog in federal law but appears mostly (if not completely) redundant to Sub-division 1.[8]

Division D also operates on all kinds of legal persons.  That Division reads: "No person shall knowingly aid or facilitate a violation of division (B) or (C) of this section."  Ohio Rev. Code § 3517.121(D).  This provision establishes accomplice liability for violations of the crimes created by the substantive Divisions of Section 121.[9]

Division F designates penalties for violations of Divisions B, C, and D. Foreign nationals who violate Division B and other persons who violate Division C receive the same basic penalty: a fine equal to the greater of $10,000 dollars or three times the amount contributed or expended, plus a first-degree misdemeanor for a first offense or a fifth-degree felony for a repeat offense.[10] Ohio Rev. Code § 3517.121(F).  Accomplices who violate Division D receive a $1,000 dollar penalty and a first-degree misdemeanor.

Divisions G and H explains who may enforce Section 121 and how they may do so.  As relevant here (to Plaintiffs' standing), Division (G)(1)(a) vests

---

[8] It would be the rare instance in which a person could violate Sub-division 2 (by expending or contributing funds knowingly received from a foreign national) without also violating Sub-division 1 (by receiving those funds from a foreign national).

[9] The FECA's accomplice liability analogue is found at 11 C.F.R. § 110.20(h).

[10] For a first-degree misdemeanor, a court may impose a jail term of up to 180 days. Ohio Rev. Code. § 2929.24.  For a fifth-degree felony, a court must impose a prison term of six to twelve months.  Ohio Rev. Code. § 2929.14.

primary enforcement authority with the Ohio Attorney General and (G)(2) *obligates* the Ohio Attorney General to investigate whenever the governor, the secretary of state, the general assembly, the Ohio elections commission, or an elector allege a violation.

In sum, Section 121 expands upon federal limits to foreign national contributions and expenditures in three ways. One, Section 121 defines "foreign national" differently than does FECA; Section 121's definition of "foreign national" includes LPR's (green card holders), while FECA expressly *excludes* the same from the definition of "foreign national." Two, Section 121 extends the regulations to ballot initiative campaigns. And three, Section 121 empowers the Ohio Attorney General to enforce the prohibition and provides for mandatory investigations upon receipt of a violation allegation.

## B.    Factual Background

A group of organizational and individual plaintiffs filed this suit, challenging Section 121 on the grounds that it will violate their First Amendment free speech and associational rights if it goes into effect.

### 1.    Organizational Plaintiffs

Plaintiff OPAWL describes itself as "a nonprofit grassroots member-led community organization," operating as a "continuing association" under Ohio law, with over 350 members in Ohio. Decl. Hilario ¶¶ 3–5, ECF No. 16-1. "Although OPAWL does not require its members to disclose their citizenship status or the

status of others in their households, OPAWL knows that many of its members"
are not U.S. citizens.  *Id.* ¶ 12.

OPAWL's stated mission is "to build collective power to advance social
justice and elevate the voices, visibility, and progressive leadership of Asian
American and Pacific Islander ("AAPI") and Asian women and nonbinary people
across Ohio."  *Id.* ¶ 3.  To advance this mission, OPAWL has engaged with ballot
issues in several ways: it has translated voter education materials into Asian
languages, hosted events to inform its members about upcoming referenda,
organized phone and text banks, purchased digital ads, and collected signatures
for ballot initiative petitions.  *Id.* ¶¶ 6–9.

OPAWL funds its ballot-related advocacy with "foundation grants and
donations from individual donors, including its individual members."  *Id.* ¶ 18.
OPAWL does not ask its donors "to disclose their citizenship status or affiliation
with foreign nationals[.]"  *Id.*  "Nor do[es it] ask [its] grant funders to track the
citizenship status of their own contributors."  *Id.*  OPAWL accordingly has no
system to segregate funds it receives from noncitizens.  *Id.* ¶ 21.

Plaintiff NEOCH is a nonprofit charitable organization registered under
501(c)(3) and operating in Cleveland.  Decl. Knestrick ¶ 2, ECF No. 16-2.  It also
describes itself as a "continuing association" under Ohio law.  *Id.* ¶ 7.  NEOCH
provides no information about the citizenship of its directors, employees,
volunteers, or other formally affiliated individuals, but it has received contributions
from noncitizens.  *Id.* ¶ 9.

NEOCH's mission is "to eliminate the root causes of homelessness while loving our diverse community through organizing, advocacy, education, and street outreach." *Id*. ¶ 3.  In support of this mission, NEOCH expends resources "to engage[] in nonpartisan advocacy for or against policies that impact the unhoused community in Ohio." *Id.* "Some of the policies that NEOCH advocates for or against include Ohio ballot issues that stand to impact [its] mission or the communities that [it] serve[s]." *Id*. ¶ 4.  For example, NEOCH participated in a 2019 ballot initiative regarding lead in houses, and, in 2023, it contributed to local ballot initiatives for participatory budgeting.  *Id.*

Like OPAWL, NEOCH funded those efforts "through a combination of grants and individual donations[,]" including individual donations from non-citizens.  *Id*. ¶¶ 6, 9.  Also like OPAWL, NEOCH does not track or ask about the citizenship status of its donors or ask its grant funders to track the citizenship status of their contributors.  *Id.* ¶ 9.  NEOCH further has "no system to segregate funds received from noncitizens."  *Id.*

### 2.    Individual Plaintiffs

Plaintiff Elisa Bredendiek is an LPR of the U.S. and has been since 2010.  Bredendiek Decl. ¶ 6, ECF No. 16-4.  A German citizen, Ms. Bredendiek moved to the U.S. in 2005, after graduating high school, and has lived in Northeast Ohio ever since.  *Id.* ¶¶ 2–3.  She has since attended college, married, and had two children.  *Id.* ¶¶ 4–5.  She lives in Cleveland, teaches French and Spanish at St. Ignatius High School, and has no intention of leaving Ohio.  *Id.* ¶¶ 5, 7.

Ms. Bredendiek further avers the following:

From the time I moved to Northeast Ohio as a teenager, I have been an active member of my local community and supported causes I care about by working for nonprofit organizations including the ACLU of Ohio, volunteering my time with other organizations, lending my voice to demonstrations, and making monetary contributions where I could . . . . I have attended countless protests related to human rights, immigrants' rights, environmental justice, and anti-war efforts. . . . I have made financial contributions to the Northeast Ohio Coalition for the Homeless (NEOCH) and several other organizations that support the homeless and immigrants.

*Id.* ¶¶ 8–13.

But, if Section 121 goes into effect, Ms. Bredendiek will be forced to cease donating to organizations like NEOCH.  *Id.* ¶ 14.  She "will even be wary of attending protests or rallies, because [she will] have to make small expenditures for gas, parking, and supplies in order to participate in them."  *Id.* ¶ 18.  She believes "[t]hose expenditures would run contrary to HB 1's ban on noncitizens making an 'independent expenditure in support of or opposition to a statewide ballot issue or question,' especially since the ban applies to issues 'regardless of whether [they] ha[ve] yet been certified to appear on the ballot.'"  *Id.* ¶ 18 (quoting § 3517.121(B)(2)).

Ms. Bredendiek's husband is Plaintiff Peter Quilligan.  Mr. Quilligan is a U.S. citizen, originally from Ohio.  Quilligan Decl. ¶ 2, ECF No. 16-5.  Like his wife, Mr. Quilligan has attended countless protests and made direct financial contributions to organizations like NEOCH.  *Id.* ¶¶ 8–9.

Mr. Quilligan fears that, if HB 1 is enforced, he will not be able to continue to advocate for issues or participate in organizations he cares about.  *Id.* ¶ 13.  Ms. Bredendiek is their family's primary earner, and the couple shares a bank account.  *Id.* ¶¶ 12–13.  If HB 1 goes into effect, Mr. Quilligan fears that contributing from their joint account will constitute a crime.  *Id.*  He also questions whether he can lawfully expend or contribute even from a separate account, given Section 121's prohibition on using funds received from a noncitizen to make contributions and the fact that his wife is the primary earner.  *See id.* ¶¶ 12, 14–15.

Plaintiff John Gerrath has been an LPR of the U.S. since 2019.  Gerrath Decl. ¶ 1, ECF No. 16-3.  Mr. Gerrath immigrated to the U.S. from Canada with his wife and daughter in 2012.  *Id.* ¶ 2.  Since moving to the U.S., he and his wife had a son in Michigan.  *Id.*  For the past seven years, Mr. Gerrath has lived and worked in Silver Lake, Ohio, at Kent State University as a botanist and conservation biologist.  *Id.* ¶¶ 6–7.  Mr. Gerrath will be eligible to apply for citizenship in November 2024, and plans to do so.  *Id.* ¶ 4.

Mr. Gerrath "cares greatly about the policies that affect [his] family and [him] as Ohio residents, and [he] closely follow[s] laws and public policies that develop in [Ohio] by speaking with colleagues and neighbors.  [His] interest in policy includes ballot issues pending in the state."  *Id.* ¶¶ 10–11.  In fact, within the last year, Mr. Gerrath bought signs supporting the reproductive rights and cannabis amendments and displayed those signs in his yard.  *Id.* ¶ 11.

But, "[g]iven the criminal and monetary penalties that could follow from violating HB 1, if it goes into effect, [he] would no longer feel like [he] could spend money to buy a sign on this or any future ballot issue" as a noncitizen, despite his "strong belief that publicly supporting causes [he is] passionate [about] contributes to the discourse about them." *Id.* ¶ 12.  Indeed, Mr. Gerrath declared that he may have to cease contributing to nonprofit organizations out of fear of prosecution.  *Id.* ¶ 16.

## II.    JUSTICIABILITY

Before reaching the merits, the Court first confirms that Plaintiffs have standing.

Article III of the United States Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies[,]" U.S. Const. Art. 3 § 2, and "[t]he doctrine of standing gives meaning to these constitutional limits by 'identif[ying] those disputes which are appropriately resolved through the judicial process[,]'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (second alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

In essence, the standing doctrine prompts courts to ask "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."  *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  Generally, to establish Article III standing, a "plaintiff must show (1) an injury in fact, (2) fairly traceable

to the challenged conduct of the defendant, (3) that is likely to be redressed by

the requested relief[.]"  *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022)

(internal citations omitted).  A plaintiff challenging a law as unconstitutional

typically cannot establish standing unless and until the State or the Government

enforces the challenged law against them.  Pre-enforcement standing can exist

in some cases, however.  *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974)

("[I]t is not necessary that petitioner first expose himself to actual arrest or

prosecution to be entitled to challenge a statute that he claims deters the

exercise of his constitutional rights"); *see also MedImmune, Inc. v. Genentech,

Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by government is

concerned, we do not require a plaintiff to expose himself to liability before

bringing suit to challenge the basis for the threat").

Pre-enforcement standing often exists when the legal challenge arises

under the First Amendment, where even the threat of enforcement curtails the

would-be speaker's rights.  *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573

U.S. 149 (2014); *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010).  But the

threat of enforcement confers standing only if it is "certainly impending."  *E.g.*,

*Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024) (internal

quotation marks and citations omitted); *Savage v. Gee*, 665 F.3d 732, 740 (6th

Cir. 2012) (internal quotation marks and citations omitted).

The U.S. Supreme Court has set out a three-prong test for pre-

enforcement standing.  The plaintiff must allege (1) "an intention to engage in a

course of conduct arguably affected with a constitutional interest," that is (2) "proscribed by a statute," (3) under which the plaintiff faces "a credible threat of prosecution[.]"  *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). Translated into First Amendment terms, a plaintiff can establish pre-enforcement standing by alleging "(1) an intent to engage in expression that the Free Speech Clause arguably protects, (2) that this expression is arguably prohibited by [the challenged law], and (3) that there exists a credible threat of prosecution for engaging in that expression."  *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019 (6th Cir. 2024) (internal citations and quotations omitted).  To establish the third element (credible threat of prosecution), Plaintiff must make more than "'mere allegations of a 'subjective chill' on protected speech[.]"  *McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (quoting *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012)), but subjective chill is sufficient when combined with any of the four "*McKay*" factors:

> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

*Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting *McKay*, 823 F.3d at 869).

Plaintiffs' allegations here satisfy all three elements.

First, all Plaintiffs allege an intent to engage in expression that the Free Speech Clause arguably protects.  Both Organizational Plaintiffs OPAWL and NEOCH allege an intent to continue expending on ballot issues.  *See* Hilario Decl. ¶ 9, ECF No. 16-1; Knestrick Decl. ¶ 17–18, ECF No. 16-2.  And each Individual Plaintiff alleges an intent to do the same, an intent to contribute to organizations that regularly expend on ballot issues, or both.  *E.g.*, Compl. ¶ 138, ECF No. 1; Gerrath Decl. ¶ 22, ECF No. 16-3; Bredendiek Decl. ¶ 15, ECF No. 16-4; Quilligan Decl. ¶ 17, ECF No. 16-5.  The Free Speech Clause arguably protects those intended expenditures and contributions.  *See generally Buckley*, 424 U.S. at 14–15; s*ee also, infra*, III. A. 1 (holding that the First Amendment does, indeed, protect Plaintiffs' expenditures and contributions).

Second, Plaintiffs' expenditures and contributions would arguably be prohibited by Section 121.

The noncitizen Plaintiffs' expenditures and contributions are prohibited by Section 121.  Section 121 prohibits "foreign nationals" from "directly or indirectly" making "a contribution, expenditure, or independent expenditure in support of or opposition to a statewide ballot issue or question[.]"  Ohio Rev. Code § 3517.121(B)(2).  Plaintiffs Elisa Bredendiek and John Gerrath, as LPRs, qualify as "foreign nationals."  Ohio Rev. Code § 3517.121(A)(2)(a).  They would thus violate the statute by continuing to contribute to organizations that support or oppose ballot issues or questions, as they intend to.  They would also violate the

statute by following through on their intent to expend in direct support of or opposition to a statewide ballot issue or question.

The same goes for the organizational and U.S. citizen Plaintiffs.  Section 3517.121(C) prohibits "individuals" and "continuing associations"—regardless of their citizenship—from "directly or indirectly" either "[s]olicit[ing], accept[ing], or receiv[ing] any funds from a foreign national [for certain purposes]" or "mak[ing] a contribution, expenditure, or independent expenditure using any funds the person knows were received from a foreign national [for certain purposes]."  Supporting or opposing a ballot issue or question is a prohibited purpose.  Ohio Rev. Code § 3517.121(C)(1), (2) (designating prohibited purposes with a reference to division B); *id.* § 3517.121(B)(2) (designating supporting or opposing a ballot issue or question as a prohibited purpose).  OPAWL and NEOCH aver that they have knowingly received donations from non-citizen members in the past. OPAWL Decl. ¶ 12, ECF No. 16-1; NEOCH Decl. ¶ 9, ECF No. 16-2.  They imply that they will not track noncitizen donations or prevent noncitizens from donating unless Section 121 goes into effect, and even then, may be unable to do so.[11] OPAWL Decl. ¶¶ 21–23, ECF No. 16-1; NEOCH Decl. ¶¶ 10–13, ECF No. 16-2. Yet, OPAWL and NEOCH also avow that they would like to continue supporting or opposing ballot issues and questions with expenditures and contributions.

_____

[11] Organizational Plaintiffs also plead facts suggestive of a "diversion of resources" theory of standing, but the Court does not assess this theory because it finds they have standing on other grounds.

Case No. 2:24-cv-3495                                          Page 20 of 53

*See, e.g.*, OPAWL Decl. ¶ 9, ECF No. 16-1.  Expending and contributing in this way would therefore likely violate Section 121(C) because OPAWL and NEOCH would be using some "funds [it] knows were received from a foreign national" for prohibited purposes.[12]

Third and finally, all Plaintiffs face a credible threat of prosecution if they expend or contribute in connection with ballot issues and questions after Section 121 becomes effective.  Plaintiffs all show their speech would be subjectively chilled. See OWPAL Decl. ¶ 27, ECF No. 16-1; NEOCH Decl. ¶ 18, ECF No. 16-2; Bredendiek Decl. ¶¶ 15, 17–18, ECF No. 16-4, Quilligan Decl. ¶¶13–14, ECF No. 16-5," Garrath Decl. ¶ 21, ECF No. 16-3.  On top of subjective chill, Plaintiffs satisfy the third *McKay* factor (an attribute of the challenged statute that makes enforcement easier or more likely) as well as the fourth (refusal to disavow enforcement of the challenged statute against the particular plaintiffs).

As to the third *McKay* factor (an attribute of the challenged statute that makes enforcement easier or more likely), Section 121 essentially allows any member of the voting-eligible public to initiate an enforcement action by filing a complaint with the attorney general, who "shall investigate" that complaint.  *See* Ohio Rev. Code § 3517.121(G)(2)(b).  An equivalent provision "bolstered" the

---

[12] Even if OPAWL created a separate bank account to hold donations it knowingly received from noncitizens, that still would not remove OPAWL from Section 3517.121(C)(2)'s crosshairs.  So long as OPAWL receives donations from noncitizens, expenditures of funds received from U.S. citizens still might be "using funds received from noncitizens" on the theory that every dollar received from a noncitizen permits a dollar received from a citizen to be spent on a ballot issue.

U.S. Supreme Court's finding of a "substantial," credible threat of future enforcement in *Susan B. Anthony List*, 573 U.S. at 164. The Ohio statute challenged in that case permitted "any person" to file a violation complaint with the Ohio Election Commission. Ohio Rev. Code § 3517.153(A). The Court in *Susan B. Anthony List* reasoned that "[b]ecause the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents." 573 U.S. at 164. The Court found that risk to be "of particular concern" because it would burden "electoral speech." *Id.* at 165. The same risk and a similar concern apply here, and so this Court finds the third *McKay* factor met.

As for the fourth *McKay* factor (defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff), the Sixth Circuit Court of Appeals has found it satisfied when "although government officials had not threatened to enforce a statute against a particular party, 'they also have not explicitly disavowed enforcing it in the future.'" *Friends of George's*, 108 F.4th at 451–52 (Mathis, J., dissenting) (quoting *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015)); *see also Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022). Here, the Attorney General has not disavowed enforcing Section 121 against Plaintiffs. Rather, the Attorney General has staunchly defended his authority to enforce Section 121 against Plaintiffs. This factor is therefore also satisfied.

Having established that Plaintiffs meet all three elements to bring a pre-enforcement challenge to Section 121 under the First Amendment, the Court concludes Plaintiffs have Article III standing.  The Court turns now to the merits of Plaintiffs' First Amendment challenge.

## III.   PRELIMINARY INJUNCTION FACTORS

Plaintiffs move for a preliminary injunction.  In determining whether to grant such a motion, the Court must consider four factors: (1) the moving party's likelihood of success on the merits; (2) the moving party's likelihood of suffering irreparable injury absent the injunction; (3) the probability that granting the injunction will cause substantial harm; and (4) the degree to which the injunction would serve the public interest.  *E.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   When the potential constitutional violation is of the First Amendment, "only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?"  *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).  To establish the requisite likelihood of success, the plaintiff need not "establish his right to an injunction wholly without doubt," *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978) (internal quotation marks and citation omitted)

**A.    Plaintiffs are likely to partially succeed on the merits.**

**1.  The First Amendment subjects Section 121 to heightened scrutiny because the law restricts political speech.**

No court has yet addressed the level of scrutiny courts must apply to laws that restrict foreign nationals' political speech.[13]  Indeed, *Bluman* sidestepped the level-of-scrutiny issue, concluding that the federal ban would pass muster even under strict scrutiny.  800 F. Supp. 2d at 285–86.  *Bluman* therefore assumed, without deciding, that bans on foreign national political contributions and expenditures are subject to strict scrutiny.  *Id.*

This Court cannot operate on a similar assumption because the level of scrutiny may be decisive here.  The Court ultimately concludes that Section 121 is likely not, in all respects, closely drawn to the State's interest in preventing foreign influence over Ohio's political processes, but it would likely be rationally related to the same.  The Court must therefore determine whether heightened scrutiny applies to Section 121.

The level-of-scrutiny question is "complex" because "the statute implicates both the First Amendment and national security."  *Bluman*, 800 F. Supp. 2d at 285.  The Court first resolves that tension before deciding which specific level of heightened scrutiny (strict or exacting) applies to each portion of Section 121.

---

[13] *But cf. Minnesota Chamber of Com. v. Choi*, No. 23-CV-2015 (ECT/JFD), 2023 WL 8803357 (D. Minn. Dec. 20, 2023) (applying heightened forms of scrutiny to a Minnesota state statute that limits corporate spending based on a foreign ownership threshold).

a. **State regulation of citizens' and resident foreign nationals' political speech is subject to heightened scrutiny because the First Amendment protects their speech.**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend I, and the Fourteenth Amendment applies that prohibition to the States, *see, e.g.*, *Gitlow v. New York*, 268 U.S. 652 (1925). "Political speech is the primary object of First Amendment protection." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 228 (2014) (Thomas, J., concurring). Political expenditures and contributions qualify as political speech. *See Buckley*, 424 U.S. at 14–17. The First Amendment generally protects political speech by subjecting laws that regulate it to heightened scrutiny.

The First Amendment's protections naturally cover U.S. citizens like Plaintiff Peter Quilligan, *see id.*, and U.S. corporate entities like Plaintiffs OPAWL and NEOCH, *see Citizens United*, 558 U.S. at 365. Insofar as Section 121 restricts their political speech, the law should therefore be subject to heightened scrutiny, by default.

Lawfully resident foreign nationals also generally enjoy First Amendment rights. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (holding that a foreign national who published communist literature was protected by First Amendment); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (noting that the First Amendment does not distinguish between citizens and "resident

aliens"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 270, 271 (1990) (confirming that resident aliens "enjoy certain constitutional rights," including "First Amendment rights").  And the Supreme Court has never held that the First Amendment fails to protect their political speech to the same extent it protects citizens' political speech.[14]  Indeed, Chief Justice Rehnquist's opinion for the Court in *Verdugo-Urquidez* suggests that lawfully resident foreign nationals' First Amendment rights are on par with citizens'.  *Verdugo-Urquidez*, 494 U.S. at 265 (interpreting the First Amendment's reference to "the people," as including foreign nationals lawfully residing in the U.S., at least those who are "are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.").

Not only does the First Amendment protect lawful resident foreign nationals as speakers, but it also protects U.S. citizens' right to hear those foreign nationals' political speech.  The "right to hear" certain speech flows from Justice Holmes's famous "marketplace of ideas" metaphor, reaffirmed by the Supreme Court in *Citizens United*, 558 U.S. at 335, 350–51, 354, 367, 369 (striking down corporate expenditure limits based in part on the theory that "[b]y suppressing the speech of manifold corporations . . . , the Government prevents

---

[14] This proposition is compatible with *Bluman*. To say that foreign nationals enjoy a right is to say nothing about whether the states have a compelling interest to overcome that right in certain circumstances.  Therefore, just because the Government has a compelling government interest that allows it to restrict foreign nationals' political speech (where it could not restrict citizens' political speech) does not mean that foreign nationals lack a full right to political speech in the first instance.

their voices and viewpoints from reaching the public and advising voters," and thereby engages in unlawful "censorship.").

Regulations barring certain foreign speakers from sharing their "voices and viewpoints" distorts "the open marketplace of ideas" much like barring corporate voices.  Foreign speakers occupy a similar spot in the marketplace as Corporations: their booths are probably next to each other in the "distrusted source" corner.  *Id.* at 356.  And just as corporations might nonetheless "possess valuable expertise" in their areas, *id.* at 364, so too might foreign nationals have valuable perspectives stemming from their familiarity with different political communities.

In sum, either because it directly protects lawful resident foreign nationals as speakers or because it protects their speech, the First Amendment likely requires courts to review laws like Section 121 (laws that restrict the political speech of lawful resident foreign nationals) with heightened scrutiny, at least as a default.

Congress may displace the default of heightened scrutiny, but the Ohio state legislature cannot.  When Congress makes laws concerning foreign nationals that implicate "national security," courts review those laws with great deference.  *See, e.g.*, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950).  This is because Congress has plenary power to make laws concerning foreign nationals.  *See id.*  Ohio's power in this realm is not similarly plenary. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003); *Crosby v. Nat'l*

*Foreign Trade Council*, 530 U.S. 363 (2000); *Zschernig v. Miller*, 389 U.S. 429 (1968).

Even so, Defendants argue that Section 121 should be evaluated under rational basis review because it governs foreign citizens, who "do not have a constitutional right to participate in . . . activities of democratic self-government." Resp. 4, ECF No. 29 (quoting *Bluman*, 800 F. Supp. 2d at 288).

Before considering the merits of this argument, it is important to point out that Section 121 does not govern only foreign citizens.  Division C acts directly upon U.S. citizens and U.S. corporate entities, such as Plaintiffs Peter Quilligan, OPAWL, and NEOCH.  These Plaintiffs assert that Section 121 violates their own First Amendment rights, not just the First Amendment rights of others.  Parts of Section 121 trigger heightened scrutiny for this reason alone.

Defendants rely on "political function exception" cases to support their request for rational basis review.[15]  Those cases lower the standard of review for laws that exclude foreign nationals from the "most important" government positions.  *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991).  But all those cases

---

[15]See *Cabell v. Chavez–Salido*, 454 U.S. 432 (1982) (upholding a law barring foreign citizens from working as probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding a law barring foreign citizens from teaching in public schools unless they intend to apply for citizenship); *Foley v. Connelie*, 435 U.S. 291 (1978) (upholding a law barring foreign citizens from serving as police officers); *Perkins v. Smith*, 370 F. Supp. 134 (D.Md.1974), *aff'd*, 426 U.S. 913 (1976) (upholding a law barring foreign citizens from serving as jurors); *Sugarman v. Dougall*, 413 U.S. 634, 648–49 (1973) ("citizenship is a permissible criterion for limiting" the "right to vote or to hold high public office").

arise under the Equal Protection Clause alone; none arise under the First Amendment.

That difference matters.  The First Amendment establishes an affirmative, substantive right to engage in political speech.  The Equal Protection Clause, however, does not establish an affirmative right to be a schoolteacher (*Ambach*) or a probation officer (*Chavez–Salido*); it establishes a right not to be discriminated against based on citizenship.  So, although the "political function" exception lowers the standard of review for some State laws that discriminate based on citizenship, it does not lower the standard when the state law prohibits activity—like political speech—that the Constitution otherwise affirmatively protects with heightened scrutiny.  Section 121 infringes on lawful resident foreign nationals' First Amendment right to political speech and therefore, triggers heightened scrutiny notwithstanding the political-function exception.

Nor does *Bluman* suggest otherwise.  After examining the political function cases, the *Bluman* court stated: "It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government."  800 F. Supp. 2d at 288.  But that quotation does not stand for the radical proposition that lawful resident foreign nationals lack a First Amendment right to engage in political speech.  Rather, it stands for the more limited proposition that the U.S. Government's compelling interest in defining the

national political community trumps their right to engage in political speech.  The Court interprets *Bluman* this way for two reasons.

First, *Bluman* includes the quote in its discussion of the compelling government interest, not a discussion of the appropriate level of scrutiny (an issue which the court dodged).[16]  The sentence following the quoted sentence underscores this point: "It follows, therefore, that the United States has a compelling interest for purposes of First Amendment analysis . . . ."  *Id.*

Second, this Court doubts that the U.S. Supreme Court would answer such a major question via a summary affirmance.  The Supreme Court generally "does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Assn's, Inc.*, 531 U.S. 457, 468 (2001) (Scalia, J.).  This Court suspects that the Supreme Court did not intend to hide the elephantine holding that lawful resident foreign nationals do not have First Amendment political speech rights in the mousehole of summarily affirming *Bluman*.

Because this Court finds the narrower reading of *Bluman* to be the better reading, it reaffirms that lawful resident foreign nationals have First Amendment rights to political speech that can trigger heightened scrutiny.  Section 121 restricts such speech and so likely triggers some form of heightened scrutiny. The next issue is *which* form(s) of heightened scrutiny Section 121 triggers.

_____

[16] This makes sense given, as discussed above, the "political function" exception cases from which *Bluman* derived the interest do not analyze laws that implicate constitutional rights other than that guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

      **b.**    **Section 121's expenditure bans warrant strict scrutiny; its contribution bans warrant exacting scrutiny.**

This which-form-of-heightened-scrutiny issue is much easier to resolve. Since *Buckley v. Valeo*, the U.S. Supreme Court has distinguished between expenditure limits, which receive strict scrutiny on the one hand, and contribution limits, which receive a more forgiving form of heightened scrutiny, on the other. The distinction rests on the rationale that expenditures constitute "core" political expression, while contributions amount to speech that falls "closer to the edges" of political expression. *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003). Courts therefore review expenditure limits under strict scrutiny and contribution limits according to "exacting scrutiny," under which "the challenged law must advance a sufficiently important state interest and employ means closely drawn to avoid unnecessary abridgment of First Amendment freedoms." *Buckley*, 424 U.S. at 25.

      **c.**    **Conclusion on standard of scrutiny**

In sum, lawful resident foreign nationals have political speech rights, meaning abridgements of those rights are, by default, subject to a heightened scrutiny. And, separately, regulations on political expenditures and contributions (no matter the source) are, by default, subject to heightened scrutiny. These principles lead this Court to conclude that more than rational basis review applies here.

And, because Section 121 limits both expenditures and contributions, this Court applies two different levels of heightened scrutiny.  The Court reviews Section 121's expenditure bans under strict scrutiny and its contribution bans under exacting scrutiny.  The test for Section 121's expenditure bans is whether they are narrowly tailored to a compelling state interest.  And the test for Section 121's contribution bans is whether they are closely drawn to a sufficiently important state interest.

> ## 2. Ohio has a compelling interest in preventing foreign influence over state political processes.

*Bluman* leaves little for this Court to analyze on the "compelling state interest" question.  As mentioned above, *Bluman* reads the "political function" exception cases to

> set forth a straightforward principle: . . . the United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process.

800 F. Supp. 2d at 288.

*Bluman*'s holding is binding on this Court.[17]  *See United States v. Singh*, 979 F.3d 697 (9th Cir. 2020) (holding that *Bluman* bound the district court below).

---

[17] Plaintiffs imply that the State does not have a compelling government interest in preventing foreign influence over state politics.  *See* Reply at 6, ECF No. 31.  The Court finds that *Bluman* cannot be plausibly read as Plaintiffs read it.  However, the Court considers Plaintiffs' arguments on this point in determining whether Section 121's provisions are narrow tailored or closely drawn.

*Bluman* does not completely resolve the issue, though.  Because *Bluman* was summarily affirmed, its "precedential effect . . . extends no further than the precise issues presented and necessarily decided."  *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983).  *Bluman* did not decide two compelling state interest issues presented here.

First, *Bluman* did not decide whether *states* have a compelling interest in preventing foreign influence over *state* political processes; it decided that the *federal government* has a compelling interest in preventing foreign influence over the *federal* political process.

States' interest in defining their political community is equivalent to the Federal Government's interest in defining the national political community.  And, given that the "political function" exception cases involve state laws, those cases put Ohio's interest here on even firmer doctrinal footing than the federal government interest identified in *Bluman*.  The Court accordingly concludes that Ohio has a compelling interest in limiting the participation of foreign nationals in activities of democratic self-government, and in thereby preventing foreign influence over state political processes.[18]

_____

[18] *Bluman* also suggests governments have a compelling interest in ensuring that political expenditures "reflect actual public support for the political ideas espoused." *Austin v. Michigan Chamber of Com.*, 494 U.S. 652, 660 (1990), *overruled by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).  In this sense, *Bluman* could be understood as reviving the "anti-distortion principal" in the context of foreign nationals' political speech.  *Compare* 800 F. Supp. 2d at 291 ("[t]emporary resident foreign citizens by definition have primary loyalty to other national political communities, many

Second, *Bluman* did not deal with ballot issues.  *Bluman* only held that candidate-related expenditures implicated the Government's interest in preventing foreign influence over political processes.  *Bluman*, 800 F. Supp. 2d at 292 ("Our holding does not address such questions, and our holding should not be read to support such bans.").  Plaintiffs here argue that ballot issues do not implicate any state interest.  The Court disagrees.

The question is essentially whether ballot initiatives "constitute part of the process of democratic self-government."  *Bluman*, 800 F. Supp. 2d at 288.  As it was in *Bluman*, *id.*, the answer to that question here is straightforward.  Ballot initiatives are perhaps the purest, most democratic "process of . . . self-government."  Ballot initiatives are more directly democratic than candidate elections, in that the people make law for themselves, instead of their elected representatives making it for them.  Ohio's interest in preventing undue foreign influence is thus at or near its zenith in the context of ballot initiatives.  Ohio's compelling interest in protecting its political process from foreign influence thus extends to the ballot initiative process.

Having concluded that Ohio has a compelling state interest, the next question is whether Section 121 is narrowly tailored or closely drawn (depending on the precise provision at issue) to advancing that interest.

------

of which have interests that compete with those of the United States.") *with Austin*, 494 U.S. at 660 (finding immense corporate expenditures distorted the political arena in that they do not "reflect actual public support for the political ideas espoused.").

> **3.    Section 121 is not sufficiently tailored to prevent foreign influence in political processes.**
>
> **a.    Banning Non-LPR Foreign Nationals from expending or contributing to influence an election is likely narrowly tailored by force of *Bluman*.**

*Bluman* renders some—but not all—of Section 121's provisions constitutionally unproblematic.  Division B of Section 121 bans foreign nationals from expending or contributing for various purposes, including to influence a candidate election.  *Bluman* held that banning Non-LPR Foreign Nationals from expending or contributing to influence a candidate election is narrowly tailored to the compelling government interest in preventing foreign influence in U.S. politics.  800 F. Supp. 2d at 286.  Because this Court concludes that an analogous Ohio interest undergirds Section 121, it also concludes that Section 121's ban on Non-LPR Foreign National candidate-related spending is constitutional.

*Bluman* is also controlling as to the narrow tailoring of Division C.  That provision prohibits people (both natural and corporate) from receiving funds from foreign nationals.  Courts construe limits on the receipt of funds as contribution limits.[19]  *See, e.g.*, *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), *cert. denied on unrelated issue sub nom. Keating v. FEC*, 562 U.S. 1003 (2010).  The Court does the same for Division C.  *Bluman* upheld the federal

---

[19] The Court understands Division (C)(2) to be effectively coterminous with Division (C)(1).  *See*, *supra*, note 7.  For this reason, the court treats all of Division C as a contribution limit, even though it also nominally limits expenditures.

contribution limit on Non-LPR Foreign Nationals,[20] finding it narrowly tailored to the compelling government interest in preventing foreign influence in U.S. politics.  800 F. Supp. 2d at 286.[21]  Because this Court concludes that an analogous interest also undergirds Division C, it also concludes that provision is constitutional (as to Non-LPR Foreign Nationals).

Section 121 presents two remaining tailoring issues that *Bluman* did not decide, however.  First, *Bluman* did not decide whether restricting Non-LPR Foreign National spending on ballot measures is sufficiently.  Nor, second, did *Bluman* decide whether infringing on LPR's political speech rights is sufficiently tailored.  The Court addresses the first issue in terms of Non-LPR Foreign Nationals, and then addresses Section 121's application to LPRs generally.  For the following reasons, the Court holds that the first is sufficiently tailored, but the second is not.

### b.    Banning Non-LPR Foreign Nationals from expending or contributing for the purpose of express ballot measure advocacy is likely narrowly tailored.

The constitutional propriety of banning any Non-LPR Foreign National political spending on ballot measure advocacy is a close question.  As the Court concluded above, ballot initiatives are democratic self-government in its purest

---

[20] The plaintiffs in *Bluman* wanted to make contributions to certain candidates, political parties, and an "independent organization that advocates with respect to certain issues, and candidates."  800 F. Supp. 2d at 285.

[21] The propriety of Division B's limit on what (Non-LPR) foreign nationals may contribute necessitates the propriety of Divisions C's limit on what persons may receive. Contributing and receiving are two sides of the same coin.

form, and Ohio's interest in preventing foreign influence is thus at its zenith in the ballot initiative context.  But although Ohio's interest is at its zenith, the risk of foreign influence might be at its nadir in that context.  *See Bluman*, 800 F. Supp. 2d at 292 ("Congress could reasonably conclude that the risk of undue foreign influence is greater in the context of candidate elections than it is in the case of ballot initiatives.  Congress's determination that foreign contributions and expenditures pose a greater risk in relation to candidate election than such activities pose in relation to ballot initiatives is a sensible one[.]").

That the risk of foreign influence may be at its lowest in the ballot initiative context is also the most forceful thrust of Plaintiffs' argument on narrow tailoring. As they write:

> [I]n ballot issue elections, any speech in favor or against the issue is just more speech.  There is no risk that it will alter the issue citizens will vote on, and no one is arguing voters are being bribed to vote a certain way; the only "influence" the speech could have is persuasion. But "the fact that advocacy may persuade the electorate is hardly a reason to suppress it."  And the Supreme Court has found that "the direct participation of the people in" an issue-election "increases the need for the widest possible dissemination of information from diverse and antagonistic sources."

Reply at 6, ECF No. 31 (cleaned up) (quoting *Bellotti*, 435 U.S. at 790, 790 n.29). In short, Plaintiffs argue that the "marketplace" for ideas on ballot initiatives should generally be left unregulated under the First Amendment.  Couched in narrow tailoring terms, Plaintiffs argue that restricting speech in the ballot initiative context does little to advance the compelling state interest of preventing foreign influence on state politics.

But the same argument could be said of a ban on independent expenditures, yet *Bluman* holds it is constitutional to ban Non-LPR Foreign Nationals from making independent expenditures.  So, unless there is a reason to treat independent expenditures differently from ballot-measure expenditures, this Court must hold that banning at least Non-LPR Foreign Nationals from one is just as constitutional as banning them from the other.

And aside from *Bluman*'s force on the issue, this Court finds no reason to treat independent expenditures and ballot issue expenditures differently.  Both kinds of spending pose an equivalent risk of "influencing" the Ohio political process.[22]  Just like independent expenditures, ballot expenditures can buy "influence over or access to" elected officials, *see Bellotti*, 435 U.S. at 788 n.26; *Citizens United*, 558 U.S. at 359–60 (Kennedy, J.); *id.* at 447–52 (Stevens, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in part and dissenting in part),[23] or otherwise "distort" Ohio politics.  *Austin*, 494 U.S. at 660.

Seeing no principled reason that independent expenditures should be treated differently than ballot initiatives vis-à-vis their ability to "influence the

---

[22] That is why bribery law treats independent expenditures and ballot issue expenditures the same.  *See* 18 U.S.C. § 201(b)(2) (forbidding a public official from corruptly seeking "anything of value personally or for any other person or entity" in exchange for official action (emphasis added)); *compare United States v. Menendez*, 132 F. Supp. 3d 635, 640 (D.N.J. 2015) (bribery prosecution based on a contribution to an independent expenditure organization) *with United States v. Siegelman*, 640 F.3d 1159, 1169 n.13 (11th Cir. 2011) (conviction of a former governor for soliciting a donation to an issue-advocacy organization).

[23] True, independent expenditures might buy more influence, dollar-for-dollar, than ballot expenditures. But consider the influence a foreign national could exert by spending unlimited amounts of money on hotly contested partisan ballot initiatives.

political process," the Court treats them alike and finds that, generally, Section 121's expansion to spending on ballot initiatives is more likely than not narrowly tailored.

This conclusion comes with an important caveat, however.  This Court construes Section 121's ban on ballot-issue-related spending as a ban on only express advocacy, not a ban on issue advocacy.  *See Bluman*, 800 F. Supp. 2d at 284–85 (citing *WRTL*, 551 U.S. at 456).  In other words, under the Court's interpretation of Section 121, even Non-LPR Foreign Nationals remain free to "speak[] out about issues or spend[] money to advocate their views about issues."  *Id.* at 290.  Section 121 "restrains them only from a certain form of expressive activity closely tied to the voting process": providing or spending money for the purpose of expressly advocating for or against *a ballot initiative*. And this Court adopts the same guideposts to define "express advocacy" as the U.S. Supreme Court did in *WRTL*: for ballot-related spending to be "express advocacy," the spending must be "susceptible of no reasonable interpretation other than as an appeal to [enact or defeat a certain ballot initiative]."  551 U.S. at 469–70.

c.    **Banning LPRs from expending or contributing to either candidates or ballot initiatives is likely not closely drawn (let alone narrowly tailored) to preventing foreign influence.**

A statute is not sufficiently tailored if it (i) does not actually advance the state's interest to a significant extent, (ii) sweeps too broadly, or (iii) leaves

significant influences bearing on the interest unregulated.  *See Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (collecting cases).  Section 121's definition of foreign national does all three by including LPRs but not foreign-owned U.S. corporations.

      *(i.) Restricting LPRs' political speech likely does not prevent foreign influence.*  For a court to find that a law advances a compelling state interest, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented."  *United States v. Alvarez*, 567 U.S. 709, 725 (2012).  That is, Defendants must link prohibiting LPRs' political speech to preventing foreign influence.  Defendants have not shown such a link, and neither did the Ohio State Legislature.

      To the contrary, Representative Seitz correctly pointed out that only a "selective reading" of *Bluman* could support restricting LPRs' political speech, and he expressed constitutional concerns with amending the original bill to

include LPRs within the definition of "foreign national."[24]  Ohio State Senator

Antani echoed Rep. Seitz's constitutional concerns.[25]

---

[24] Representative Seitz read the following passage from *Bluman*:

> we do not here decide whether Congress could constitutionally extend the current statutory ban to lawful permanent residents who have a more significant attachment to the United States than the temporary resident plaintiffs in this case. Any such extension would raise substantial questions not raised by this case.

Jasrasaria Decl. 25:12–25:18, ECF No. 16-7, PAGEID # 905 (quoting *Bluman*, 800 F. Supp. 2d. at 292).  Adding his gloss on this quote, the Representative continued

> Now, why would they have said that if they meant to say that jurisdictions, states and federal government could bar lawful permanent residents from any form of political participation? Why would they say it was a substantial question? They are trying to tell us something by saying that."

*Id.* at 25:18–26:3, PAGEID # 905–06  And, after assuaging concerns that President Biden could fast-track green cards for liberal foreigners, Rep. Seitz concluded by acknowledging:

> I think it would be a mistake to pass the amendment today. I personally would not have a problem banning green card holders from contributions on the rationale advanced by my friend. But it is not Judge Seitz who makes that decision. It will ultimately be the judges of the federal district, circuit and Supreme Courts of this country. . . . So if we want to get something done and have it be effective in time for the upcoming election, prudentially, we should leave the definition of foreign national alone. . . .

*Id.* at 27:8–27:16.

[25]

> "[T]he bill coming back from the house, goes a step further, which is to say that the definition of foreign national includes lawful permanent residents commonly known as green card holders. That is a big departure from longstanding federal law and presents an incredible issue to this bill . . . . [P]ermanent lawful residents have the right to freedom of speech. That is going to get sued over in this bill. And the entire thing is going to get struck down because we as the legislature are overreaching. Lawful permanent residents have the right to free speech, donating to candidates and campaigns . . . And so, this is going to get mucked up in the courts. I want

This legislative history shows that some members of the Ohio State Legislature knew extending Section 121's reach to LPRs' political speech raised major questions under the First Amendment.  But no legislator assuaged those concerns.  No one, for example, discussed any actual evidence of undue foreign influence from LPRs.  This lack of evidence pushes toward a finding that Section 121 is not narrowly tailored.  *McCutcheon*, 572 U.S. at 219–21 (considering evidence of the harm the Government sought to prevent); *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) (same); *Cruz*, 596 U.S. at 306–08 (same).  The most the Ohio State Legislature offered was "selective readings" of *Bluman*.

The legislators' "selective readings" aside, *Bluman* expressly declined to decide whether it advanced the Government's interest in preventing foreign influence to ban LPRs' political contributions.  If anything, as Rep. Seitz suggested, *Bluman* hints that bans on political spending by LPRs would not be constitutional.  In response to the argument that the federal definition of "foreign national" was underinclusive because it excludes LPRs, the *Bluman* court wrote:

> Congress may reasonably conclude that lawful permanent residents of the United States stand in a different relationship to the American political community than other foreign citizens do.  Lawful permanent

---

to see a bill that goes into law. I want to see a bill that prohibits foreign nationals from donating to ballot issue campaigns as they are prohibited from donating the candidates. But changing this long departure from federal law, a -- a critical free speech issue is going to cause this bill to get struck down[.]"

*Id.* at 19:11–21:11.

> residents have a long-term stake in the flourishing of American
> society . . . [L]awful permanent residents share important rights and
> obligations with citizens; for example, lawful permanent residents
> may—and do, in large numbers—serve in the United States military.
> In those two ways—their indefinite residence in the United States
> and their eligibility for military service—lawful permanent residents
> can be viewed as more similar to citizens than they are to temporary
> visitors, and thus Congress's decision to exclude them from the ban
> on foreign nationals' contributions and expenditures does not render
> the statute underinclusive.  In fact, one might argue that Congress's
> carve-out for lawful permanent residents makes the statute more
> narrowly tailored to the precise interest that it is designed to serve—
> namely, minimizing *foreign* participation in and influence over
> American self-government.

*Bluman*, 800 F. Supp. 2d at 290–91 (emphasis in original).  This Court agrees

that LPRs' indefinite residence and military service justify sorting them with

citizens for First Amendment political spending purposes.

Bolstering the *Bluman* Court's recognition of the "permanent" in "lawful

permanent resident," this Court adds that LPRs pay income tax.  Paying taxes is

a fundamental civic duty.  In fulfilling this duty, LPRs concretely manifest a

commitment to the country's long-term collective well-being.  Taxes paid by LPRs

fund all manner of public services (education, healthcare, national defense),

including those oriented toward the long-term.  LPRs' long-term stake is what

distinguishes them from other non-citizen residents.  That stake fully crystallizes

if, after five years, LPRs opt to become full U.S. citizens, but their stake is no less

real in the interim.

The Court finds it to be even more significant that LPRs may serve in the

U.S. military service and must register for the selective service (depending on

their age).  It would be absurd to allow (or force) LPRs to fight and die for this country, on the one hand, and to prohibit them from making incidental expenditures for a yard-sign that expresses a view on state or local politics, on the other.[26]  This is more than mere rhetoric.  Where is the danger of people beholden to foreign interests higher than in the U.S. military?  Nowhere.  So, if the U.S. Federal Government trusts LPRs to put U.S. interests first in the military (of all places), how could this Court hold that it does not trust them to promote U.S. interests in their political spending?  It cannot.

LPR political spending does not carry a risk of undue foreign influence.  And, so, preventing LPR political spending cannot be closely drawn to Ohio's interest in preventing undue foreign influence.

(ii.) Whether restricting LPRs' indirect political speech is overinclusive.  A statute may fail narrow tailoring for being overinclusive—that is, infringing on more First Amendment rights than is necessary to advance the compelling interest.  See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 122 n.* (1991).  Section 121 sweeps in U.S. citizens who share finances with noncitizens.

Plaintiff Peter Quilligan's situation illustrates the statute's overbreadth.  If he were to expend or contribute with money from the joint bank account he

---

[26] Many congresspeople pointed out this absurdity when they considered amending the federal prohibition on foreign national political spending to extend to lawful permanent residents.  See 148 Cong. Rec. H369-01, H448–52.

shares with his noncitizen, LPR, wife, then he would have violated Division C of Section 121.  *See* Ohio Rev. Code § 3517.121(C).  No one denies that Mr. Quilligan has a First Amendment right to make expenditures and contributions. By restricting Mr. Quilligan's ability to make expenditures and contributions with money he shares with his noncitizen spouse, Division C therefore impinges these First Amendment rights.  This impingement might be necessary when a U.S. citizen shares finances with a foreign national other than an LPR, but, for the reasons discussed above, it is not necessary when a U.S. citizen shares finances with an LPR.

 *(iii.) Whether restricting LPRs' political speech is underinclusive.*

"[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'"  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011)).  And "[u]nderinclusiveness can also reveal that a law does not actually advance a compelling interest."  *Id*. at 449.  A "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (cleaned up).

Section 121's definition of "foreign national" is underinclusive in that the risk of foreign influence posed by foreign-owned U.S. corporate entities',[27] whose spending Section 121 leaves unfettered, likely qualitatively and quantitively exceeds the same risk posed by LPRs (if LPRs pose any risk at all).

Foreign-owned U.S. corporations have interests "that compete with those of the United States," *Bluman*, 800 F. Supp. 2d at 291, and, by extension, Ohio. This is especially true on matters such as tax, foreign investment, national security, the environment, and labor.  Policies on these matters could benefit persons with a long-term stake in Ohio and the U.S. (like an LPR) but could never benefit a corporation's foreign owners in the same way.

Not only do foreign investors have interests that will diverge from the interests of Ohioans, but corporate directors have fiduciary obligations to consider and possibly pursue those interests.  These duties would require corporate directors to pursue interests at odds with Ohio's, if doing so would maximize profit for the corporation's foreign owners.  Which in turn, may involve political spending on candidates or ballot issues that would promote foreign interests.  All in all, foreign-owned corporations likely pose a much higher risk of

---

[27] By foreign-owned U.S. corporation, the Court means corporations that are both incorporated in the U.S. and have their principal place of business in the U.S., but in which foreign individuals, foreign governments, or foreign entities have an ownership interest.

undue foreign influence over Ohio politics than LPRs,[28] but Section 121 does not regulate them. This reinforces the Court's conclusion that Section 121's definition of foreign national is underinclusive, and thereby not sufficiently tailored to the interest of preventing foreign influence.

*(iv.) Conclusion.* The restrictions imposed by Section 121 on LPRs' political speech are likely not closely drawn to Ohio's interest in preventing foreign influence. Plaintiffs have thus met their burden to show that Section 121 is unconstitutional, at least with respect to its definition of "foreign national."

**B.    Plaintiffs have also satisfied the other preliminary injunction factors.**

The Court touches only briefly upon the remaining preliminary injunction criteria: irreparable harm, harm to third parties, and the balance of harms with the public interest. *See Fischer*, 52 F.4th at 307 ("[I]n First Amendment cases, only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?"); *Schimmel*, 751 F.3d at 430 (en banc).

---

[28] Foreign-influenced corporate money in U.S. state politics is not a hypothetical concern. *See Minnesota Chamber of Com. v. Choi*, No. 23-CV-2015 (ECT/JFD), 2023 WL 8803357, at *7–8 (D. Minn. Dec. 20, 2023) (discussing evidence of foreign-owned U.S. corporate entities spending in state and local election); Jimmy Cloutier et al., OpenSecrets, *A Case Study of State-Level Corporate Political Contributions in Colorado, Michigan, Minnesota, Montana, New York & Washington*, available at https://www.opensecrets.org/news/reports/foreign-influenced-corporate-money. Foreign-influenced corporate spending occurs in Ohio too. *See* Katz Decl. ¶ 20–27, ECF No. 29-3]. In fact, foreign-influenced corporate money was a primary concern of the Ohio state legislature. Jasrasaria Decl., ECF No. 16-7, PAGEID # 557, 559, 564–66, 574 (discussing the "Sixteen Thirty Fund"); *id.* at PAGEID # 667, 710–14 (referencing a letter and testimony by Professor Lawrence Tribe about "Regulating political spending by corporations with significant foreign ownership").

Because Plaintiffs are likely to succeed on the merits and because "'[t]he loss of First Amendment freedoms, for even minimal periods of time,' amounts to irreparable injury," the irreparable harm factor favors an injunction.  *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 408 (6th Cir. 2022) (quoting *Roman Cath. Diocese v. Cuomo*, 592 U.S. 14 (2020) (per curiam)).

The third and fourth preliminary injunction requirements "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These factors, like the second, turn on whether Plaintiffs are likely to succeed.  *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]t is always in the public interest to prevent violation of a party's constitutional rights." (quoting *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994))).  Plaintiffs' likely success on the merits thereby also pushes the third and fourth factors in favor of an injunction.

Overall, the Court thus concludes that a preliminary injunction is needed to remedy the likely unconstitutional parts of Section 121.  The Court now turns to the appropriate scope of that injunction.

## IV.    REMEDIES

Plaintiffs brought a facial challenge to Section 121.  "A facial challenge to a law is no small matter."  *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009).  At stake is not an attempt to invalidate the law in a discrete setting but an effort "to leave nothing standing."  *Id.* (quoting *Warshak v. United*

*States*, 532 F.3d 521, 528 (6th Cir.2008) (en banc)).  Before courts order such a remedy, they must determine whether: (1) there truly are "no" or at least few "circumstances" in "which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008); or (2) that a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications.  "To do otherwise would amount to a judicial trespass—a court's striking of a law in all of its applications even though the legislature has the prerogative and presumed objective to regulate some of them."  *Connecting Distribution*, 557 F.3d at 335. This Court thus considers these two prongs in turn.

Courts modify the few-valid-applications prong of the severability inquiry when the Constitutional provision at issue is the First Amendment.  In facial challenges arising under the First Amendment, a law may be invalidated for overbreadth if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n.6 (2008) (internal quotation marks omitted); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010).

As discussed above, much of Section 121 is constitutional.  The First Amendment does not protect several of the kinds of "foreign nationals" included in Section 121's definition (foreign governments, foreign political parties, persons organized under foreign law, and persons with their principal place of business in

a foreign country).  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591

U.S. 430, 433–434 (2020) ("[I]t is long settled as a matter of American

constitutional law that foreign citizens outside U.S. territory do not possess rights

under the U.S. Constitution.").  Even if it did, banning their political speech would

likely be narrowly tailored to Ohio's compelling interest in preventing foreign

influence on the Ohio political process.

    And, for the reasons discussed above, Section 121 also legitimately

sweeps in individual temporary-resident foreign nationals and non-natural

persons that receive funding from foreign nationals (of all kinds other than LPRs).

    The Court has found only that Section 121 is overbroad insofar as it

sweeps in LPRs and those who receive money from them.

    Thus, the ratio of legitimate-to-illegitimate applications of Section 121 does

not justify blanketly invalidating Section 121.  So, the Court turns to the

severability inquiry.

    In a case that presents a partial conflict between the Constitution and a

statute, courts are to give "full effect" to the Constitution and to whatever portions

of the statute are "not repugnant" to the Constitution, effectively severing the

unconstitutional portion of the statute.  *United States v. Arthrex, Inc.*, 594 U.S. 1,

24 (2021) (Roberts, C.J.) (quoting *Bank of Hamilton v. Lessee of Dudley*, 2 Pet.

492, 526 (1829) (Marshall, C. J.)).  To determine severability, courts consider

three things.  "First, the Court seeks to avoid 'nullify[ing] more of a legislature's

work than is necessary,' because doing so 'frustrates the intent of the elected

representatives of the people.'" *Northland Fam. Plan. Clinic, Inc. v. Cox*, 487 F.3d 323, 333 (6th Cir.2007) (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006)).  Second, "mindful that [the Court's] constitutional mandate and institutional competence are limited, [the Court] restrain[s] [itself] from rewriting state law to conform it to constitutional requirements even as [the Court] strive[s] to salvage it."  *Ayotte*, 546 U.S. at 329 (internal alteration and quotation marks omitted).  And third, "the Court considers legislative intent, and inquires whether the legislature would prefer to have part of the statute remain in force." *Id.*  This third factor is usually the most important.  *Buckley v. Valeo*, 424 U.S. at 108 (quoting *Champlin Refin. Co. v. Corp. Comm'n of Oklahoma*, 286 U.S. 210, 234 (1932)).  Courts also generally presume a provision is severable.  *Id*.

Finding it to be the narrowest remedy available, the Court nullifies Section 121's definition of foreign national individuals (Ohio Rev. Code § 3517.121(A)(2)(a)).  To be clear, this means that Defendants are enjoined from enforcing any of Section 121's provisions in connection with an individual's political spending.  While the injunction is in effect, Defendants may not enforce Division B against an individual (LPR or otherwise) who expends or contributes for any of the listed purposes.  Nor may Defendants enforce Division C against a person who solicits, accepts, receives, expends, or contributes funds from an individual foreign national.  Nor may Defendants enforce Division D against

anyone who knowingly aids or facilitates an individual foreign national's political spending.

The Court acknowledges that this injunction prevents Defendants from enforcing Section 121 against temporary resident foreign nationals even though the Court concludes that Ohio generally has the power to do so.  The Court is mindful, however, that it may not re-write the statute.  Enjoining Defendants from enforcing Section 121 against only LPRs would require the Court to effectively re-write the statute.  Preliminarily striking the definitional provision that encompasses foreign nationals is therefore the narrowest remedy the Court can impose.

The Court is also convinced that the legislature would prefer this narrow invalidation to an injunction of Section 121 in its entirety.  The remaining portions of the statute hang together without issue.  Portions of Section 121 itself reveal an intent that the law apply "to the maximum extent permitted by law and by the constitutions of the United States and of this state."  § 3517.121(B)(4), (C).  Neither party presents evidence or argument that the Ohio State Legislature would not have enacted Section 121 but for its extension to LPRs.  In view of nothing that could overcome the presumption of severability, the Court finds that Division (A)(2)(a) in severable.

## V.    CONCLUSION

For these reasons, Plaintiffs' motion is **GRANTED IN PART**.  Defendants, in their official capacities, and their officers, agents, servants, employees, and attorneys, along with other persons who are in active concert or participation with Defendants, are enjoined from pursuing civil or criminal liability for any alleged violations of Ohio Rev. Code § 3517.121 based on the definition of a "foreign national," in Division (A)(2)(a).  Given the strong First Amendment interests at stake and the little harm to Defendants, the Court declines to require Plaintiffs to post security pursuant to Federal Rule of Civil Procedure 65(c).

**IT IS SO ORDERED.**

 **s/ Michael H. Watson**
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**