Nos. 24-3768/24-3818

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| OPAWL – BUILDING AAPI FEMINIST | : | |
| LEADERSHIP, ET AL., | : | On Appeal from the |
|     Appellees/Cross-Appellants, | : | United States District Court |
| | : | for the Southern District of Ohio |
|     v. | : | Eastern Division |
| | : | |
| DAVE YOST, ET AL., | : | District Court Case No. |
|     Appellants/Cross-Appellees. | : | 2:24-cv-3495 |
| | : | |

## BRIEF OF APPELLANTS/CROSS-APPELLEES

DAVE YOST
Attorney General of Ohio

T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record*
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
KATIE ROSE TALLEY
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Appellants/Cross-Appellees*
  *Ohio Attorney General Dave Yost and*
  *Ohio Secretary of State Frank LaRose*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................iii

STATEMENT REGARDING ORAL ARGUMENT ...........................................x

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES .........................................................2

INTRODUCTION ........................................................................3

STATEMENT ............................................................................6

STANDARD OF REVIEW ............................................................. 11

SUMMARY OF THE ARGUMENT .................................................. 11

ARGUMENT............................................................................ 14

I.    The First Amendment is no barrier to Ohio deciding that it will weed out foreign money from influencing its elections. ................................... 15

    A.    Ohio's law is properly tailored to serve the compelling interest of eliminating the reality and perception of foreign money influencing Ohio elections. ................................................................... 16

        1.    Ohio has a compelling interest in preserving the reality and the perception that foreign money does not influence its elections, including elections that shape its Constitution. ............................ 17

        2.    Ohio's exclusion of foreign money from its elections is tailored to match its compelling interest while obeying the Supreme Court's holding about corporate speech......................................22

        3.    Ohio's law is constitutional by analogy to other laws the Supreme Court has upheld under First Amendment strict scrutiny.......................................................................... 25

B.    Ohio's law should trigger no First Amendment scrutiny because non-citizens have no First Amendment right to spend money to influence Ohio elections. ....................................................29

C.    At most, Ohio's law should be reviewed under intermediate scrutiny. ......................................................................... 33

D.    The remaining factors cut against the preliminary injunction. ...........34

II.    Even if the Court holds that Ohio's law suffers constitutional shortcomings, it should vacate the preliminary injunction in part because it is overbroad in two ways. ..................................... 36

A.    The injunction blocks constitutional applications of Ohio law. .......... 37

B.    The preliminary injunction is overbroad because it reaches non-parties. ............................................................................ 39

III.    The District Court's reasoning does not justify its injunction. ............... 41

A.    The District Court's cramped reading of Supreme Court precedent led it astray. ....................................................................... 41

B.    The District Court's defense of its overbroad injunction does not hold water. ...................................................................... 45

CONCLUSION ....................................................................................48

CERTIFICATE OF COMPLIANCE .................................................49

CERTIFICATE OF SERVICE ..........................................................50

DESIGNATION OF DISTRICT COURT RECORD ...........................51

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Abbott v. Perez,*
　585 U.S. 579 (2018) ................................................................ 35

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
　591 U.S. 430 (2020) ............................................................... 44

*Ambach v. Norwick,*
　441 U.S. 68 (1979) ....................................................... 17, 18, 21, 31

*Arizona v. Biden,*
　31 F.4th 469 (6th Cir. 2022) ................................................ 37, 40

*Auburn Police Union v. Carpenter,*
　8 F.3d 886 (1st Cir. 1993) ......................................................... 23

*Ayotte v. Planned Parenthood of N. New England,*
　546 U.S. 320 (2006) ................................................................. 46

*Bluman v. Fed. Election Comm'n,*
　800 F. Supp. 2d 281 (D.D.C. 2011) ...................................... *passim*

*Branti v. Finkel,*
　445 U.S. 507 (1980) ................................................................. 32

*Bridges v. California,*
　314 U.S. 252 (1941) ................................................................. 31

*Bridges v. Wixon,*
　326 U.S. 135 (1945) ................................................................. 31

*Broadrick v. Oklahoma,*
　413 U.S. 601 (1973) ................................................................. 19

*Buckley v. Valeo,*
　424 U.S. 1 (1976) ................................................................. 5, 18

*Burson v. Freeman,*
　504 U.S. 191 (1992) .................................................... 19, 20, 22, 26

*Cabell v. Chavez-Salido*,
 454 U.S. 432 (1982) ..................................................................*passim*

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) ................................................................. 39

*California v. Texas*,
 593 U.S. 659 (2021).............................................................. 39, 45

*Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election
 Pracs.*,
 No. 23-cv-00450, 2024 WL 866367 (D. Me. Feb. 29, 2024) ............................24

*Citizens United v. Fed. Election Comm'n*,
 558 U.S. 310 (2010).............................................................. 23, 29

*City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*,
 596 U.S. 61 (2022) .................................................................. 33

*City of Los Angeles v. Alameda Books, Inc.*,
 535 U.S. 425 (2002) ................................................................. 25

*Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*,
 473 U.S. 788 (1985) ................................................................. 19

*Cox v. Louisiana*,
 379 U.S. 559 (1965) ................................................................. 19

*Crawford v. Marion Cnty. Election Bd.*,
 553 U.S. 181 (2008)................................................................... 5

*Dep't of Homeland Sec. v. New York*,
 140 S. Ct. 599 (2020) ................................................................40

*Ohio ex rel. Eaton v. Price*,
 360 U.S. 246 (1959) ..................................................................20

*FEC v. Beaumont*,
 539 U.S. 146 (2003) .................................................................. 32

*First Nat'l Bank of Atlanta v. Bartow Cnty. Bd. of Tax Assessors*,
 470 U.S. 583 (1985).................................................................. 23

*Foley v. Connelie*,
  435 U.S. 291 (1978) ................................................................*passim*

*Fusari v. Steinberg*,
  419 U.S. 379 (1975) .................................................................. 21

*Gill v. Whitford*,
  585 U.S. 48 (2018) .................................................................... 37

*Greer v. Spock*,
  424 U.S. 828 (1976) .................................................................. 19

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ............................................................ 28, 33

*Grupo Mexicano De Desarrollo v. All. Bond Fund*,
  527 U.S. 308 (1999) .................................................................. 37

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ............................................................ 17, 27, 29

*Ill. State Bd. of Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979) .................................................................. 20

*L.W. v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) .................................................... 40

*Labrador v. Poe*,
  144 S. Ct. 921 (2024) .................................................. 35, 37, 39, 40

*Libertarian Nat'l Comm., Inc. v. Saliba*,
  116 F.4th 530 (6th Cir. 2024) .................................................. 11

*Lindenbaum v. Realgy, LLC*,
  13 F.4th 524 (6th Cir. 2021) .................................................... 46

*Little v. Reclaim Idaho*,
  140 S. Ct. 2616 (2020) ............................................................ 36

*Mandel v. Bradley*,
  432 U.S. 173 (1977) .................................................................. 21

*Maryland v. King,*
    567 U.S. 1301 (2012) ......................................................... 35

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ........................................................... 37

*McCutcheon v. Fed. Election Comm'n,*
    572 U.S. 185 (2014) ........................................................... 16

*Moody v. NetChoice, LLC,*
    144 S. Ct. 2383 (2024) ............................................. 16, 38, 44, 47

*Murphy v. NCAA,*
    584 U.S. 453 (2018) ........................................................... 39

*Nixon v. Shrink Mo. Gov't PAC,*
    528 U.S. 377 (2000) ...................................................... 5, 18, 36

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................... 36

*Norton Outdoor Adver., Inc. v. Vill. of St. Bernard, Ohio,*
    99 F.4th 840 (6th Cir. 2024) .............................................. 47

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost,*
    118 F.4th 770 (6th Cir. 2024) ....................................*passim*

*Oregon v. Mitchell,*
    400 U.S. 112 (1970) ........................................................... 30

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) ............................................................. 33

*Perkins v. Smith,*
    370 F. Supp. 134 (D. Md. 1974) .................................. 17, 21, 31

*Planned Parenthood Cincinnati Region v. Taft,*
    444 F.3d 502 (6th Cir. 2006) ............................................ 46

*Plyler v. Doe,*
    457 U.S. 202 (1982) ........................................................... 42

*Police Dep't of City of Chicago v. Mosley,*
 408 U.S. 92 (1972) ................................................................ 33

*Purcell v. Gonzalez,*
 549 U.S. 1 (2006) .......................................................... 5, 18

*R.J. Reynolds Tobacco v. Durham Cnty.,*
 479 U.S. 130 (1986) ............................................................ 20

*Reed v. Town of Gilbert, Ariz.,*
 576 U.S. 155 (2015) ............................................................ 22

*Regan v. Taxation with Representation of Wash.,*
 461 U.S. 540 (1983) ............................................................ 32

*Reno v. ACLU,*
 521 U.S. 844 (1997) ................................................ 22, 23, 25

*Richardson v. Ramirez,*
 418 U.S. 24 (1974) ............................................................. 21

*Seila Law LLC v. CFPB,*
 591 U.S. 197 (2020) ............................................................ 37

*Starbucks Corp. v. McKinney,*
 602 U.S. 339 (2024) ............................................................ 11

*Sugarman v. Dougall,*
 413 U.S. 634 (1973) ............................................................ 30

*Thompson v. DeWine,*
 959 F.3d 804 (6th Cir. 2020) ......................................... 35, 36

*United States ex rel. Turner v. Williams,*
 194 U.S. 279 (1904) ............................................................ 42

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,*
 413 U.S. 548 (1973) ....................................................... 18, 32

*United Public Workers of Am. (C.I.O.) v. Mitchell,*
 330 U.S. 75 (1947) ............................................................. 18

*United States v. Arthrex, Inc.*,
   594 U.S. 1 (2021) .................................................................. 38

*United States v. Raines*,
   362 U.S. 17 (1960) ............................................................... 38

*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020) ............................................................. 38

*United States v. Singh*,
   979 F.3d 697 (9th Cir. 2020) ................................................. 3

*United States v. Stevens*,
   559 U.S. 460 (2010) ............................................................. 47

*Vidal v. Elster*,
   602 U.S. 286 (2024) .............................................................. 31

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ............................................................. 33

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015) ......................................................*passim*

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................ 11

**Statutes and Constitutional Provisions**

U.S. Const. amend. X ................................................................. 5

28 U.S.C. §1292 .......................................................................... 1

28 U.S.C. §1331 .......................................................................... 1

52 U.S.C. §30121 ........................................................................ 7

21-A M.R.S. §1064 .................................................................... 24

Ohio Adm. Code 111:2-4-14 ............................................... 35, 44

Ohio Rev. Code §3517.01 ........................................................... 8

Ohio Rev. Code §3517.13 ........................................................................7

Ohio Rev. Code §3517.121.............................................................7, 8, 9, 45

**Other Authorities**

Ali Swenson, *Abortion rights supporters far outraise opponents, out-of-state money flowing to Ohio*, PBS News (Oct 27, 2023) ........................6

Ali Swenson and Samantha Hendrickson, *Ohio Issue 1: An election that revolves around abortion rights has been fueled by national groups and money*, WKYC, Cleveland (Aug. 8, 2023) ..........................................6

Frank LaRose, Press Release, *LaRose to Ohio House: Ban Foreign Influence Over Ohio's Elections* (May 9, 2024)....................................6

George Washington, *Washington's Farwell Address to the People of the United States*, S. Doc. 106-21 (2000) ....................................................3

H.R. Rep. 118-318, Stop Foreign Funds in Elections Act (Dec. 14, 2023) ...............................................................................................4

Karen Kasler, *Ohio redistricting amendment backers raise $23 million, and have intentionally spent even more*, The Statehouse News Bureau (August 2, 2024) .................................................................................4

Patrick Whittle and David Sharp, *Maine votes to ban foreign influence after Hydro-Québec spends on campaign*, Montreal Gazette (Nov. 8, 2023) ...............................................................................................4

S. 4666, Get Foreign Money Out of U.S. Elections Act (July 10, 2024) .................4

Taylor Giorno, *Democratic lawmakers take aim at foreign money in elections*, The Hill (July 11, 2024) ........................................................4

## STATEMENT REGARDING ORAL ARGUMENT

The State defendants believe that this case merits oral argument.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the District Court's preliminary injunction under 28 U.S.C. §1292(a)(1).  The District Court had jurisdiction over the complaint under 28 U.S.C. §1331.

## STATEMENT OF THE ISSUES

**1.**     Whether the District Court erred in preliminarily enjoining Ohio's law restricting campaign spending by foreign nationals as inconsistent with the First Amendment.

**2.**     Whether the District Court erred in preliminarily enjoining Ohio's law as to all foreign nationals despite concluding that the law transgresses the Constitution only as to lawful permanent residents.

**3.**     Whether the District Court erred by not limiting its preliminary injunction of Ohio's law to the party plaintiffs.

## INTRODUCTION

"[W]e have often been described as a nation of immigrants," and "aliens lawfully residing in this society have many rights which are accorded to noncitizens by few other countries." *Foley v. Connelie*, 435 U.S. 291, 294 (1978) (quotation omitted). Despite this openness seen in few other countries, citizens in each State retain "the choice, and right,….to be governed by their citizen peers." *Id.* at 296.  From the beginning, the link between citizenship and governance has also meant caution about non-citizen influence over our government.  George Washington famously warned against "foreign influence" finding "facilitated access to the government itself," which would allow "the policy and the will of one country" to be "subjected to the policy and will of another." George Washington, *Washington's Farwell Address to the People of the United States*, S. Doc. 106-21, at 17–18 (2000) (first published Sept. 19, 1796).  At the ratification debates, George Mason opposed a structure that would allow "foreigners and adventurers" to "make laws" and "govern" the new nation. 2 The Records of the Federal Convention of 1787, at 216 (Max Farrand, ed.) (1911).

These concerns are not merely the bygone eighteenth-century worries of a new nation.  Even after the federal government started regulating foreign money, "suspicions of foreign influence in American elections remained a pervasive concern." *United States v. Singh*, 979 F.3d 697, 709 (9th Cir. 2020).  Those concerns persist.

3

Today, both federal and state policymakers worry about foreign money influencing U.S. elections. Two proposed federal bills would crack down on foreign money in state issue elections or limit spending by U.S. companies with significant foreign ownership. *See* H.R. Rep. 118-318, Stop Foreign Funds in Elections Act (Dec. 14, 2023); S. 4666, Get Foreign Money Out of U.S. Elections Act (July 10, 2024); *see* Taylor Giorno*, Democratic lawmakers take aim at foreign money in elections*, The Hill (July 11, 2024), https://perma.cc/J3Y4-R53Q . In a recent Maine election, an electric-generating company based in Quebec spent $22 million against a Maine referendum about cross-border power transmission. *See* Patrick Whittle and David Sharp, *Maine votes to ban foreign influence after Hydro-Québec spends on campaign*, Montreal Gazette (Nov. 8, 2023), https://perma.cc/5CZM-PKJ8. And in Ohio's just-completed vote about amending its constitution, media reports indicate that foreign money poured in to influence how Ohio would draw lines for state and congressional districts. *See* Karen Kasler, *Ohio redistricting amendment backers raise $23 million, and have intentionally spent even more*, The Statehouse News Bureau (August 2, 2024), https://perma.cc/6HM2-2EKY.

The old and new concerns about foreign influence over domestic elections strike a sensitive nerve in our participatory democracy because "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory

democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (Stevens, J., op.). And when a State sets out to preserve confidence in its elections, voter perception matters. If a State leaves a "perception of impropriety unanswered," voters will make "the cynical assumption" that their perception is reality. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390 (2000); *Buckley v. Valeo*, 424 U.S. 1, 30 (1976) (per curiam).

Ohio aimed to address the corrosive effects on citizen perception wrought by foreign money pouring into issue campaigns to amend the Ohio Constitution. Ohio's General Assembly—the institution entrusted to manage state election rules, *see* Const. amend. X—enacted a law preventing foreign nationals from contributing to electoral campaigns. But hours before the law could take effect, the District Court enjoined Ohio's officials from executing the law. That injunction even reached applications of the law the District Court found *constitutional*, and it extended to nonparties. That injunction "frustrates the intent of the elected representatives of the people," *Crawford*, 553 U.S. at 203 (Stevens, J., op.) (quotations omitted), and overrides the democratic process. A panel of this Court has already stayed the injunction because the District Court is likely wrong about the constitutional validity of Ohio's law. This Court should reaffirm that correct interim judgment by reversing the preliminary injunction now.

## STATEMENT

In Ohio's 2023 election cycle, the media widely reported that foreign nationals contributed millions of dollars to issue campaigns in back-to-back elections. According to those reports, in both Ohio's August 2023 special election and in its November general election, groups known to receive substantial funding from foreign nationals spent millions of dollars to influence Ohio voters. *See, e.g.,* Ali Swenson, *Abortion rights supporters far outraise opponents, out-of-state money flowing to Ohio*, PBS News (Oct 27, 2023), https://tinyurl.com/s8ev69rt; Ali Swenson and Samantha Hendrickson, *Ohio Issue 1: An election that revolves around abortion rights has been fueled by national groups and money*, WKYC, Cleveland (Aug. 8, 2023), https://perma.cc/JAF3-6WAN; *see also* Katz Decl., R.29-3, ¶17–20, PageID#1092–93.

The next year, Ohio's Secretary of State recommended that Ohio update its election laws to ward off foreign influence. *See* Frank LaRose, Press Release, *LaRose to Ohio House: Ban Foreign Influence Over Ohio's Elections* (May 9, 2024), https://perma.cc/GQC6-AJWQ. Despite the Secretary's keen interest in this spending as reported in the media, his office lacked statutory tools to investigate, let alone regulate, foreign influencing. When his Office endeavored to investigate, donor-secrecy laws blocked the way. Katz Decl., R.29-3, ¶24–27, PageID#1094–95.

The Secretary's concern and resulting recommendation spurred a legislative response. Ohio's General Assembly passed, and Governor signed, a new election-spending law in 2024. That law bans "foreign national[s]" from certain election spending, including spending related to statewide ballot issues. Ohio Rev. Code §3517.121(B). The new law broadened Ohio's previous restrictions on foreign election spending. Before the 2024 change, Ohio law tracked federal law. Both Ohio and federal law generally prohibited foreign nationals from making contributions or expenditures in connection with federal, state, and local elections for office, and further prohibited any person from soliciting, accepting, or receiving such contributions from a foreign national. 52 U.S.C. §30121(a)–(b); Ohio Rev. Code §3517.13(W)(1)–(2). Both federal and state law defined "foreign national" to mean "an individual who is not a citizen of the United States or a national of the United States . . . and who is not lawfully admitted for permanent residence" under federal immigration law. 52 U.S.C. §30121(b)(2); Ohio Rev. Code §3517.13(W)(3).

The 2024 legislation expanded Ohio's prohibitions in three ways. First, it extended the spending prohibitions to issue campaigns. Under the new law, foreign nationals may not directly or indirectly make contributions or expenditures in support of or in opposition to statewide ballot issues or questions. Ohio Rev. Code §3517.121(B)(2) & (5). Second, the new law makes plain that "continuing

associations," *i.e.*, associations with "a primary purpose other than" elections, Ohio Rev. Code §3517.01(C)(4), may not conduct election-related spending using funds knowingly received from a foreign national. Ohio Rev. Code §3517.121(C)(2). Finally, the law expanded the definition of "foreign national" to include lawful permanent residents. *Id.* §3517.121(A)(2). Other provisions of the new law complement these changes by restricting those who might receive money from foreign nationals (including continuing associations) from spending foreign money or aiding or abetting prohibited spending. *Id.* §3517.121(C), (D). Still others set penalties and detail enforcement mechanisms. *Id.* §3517.121(F), (G), (H).

Before the law took effect, Plaintiffs—a Canadian citizen, a German citizen and her American husband, and the nonprofit organizations OPAWL and the Northeast Ohio Coalition for the Homeless—filed this action challenging the law as unconstitutional by suing Ohio Attorney General Dave Yost and Ohio Secretary of State Frank LaRose (this brief will call these two officials the Ohio Defendants, or Ohio). Compl., Doc. 1 at PageID #6, 8–9, ¶¶16, 21, 26, 28. The five-count facial challenge alleges that the new Ohio law violates their rights to speech and association, is unconstitutionally overbroad, is unconstitutionally vague, and illegally classifies on account of alienage. *Id.* at PageID #33–47, ¶¶152–220. Their final claim, an equal

protection challenge, alleges that the law contains unlawful classifications based on alienage. *Id.* at PageID#45–47, ¶¶212–20.

The day before the law would have taken effect, a district court preliminarily enjoined enforcement of portions of Ohio Rev. Code §3517.121. With one narrow exception, the District Court actually found the law constitutional. Op., R.32, PageID#1187–88. The exception: the Court decided that lawful permanent residents "have political speech rights," and therefore any restriction on those rights must be constitutionally tailored to advance the State's interests. *Id.* at PageID#1169. The Court concluded that the law is improperly tailored because, in the Court's view, Ohio showed no link between lawful permanent residents and the State's interest in preventing foreign influence over Ohio elections. *Id.* at PageID#1178.

As a remedy, the Court enjoined enforcement of Ohio Rev. Code §3517.121(A)(2)(a), the definition of a foreign-national individual, in its entirety. That is, even though the Court recognized that *most* foreign-national individuals covered by Ohio Rev. Code §3517.121(A)(2)(a) do not have any First Amendment rights to participate in American self-government, it nonetheless enjoined the law as applied to *all* foreign-national individuals. *Id.* at PageID#1189–90.

The defendants sought a stay or partial stay first in the District Court, which denied those requests. The District Court reasoned that the Supreme Court's cases

upholding laws excluding non-citizens from political participation do not apply here because they arose in the equal-protection context. Significantly, the court also held that, as a remedy, it had to "enjoin some likely constitutional applications" because the court had no alternative but to "strike" an entire provision to avoid judicial legislation. Stay Op., R.40, PageID#1259, 1271, 1276.

Ohio then sought a stay in this Court, which granted it administratively for two weeks, and then pending appeal. Doc.39; *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 773 (6th Cir. 2024). The stay panel reasoned as follows. First, the panel turned aside plaintiffs' overbreadth challenge by noting that the law permissibly regulates millions of non-citizens even if it cannot reach lawful permanent residents. *OPAWL*, 118 F.4th at 775–76. Next, the panel assumed strict scrutiny applies even though it acknowledged that Supreme Court precedent "suggests that a lesser level of scrutiny could apply." *Id.* at 777. Applying strict scrutiny, the panel held that Ohio's law is likely constitutional as it is narrowly targeted on Ohio's compelling interest in stopping non-citizens from pouring money into Ohio elections. *Id.* at 777, 785. Ohio's compelling interest, the panel reasoned, fit comfortably within the Supreme Court's cases upholding state laws that defined the limits on participation in self-government. *Id.* at 777–78. And Ohio narrowly tailored its law, the panel

10

said, because it could not achieve its interest using less restrictive means.  In the panel's words, "[n]othing could be more narrowly tailored." *Id.* at 783.

## STANDARD OF REVIEW

Following a "practice with a background of several hundred years of history," *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quotations omitted), a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  This court assesses a district court's evaluation of these factors for abuse of discretion overall, with de-novo review for legal conclusions and clear-error review of facts. *See, e.g., Libertarian Nat'l Comm., Inc. v. Saliba*, 116 F.4th 530, 533 (6th Cir. 2024).

## SUMMARY OF THE ARGUMENT

The District Court's preliminary injunction is wrong on the merits and wrong as to scope regardless of the merits.  On the merits, Ohio's law banning non-citizens from pouring money into Ohio elections complies with the First Amendment.  As this Court already held in a stay posture, Ohio's law survives strict scrutiny.  Ohio also believes that its law should not face any First Amendment scrutiny—or at most should face only intermediate scrutiny—because non-citizens have no right to dump

money into Ohio elections with the goal of influencing electoral outcomes. Ohio leads with the strict-scrutiny approach because it represents the more direct path to reverse.

As the stay-stage panel already held, Ohio's ban on non-citizens spending on elections satisfies strict scrutiny. Ohio has an undoubtedly compelling interest in avoiding both the reality and perception that non-citizens hold sway over elections to select Ohio's leaders or amend Ohio's Constitution. And Ohio's law is tailored to serving that interest. It appropriately includes a ban on spending by lawful permanent residents because—as the Supreme Court has recognized—States have the power to distinguish citizens from non-citizens even in the context of hiring teachers and police officers. States therefore may draw the line on participating in the machinery of self-government through the same distinction. Ohio law also appropriately permits U.S. corporations to spend on Ohio elections even if non-citizens own a substantial stake. Again, that is a line the Supreme Court has drawn because blocking domestic corporation speech would block speech by U.S. citizens. Finally, Supreme Court decisions upholding speech restrictions at polling places, on speech aiding foreign organizations, on spending by most non-citizens, and in judicial campaigns all indicate that Ohio's law is compatible with the First Amendment.

Ohio's law should survive for the alternate reason that non-citizens have no First Amendment right to spend money on Ohio elections at all.  The question is not whether lawful permanent residents have any First Amendment rights, but whether they have First Amendment rights to spend money on Ohio elections.  Much like certain public employees have some First Amendment rights, but not rights co-extensive with other citizens, lawful permanent residents have the right to speak in the public square, but not to spend money on elections.  At the least, the narrow rights lawful permanent residents possess should subject Ohio's law to only intermediate scrutiny—which it easily satisfies.

All this shows why the remaining preliminary injunction factors cut against the District Court's injunction.  Plaintiffs will suffer no irreparable harm because Ohio's law is constitutional.  Nor are the harms significant otherwise.  One individual announced plans to become a citizen.  And one organizational plaintiff doubts it receives much money from non-citizens.  On the other hand, the harm to Ohio from blocking its law is immediate and widespread.  The injunction removes from the people the power to protect their elections from foreign interference.  The injunction also leaves the impression that non-citizens influence the most basic decisions Ohioans should make for themselves about how they are governed: what their state Constitution and laws say.

13

Significantly, the District Court's preliminary injunction is error even if it is right on the merits of the underlying First Amendment question. First, the injunction reaches applications—and bars Ohio from enforcing its law in situations—that the District Court agreed were constitutional. The court had no warrant to enjoin those applications. Second, the injunction reaches non-parties. The district court likewise had no authority to block Ohio from enforcing its law as to those not before the court.

The District Court's reasoning does not hold up to scrutiny. Respectfully, it misread Supreme Court cases that allow States to draw lines distinguishing citizens from non-citizens. The District Court also overread its power to enjoin Ohio from enforcing its law because the court thought it should attempt to read Ohio legislators' minds rather than let Ohio's law govern in situations where the statute is compatible with the Constitution.

## ARGUMENT

The District Court's preliminary injunction rests on two kinds of error. For starters, plaintiffs' First Amendment claim that the District Court accepted will likely fail on the merits. This defect in the injunction also steers the other three injunction factors against the District Court's judgment. But even if the District Court's First Amendment holding survives, the preliminary injunction is still overbroad—and therefore must be modified on two measures. One, the injunction reaches

14

applications that the District Court itself concluded were constitutional. The District Court held that Ohio's law is unconstitutional only as applied to lawful permanent residents, but not to other foreign nationals. But the District Court then enjoined the law as to all foreign nationals. Therefore, the injunction must be reversed at least to match its scope with the District Court's legal conclusions. Two, the injunction reaches non-parties to the litigation. Therefore, the injunction must be reversed, or at least confined to the plaintiffs in this case. Finally, the District Court's justifications for its preliminary injunction do not hold up as it overread Supreme Court precedent and underappreciated the requirement to impose a narrower injunction.

## I.    The First Amendment is no barrier to Ohio deciding that it will weed out foreign money from influencing its elections.

The District Court's preliminary injunction rests on one key holding about the First Amendment—that lawful permanent residents have a First Amendment right to spend money to influence Ohio election contests. That holding is wrong for two independent reasons. First, Ohio's law survives First Amendment scrutiny, as a motions panel of this Court already said. Second, Ohio's law does not even trigger First Amendment scrutiny, so the District Court should have never proceeded past that threshold inquiry. The State Defendants acknowledge that the first route to

reversing is the more direct path, and therefore discuss it first, even though the second route is logically prior.

Within this more direct, strict-scrutiny path, there is one more fork in the order of operations. Even if the First Amendment applies, the Supreme Court has instructed that a court "usual[ly]," but "need not" decide first what level of review governs. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (2024). Ohio believes that the same authorities that take Ohio's law outside the First Amendment entirely should lead to, at most, intermediate-scrutiny review here. *See* below at 29–34. But because Ohio's law satisfies strict-scrutiny review, we defer discussing intermediate scrutiny until after discussing the reasons for no First Amendment scrutiny at all. Ohio begins with its compelling interests and the law's airtight means-end fit.

**A.    Ohio's law is properly tailored to serve the compelling interest of eliminating the reality and perception of foreign money influencing Ohio elections.**

Laws that restrict *citizens*' election-related expenditures must survive strict scrutiny. *See, e.g., McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 196–97 (2014). Extending that standard to non-citizens is not fatal to Ohio's law. The usual formulation of that standard says that a "State may restrict" speech "if the restriction is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). And the usual order of operations in applying that test starts

16

with the compelling interest.  *See id.* at 445; *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010).

> ### 1. Ohio has a compelling interest in preserving the reality and the perception that foreign money does not influence its elections, including elections that shape its Constitution.

Ohio's interest in excluding foreign dollars from its elections is compelling, as this Court held when granting the stay pending appeal.  118 F.4th at 777–78.  And on this point, both the panel dissent and the District Court agreed.  *Id.* at 788 (Davis, J., dissenting); R.32, PageID#1170.  That conclusion rests on three sets of Supreme Court precedents.

*Citizenship requirements.*  Supreme Court precedent repeatedly recognizes the States' interest in requiring citizen status to participate in activities of self-government.  In four cases, the Court upheld state laws that excluded *all* non-citizens from roles in democratic self-government.  Those statutes barred non-citizens from roles as teachers, police officers, parole officers, and jury members.  *See Ambach v. Norwick*, 441 U.S. 68, 75, 80–81 (1979); *Cabell v. Chavez-Salido*, 454 U.S. 432, 441, 444 (1982); *Foley*, 435 U.S. at 299; *Perkins v. Smith*, 370 F. Supp. 134, 138 (D. Md. 1974), *aff'd*, 426 U.S. 913 (1976).  The through-line of these cases is that States have the "power and responsibility" to "preserve the basic conception of a political community," which includes barring non-citizens from "functions that go to the heart of

17

representative government." *Ambach*, 441 U.S. at 74 (quotations omitted). The States' power and duty can also be viewed from the citizens' perspective. The citizens have "the choice, and right … to be governed by their citizen peers." *Foley*, 435 U.S. at 296. And in exercising that choice, citizens may pass laws that recognize the "special significance of citizenship," including the "unequivocal legal bond" between the citizen and the State. *Ambach*, 441 U.S. at 75.

*Public confidence in government.* A second group of Supreme Court precedent explains that States have a strong interest in protecting voters' perceptions that the voting process is fair. Because voter "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," *Purcell*, 549 U.S. at 4, States need not leave voter "perception of impropriety unanswered," *Nixon*, 528 U.S. at 390 (2000).

The States retain some power to restrict speech to shore up voter confidence. In several cases, the Supreme Court has upheld laws that limit speech because those limits foster voter confidence in the democratic process. The Court cited voter perception when it upheld limits on candidate donations. *Buckley*, 424 U.S. at 30. It also invoked the public's "confidence" when it upheld restrictions on civil-servants' speech. *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 565 (1973) (limits on political activity by public employees); *accord United Public*

*Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 98–99 (1947) (same); *Broadrick v. Oklahoma*, 413 U.S. 601, 616–17 (1973) (similar). The Court has similarly cited the concern about an "appearance" of partisanship in sustaining rules restricting who may appear in certain fora. *Greer v. Spock*, 424 U.S. 828, 839 (1976) (restrictions on military-political entanglement); *accord Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*, 473 U.S. 788, 790, 809 (1985) (limitations on participants in charity donations by public employees); *Cox v. Louisiana*, 379 U.S. 559, 565 (1965) (perception, even if not reality, of judicial integrity may justify speech limits). All told, the Supreme Court has cited public perception about the democratic process in many contexts while upholding laws that regulate speech.

The Court has even cited public perception when upholding speech restrictions under strict-scrutiny review. In 2015, the Court upheld Florida's ban on judicial campaign solicitations after recognizing the compelling interest in protecting voter perceptions of an impartial judiciary. The "public confidence in judicial integrity," the Court held, represented a "genuine and compelling" basis for Florida to "sever the direct link between judicial candidates and campaign contributors." *Williams-Yulee*, 575 U.S. at 447. An earlier case recognizes States' compelling interest in voter perceptions about elections. In *Burson v. Freeman*, the Court upheld Tennessee's restriction on campaign speech within 100 feet of a polling place. 504 U.S. 191, 193

(1992) (plurality op.).  That restriction arose from reforms designed to end the old system of open campaigning, bribery, and intimidating voters approaching the polls. *Id.* at 200.  Those evils, of course, sapped confidence from any observer "who believed in democratic government." *Id.* at 202; *see also id.* at 201 n.6, 204.  So ending those practices restored confidence in the democratic process.

*Citizenship requirements for elections.*  The third precedent is a single case, but it is the closest the Court has come to marrying precedent about citizenship and precedent about money in elections.  In 2012, the Supreme Court summarily affirmed a three-judge district court that upheld the federal ban on foreign-citizen contributions and expenditures regarding elections.  The judgment affirmed by the Supreme Court rested on the conclusion that the government has an interest "in preventing foreign influence over U.S. elections." *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 288 n.3 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012).  While *Bluman* is a summary opinion, it is Supreme Court precedent. *See, e.g.*, *R.J. Reynolds Tobacco v. Durham Cnty.,* 479 U.S. 130, 139 n. 7 (1986); *Ohio ex rel. Eaton v. Price*, 360 U.S. 246, 247 (1959).  And its precedential force includes anything "essential to sustain" the lower-court's judgment. *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–83 (1979).  Those essential sustaining principles are usually

20

"established by prior decisions" and applied "to the particular facts involved," which is why the Court acts summarily. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).

One essential principle in *Bluman* is its conclusion that the government has a compelling interest in excluding foreign money from elections. *See* 800 F. Supp. 2d at 290. *Bluman* should thus be read to establish Ohio's compelling interest in fencing off Ohio elections from foreign money. And while the Supreme Court might have freedom "to discard a rule which a line of summary affirmances may appear to have established," *Fusari v. Steinberg*, 419 U.S. 379, 392 (1975) (Burger, C.J., concurring), this Court does not have such license, *see Richardson v. Ramirez*, 418 U.S. 24, 53 (1974) (summary affirmances "confirmed" conclusion upholding state law).

To be sure, *Bluman* did not confront a law, like Ohio's, that bans election spending by lawful permanent residents; but the cases on which *Bluman* rests all drew a line between citizens and non-citizens. Those cases involved, respectively, an alien "lawfully in this country as a permanent resident," several "lawfully admitted permanent resident aliens," two aliens married to U.S. citizens, and a "resident alien" with a degree in veterinary medicine. *Foley* 435 U.S. at 292; *Cabell*, 454 U.S. at 432; *Ambach,* 441 U.S. at 71; *Perkins*, 370 F. Supp. at 134. Despite the status of the non-citizens in those cases, in each one the Court upheld a law that drew a line between citizens and non-citizens, not a line between residents and foreign domiciliaries.

21

Ohio's law draws the same line. And those lines, as a panel of this Court already observed, have both "a strong pedigree in American political history" and align with "common sense." *OPAWL*, 118 F.4th at 781, 782.

### 2. Ohio's exclusion of foreign money from its elections is tailored to match its compelling interest while obeying the Supreme Court's holding about corporate speech.

Ohio's law banning non-citizen election spending is as narrowly tailored as possible to achieve its goals of blocking both foreign influence and the perception of foreign influence. As the stay panel put it, no law "could be more narrowly tailored" to achieve the goal of "prevent[ing] foreign influence in state elections." *OPAWL*, 118 F. 4th at 783.

The stay panel's conclusion is correct. It matches how Ohio law fits Supreme Court precedent defining narrow tailoring. The narrow-tailoring requirement guards against laws that are either "underinclusive" by restricting too little, *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015), or overinclusive by suppressing "a large amount of speech," *Reno v. ACLU*, 521 U.S. 844, 874 (1997). Narrowly tailored, though, does not mean "perfectly tailored." *Burson,* 504 U.S. at 209 (plurality op.). A law is still narrowly tailored even if a hypothetical law might better match the problem because a "State need not address all aspects of a problem in one fell swoop." *Williams-Yulee*, 575 U.S. at 449. Nor does a hypothetical law that might

better fit the problem impugn the actual law if the hypothetical law is not "at least as effective in achieving" the actual law's purpose. *Reno*, 521 U.S. at 874. The space between acceptable tailoring and "perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence." *Williams-Yulee*, 575 U.S. at 454.

Ohio's law is narrowly tailored as it is not underinclusive: its ban on non-citizen election includes all non-citizens without running afoul of the kinds of spending the Supreme Court has already signaled the First Amendment protects. Ohio's law does not reach U.S. corporate entities with foreign ownership. The reason is what the Supreme Court said in *Citizens United*. There the Court observed that a restriction on corporate speech "not limited to corporations or associations that were created in foreign countries or funded predominantly by foreign shareholders … would be overbroad." *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 362 (2010). Ohio's exclusion of U.S. corporate spending hews to this precedent. It is certainly no First Amendment violation to exempt speech from regulation that the Court has shielded under the First Amendment. *See, e.g.*, *Auburn Police Union v. Carpenter*, 8 F.3d 886, 901 (1st Cir. 1993); *cf. First Nat'l Bank of Atlanta v. Bartow Cnty. Bd. of Tax Assessors*, 470 U.S. 583, 593 (1985) (tax exemption required by intergovernmental immunity).

The wisdom of Ohio's exception for this corporate speech is borne out by Maine's recent experience. A Maine statute restricts political contributions from "foreign government-influenced entit[ies]," which Maine defines as any entity with "5% or more of the total equity" or "other applicable ownership interests" held by foreign owners. 21-A M.R.S. §1064(1)(E)(2)(a). A federal court enjoined enforcement of that law, reasoning that the 5% threshold would deprive citizen shareholders—potentially 95% of shareholders—of their First Amendment rights. *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, No. 23-cv-00450, 2024 WL 866367, at *52–53 (D. Me. Feb. 29, 2024). Ohio is free to avoid this constitutional problem by targeting foreign contributions from foreign-domiciled corporations and non-citizens while leaving untouched the speech of domestic corporations with foreign ownership.

Ohio's law is also narrowly tailored because it is not overinclusive in light of its goal—to block the reality and perception of foreign money being spent on Ohio elections. Nothing prevents foreign nationals from speaking, marching lawfully and peacefully, publishing editorials, or posting political arguments on the internet. All told, Ohio's law leaves unblocked many communication channels. Ohio could not draw the lines any narrower and still achieve the law's objective of fighting both the reality and the perception of foreign influence over Ohio elections. Exempting lawful

permanent residents, for example, would leave Ohioans to wonder why a person who has not secured U.S. citizenship should nonetheless be allowed to spend money—perhaps vast sums—on electing Ohio's leaders and amending its Constitution. Such a hypothetical law would not be "at least as effective in achieving" Ohio's purpose. *Reno*, 521 U.S. at 874. Along the same lines, if Ohio tried to draw lines to permit some foreign companies to spend money on Ohio elections, that exception would eviscerate the law's purpose. Indeed, spending by one non-citizen on two 2023 Ohio elections prompted the Ohio legislature's interest in the problem. *See* above at 6. So a single foreign entity's or person's spending could nurture the very perception issues about foreign money that the Ohio law is designed to squelch.

Ohio's law is tailored to the problem. The best way to stop non-citizens' money from influencing Ohio's election is to stop allowing non-citizens to spend money on Ohio's elections. As the stay panel put it, Ohio's law is appropriately tailored even though it "strike[s] a balance" different than federal law and includes lawful permanent residents. *OPAWL*, 118 F.4th at 784, 785.

> **3.    Ohio's law is constitutional by analogy to other laws the Supreme Court has upheld under First Amendment strict scrutiny.**

It may be that "strict scrutiny leaves few survivors," *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 455 (2002) (Souter, J., dissenting), but looking to the

undisputed survivors shows why Ohio's law is one of them. Compare Ohio's law to four Supreme Court cases upholding speech restrictions under strict-scrutiny review. Each precedent points the way to upholding Ohio's law. Three of the cases will be familiar from the above discussion, but their holdings warrant further discussion here.

In the earliest of these precedents, the Court approved a content-based Tennessee law that prohibited political speech at and near polling places. *Burson*, 504 U.S. at 211 (plurality op.). Tennessee's law helped secure "the integrity of the polling place where citizens exercise the right to vote." *Id*. at 214 (Kennedy, J., concurring). Those interests were "obviously … compelling." *Id*. at 199 (plurality op.); *id*. at 213–14 (Kennedy., J, concurring). And the law did not transgress the First Amendment, even though its restrictions could have been "somewhat tighter." *Id*. at 210 (plurality op.). Tennessee's law passed the compelling-interest and narrow-tailoring test because it rested on "simple common sense." *Id*. at 211 (plurality op.). Tennessee therefore did not need to show "empirically" the restriction's "objective effects" on election integrity. *Id*. at 208 (plurality op.) (quotations omitted). Ohio's law also aims at securing election integrity, including voters' perception of election integrity. And, like Tennessee, the rationale behind Ohio's restriction is equally common sense.

A second guiding precent arose outside the election context. In 2012, the Court refused to enjoin a federal law restricting material aid to terrorist organizations "in the form of speech." *Holder*, 561 U.S. at 28, 39. That law, the Court explained, served an interest "of the highest order." *Id.* at 28. Therefore, even though the law restricted the speech of U.S. citizens, the Court held that those citizens had no right to engage in the speech they proposed. In some ways, Ohio's law is the flip side of *Holder*. While *Holder* recognized that some interests justify limits even on citizen speech aimed at foreign ears, Ohio's law rests on the premise that foreign money to support speech aimed at domestic ears may be proscribed.

The third precedent arose again in the election context. In 2012, the Court summarily affirmed a three-judge court's holding that the federal ban on foreign spending on U.S. candidate elections passes strict-scrutiny review. The three-judge court explained that the federal law was "tailored" to "serve[] the compelling interest of limiting the participation of *non-Americans* in the activities of democratic self-government." *Bluman*, 800 F. Supp. 2d at 290. Such laws "distinguishing citizens from non-citizens" in election spending, the court noted, are "part of a common international understanding of the meaning of sovereignty and shared concern about foreign influence over elections." *Id.* at 292. The same can be said of Ohio's law. And while Ohio's restrictions reach lawful permanent residents and issue campaigns—which

the federal law did not—*Bluman's* rationale that citizenship holds a special place in line drawing around elections fully supports the lines Ohio has chosen in exercising its "constitutional responsibility for the establishment and operation of its own government." *Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991) (quotation omitted).

Finally, and once again in the election space, the Court held that a content-based Florida law restricting campaign speech in judicial races passed strict-scrutiny inspection. *Williams-Yulee*, 575 U.S. at 437. The Court held first that Florida had a compelling interest in the public's perception of elected judges' integrity. *Id.* at 447–48. It also held that Florida's ban on campaign solicitations was narrowly tailored, as "the First Amendment does not confine a State to addressing evils in their most acute form." *Id.* at 454. Ohio's judgment about public confidence in its elections merits the same respect the Court afforded Florida's. Like Florida, Ohio's choice to elect a wide range of officeholders and to permit direct lawmaking through initiative and constitutional amendment should not leave Ohio without the tools to guard "public confidence" in those elections. *Id.* at 457. And Ohio's choice to restrict all non-citizens is a permissible choice to regulate beyond foreign money's "most acute" effects on elections. *Id.* at 455.

(*Citizens United*, despite all else that it held about money in politics, did not even touch this question. It "assumed ... that the Government has a compelling interest in limiting foreign influence over our political process." 558 U.S. at 362.)

**B.    Ohio's law should trigger no First Amendment scrutiny because non-citizens have no First Amendment right to spend money to influence Ohio elections.**

While Supreme Court precedent paves the way to upholding Ohio's law and reversing the District Court's preliminary injunction even under strict-scrutiny, Ohio believes that the same result is possible along a different path. In Ohio's view, non-citizens possess no First Amendment right to spend money on Ohio elections at all. That is, the "freedom of speech" simply does not include the conduct of non-citizens spending money to influence Ohio's elections. Because this is an alternate path to reverse, this brief will not belabor the point. Ohio advances this argument more than "in passing," so that it cannot later be accused of failing to "develop it." *Holder*, 561 U.S. at 27 n.5. In brief, the reasoning is as follows.

History and precedent support the categorical exclusion of non-citizens from the mechanics of self-government. The First Amendment is no exception to that exclusion.

Starting with history, the Supreme Court years ago recognized the States' "historical power to exclude aliens from participation in [their] democratic political

institutions." *Sugarman v. Dougall*, 413 U.S. 634, 648 (1973).  In doing so, it pointed to the "debates leading to the adoption of the Fourteenth Amendment," which contained "clear evidence" that the amendment did not confer on aliens a "right of suffrage or a constitutional right to participate in the political process of state government." *Id.* at 648 n.13.  Instead, the amendment recognized that "the right to vote and the concomitant right of participation in the political process were matters of local law." *Id.*  If the Fourteenth Amendment—which considered and redefined citizenship—left to "local law" the power to define the "right of participation in the political process," there is little reason to think that the First Amendment requires a nationwide standard that mandates non-citizen participation in that process.  The debates over the Fourteenth Amendment align with founding-era views that the Constitution, "as provided in the Tenth Amendment," left to the States "the power to regulate elections" because no "function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters … and the nature of their own machinery for filling local public offices." *Oregon v. Mitchell*, 400 U.S. 112, 124–25 (1970) (opinion of Black, J.).  One last point about history.  If the First Amendment and restrictions on non-citizen voting have

coexisted for centuries, that "harmonious relationship suggests that heightened scrutiny need not … apply in this unique context." *Vidal v. Elster*, 602 U.S. 286, 299 (2024).

As for precedent (detailed above at 17–18), the Supreme Court has repeatedly held that non-citizens may be excluded from the mechanics of democratic self-government because the States enjoy "wide[] latitude" to draw lines based on the "special significance of citizenship." *Ambach*, 441 U.S. at 75 (1979); *see also Cabell*, 454 U.S. at 439; *Foley*, 435 U.S. at 299; *Perkins*, 370 F. Supp. at 136. Those cases rest on the principle that non-citizens may be excluded from core aspects of self-government.

To be sure, non-citizen lawful permanent residents have some First Amendment rights. During World War II, for instance, the Supreme Court reversed a contempt-of-court citation against a lawful permanent resident who had sent a telegram to the Secretary of Labor criticizing a state-court judgment. *Bridges v. California*, 314 U.S. 252, 277–78 (1941); *id.* at 280 (Frankfurter, J., dissenting); *see also Bridges v. Wixon*, 326 U.S. 135, 137, 140, 147–48 (1945) (citing First Amendment in constitutional-avoidance context in habeas case involving the same lawful permanent resident). Recognizing that lawful permanent residents have the core right to speak to government officials through a telegram offers little guidance about whether they possess a

First Amendment right to spend money on Ohio elections.  Lawful permanent residents' First Amendment rights are not all-or-nothing.  The First Amendment often uses a finer-bristled brush.  For example, corporate entities enjoy many First Amendment rights, but those rights are not coextensive with the rights of individuals.  *See, e.g.*, *FEC v. Beaumont*, 539 U.S. 146, 149, 155 (2003) (limits on direct contributions to candidates); *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 542, 548 (1983) (noting restrictions on lobbying).  Similarly, public employees enjoy many First Amendment rights, but they do not completely overlap with their peers in the private sector.  *See, e.g.*, *Letter Carriers*, 413 U.S. at 550–51 (campaigning restrictions on public employees); *Branti v. Finkel*, 445 U.S. 507, 518 (1980) (political affiliation may be a qualification for some positions).  So the right of lawful permanent residence to some speech does not translate into one-for-one matching with citizen rights to democratic self-government.

Both history and Supreme Court precedent offer reasons to doubt that lawful permanent residents have a First Amendment right to give money to influence elections.  In short, if "the right to govern is reserved to citizens," *Foley*, 435 U.S. at 297, then the right of the States to say who governs includes a right to exclude non-citizens from spending money in the machinery of electing lawmakers and of direct lawmaking.

**C.    At most, Ohio's law should be reviewed under intermediate scrutiny.**

The history and precedent recognizing that States have the power to limit non-citizen participation in democratic self-government should remove Ohio's law from strict-scrutiny review and subject it to no more than intermediate scrutiny. If the Court's equal-protection cases lowered the "standard of review" when testing laws that "entrust only to citizens important elective and nonelective positions whose operations go to the heart of representative government," *Gregory*, 501 U.S. at 463 (quotation omitted), the same should be true when considering similar laws under the First Amendment. *Cf., e.g.*, *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (equal-protection scrutiny and First Amendment scrutiny inform each other).

Under intermediate-scrutiny review, Ohio's law need only be "narrowly tailored to serve a significant governmental interest." *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022) (quotation omitted); *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Unlike strict-scrutiny's tailoring requirement, under this level of review, a law "must not burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017) (quotation omitted).

Ohio's law easily passes intermediate scrutiny for the same reasons it survives strict scrutiny. As noted above (at 22–25), Ohio could not draw the distinctions any other way to achieve its goal of eliminating the reality and perception of foreign-money influence over Ohio elections. The Supreme Court has labeled "inappropriate" an approach that would "require every statutory exclusion of aliens to clear the high hurdle of strict scrutiny," because that approach would "obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship." *Foley*, 435 U.S. at 295 (quotation omitted). If the distinction between citizens and non-citizens has force in laws about hiring police officers or teachers, it has even more force in laws about electing lawmakers and direct lawmaking.

**D.     The remaining factors cut against the preliminary injunction.**

For the above reasons, plaintiffs are not likely to prevail on the merits as to the meaning of the First Amendment, and that lack of likely success points the way on the other preliminary-injunction factors.

*Irreparable harm.* Enforcing the law will not cause constitutional injury to those covered by the Ohio law because it applies to foreign nationals who lack a First Amendment right to participate in the process of American democratic self-government. Nor is the risk of harm to the parties vast in any case. One non-citizen plaintiff declared that he would seek citizen status in November of 2024. R.16-3, Gerrath

Decl., Page ID#116.  One organization plaintiff does not believe that it receives "any significant contributions from noncitizens."  R.16-2, Knestrick Decl., PageID#111. And the citizen plaintiff married to a foreign national with commingled household funds is shielded by regulation from any immediate risk of harm.  "Absent evidence to the contrary," Ohio law treats contributions from a joint account as made "by the person signing or endorsing the joint check or other written instrument."  Ohio Adm. Code 111:2-4-14.  A spousal citizen may freely exercise First Amendment rights in compliance with Ohio law by simply signing the contribution check.

*Harm to other party*.  On the other hand, the harm to Ohio is acute.  A State suffers irreparable harm when a federal court prevents it "from conducting … elections pursuant to a statute enacted by" its legislature.  *Abbott v. Perez*, 585 U.S. 579, 602 (2018); *see id.* at n.17.  Indeed, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation omitted); see *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring); *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020).  The preliminary injunction would prevent Ohio "from vindicating its sovereign interest in the enforcement of [campaign] requirements that are likely consistent with the First

Amendment." *Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring in the grant of stay).

*Public interest*. There "is always a public interest in prompt execution" of the law absent constitutional infirmity. *Nken v. Holder*, 556 U.S. 418, 436 (2009). Indeed, "giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest." *Thompson*, 959 F.3d at 812. The public interest is served by giving effect to Ohio's law in full.

If Ohio is required to run elections under the District Court's injunction, and thus without the benefit of its elected representatives' high-profile response to widely reported foreign spending to influence what ballot initiatives insert into Ohio's constitution, many voters may question the integrity of those elections. *See Nixon*, 528 U.S. at 390. Surely it is in the public interest to assure Ohio's citizens that the election results will be the product of democratic self-government—of citizen's "reflection and choice"—rather than the "accident and force," Federalist No. 1 (Hamilton), of foreign influence licensed by a federal court's universal injunction.

## II.    Even if the Court holds that Ohio's law suffers constitutional shortcomings, it should vacate the preliminary injunction in part because it is overbroad in two ways.

Regardless of the First Amendment merits, the Court should vacate the injunction insofar as it applies to foreign nationals other than lawful permanent

residents and insofar as it applies to people not parties to the case. In both ways, the District Court's injunction exceeded the judicial power to provide equitable relief.

### A.   The injunction blocks constitutional applications of Ohio law.

Courts have no power to enjoin statutes. Court have only the power to enjoin their application in discrete cases to avoid any conflict between statutes and the Constitution. Injunctions therefore "must … be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 67–68 (2018) (citation omitted); *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319–20 (1999) (injunctions limited to "relief … traditionally accorded by courts of equity"); *Labrador*, 144 S. Ct. at 923 (Gorsuch, J., concurring). A consequence of this limit on injunctive relief is that federal courts lack "the power to excise, erase, alter, or otherwise strike down a statute." *Seila Law LLC v. CFPB*, 591 U.S. 197, 253 (2020) (Thomas, J., concurring in part and dissenting in part); *see also Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *Arizona v. Biden*, 31 F.4th 469, 483 (6th Cir. 2022) (Sutton, J., concurring). When federal courts speak of "invalidating" a statute, they either mean it as shorthand for enjoining its application—or they misspeak.

When a court determines a law's application is not consistent with the Constitution, the proper remedy is to enjoin the defendant from enforcing the law in

a way that will offend the Constitution. "This approach derives from the Judiciary's negative power to disregard an unconstitutional enactment in resolving a legal dispute." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23–24 (2021) (citation omitted). In other words, the judicial power is the power to "adjudge the legal rights of litigants in actual controversies," *United States v. Raines*, 362 U.S. 17, 21 (1960), not remake the law. "[C]ourts [in the early Republic] understood judicial review to consist [simply] of a refusal to give a statute effect as operative law in resolving a case once that statute was determined to be unconstitutional." *United States v. Sineneng-Smith*, 590 U.S. 371, 387 (2020) (Thomas, J., concurring) (citation omitted). The First Amendment contains no exception to these principles. "Even in the First Amendment context," courts cannot "disregard the requisite inquiry into how a law works in all of its applications." *Moody*, 144 S. Ct. at 2409.

The District Court's preliminary injunction veered from these principles because it forbids several applications of the law that the District Court agreed the First Amendment permits. The District Court agreed that Ohio could apply its law to all non-citizens except lawful permanent residents. R.32, PageID#1187–88. Yet the preliminary injunction prevents Ohio from enforcing its law against all non-citizens. *Id.* at PageID#1189. That is error, as the District Court has no power to prevent Ohio from enforcing its law in ways the District Court held were consistent with the

Constitution.  The preliminary injunction operates as if the District Court "t[ook] a blue pencil to" the law, much as a legislator might.  *Murphy v. NCAA*, 584 U.S. 453, 489 (2018) (Thomas, J., concurring).  That maneuver exceeded the judicial role. Even if this Court leaves the injunction in place as to lawful permanent residents, it should modify the injunction so that Ohio's law remains in effect for all other non-citizens.

### B.  The preliminary injunction is overbroad because it reaches non-parties.

A federal court's power to issue equitable relief is generally limited to the parties in the case.  "[T]he usual rule" is "that litigation is conducted by and on behalf of the individual named parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).  Consequently, a valid Article III remedy "operate[s] with respect to specific parties," not with respect to a law "in the abstract."  *California v. Texas*, 593 U.S. 659, 672 (2021) (quotation omitted).  A "court may not issue an equitable remedy 'more burdensome to the defendant than necessary to [redress]' the plaintiff's injuries."  *Labrador*, 601 U. S. at 923 (Gorsuch, J., concurring) (quoting *Califano*, 442 U.S. at 702).

This party-remedy limit arises from the nature of the judicial power, which is, "fundamentally, the power to render judgments in individual cases."  *Murphy*, 584 U.S. at 488 (Thomas, J., concurring).  That is why injunctions "must operate in a

party-specific and injury-focused manner." *L.W. v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023). Indeed, a court "exceeds the norms of judicial power" by enjoining "government action" "beyond the injuries of a particular plaintiff." *Id.*; *see Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of a stay). When a judge grants relief to the parties only, however, it reinforces the separation of powers and democratic accountability. Indeed, "prohibiting" "statewide injunctions may turn out to be the right rule as a matter of law." *Labrador*, 144 S. Ct. at 931 (Kavanaugh, J., concurring). Once "a court has remedied a claimant's injury, it is fair to ask what controversy remains for a court to adjudicate or remedy." *Arizona*, 31 F.4th at 483 (Sutton, C.J., concurring).

The District Court did not consider limiting its relief to the parties before it. But it should have. In this way, too, the injunction is overbroad even if this Court concludes that it has merit as applied to lawful permanent residents. In sum, this Court "need not hold that the District Court was wrong in" concluding that the Ohio statute is unconstitutional in some applications to hold that the court "was wrong in striking down the statute on its face" for all foreign nationals. *Cabell*, 454 U.S. at 442.

## III.   The District Court's reasoning does not justify its injunction.

The District Court's injunction rests on a too-narrow view of Supreme Court precedent and a too-broad view of how Ohio must tailor its law.  Those are independent bases to reverse or vacate.

### A.   The District Court's cramped reading of Supreme Court precedent led it astray.

To see where the District Court went wrong, start with the lesson of *Bluman* and the Supreme Court cases it synthesized.  *Bluman* described its task as confronting "a preliminary and foundational question about the definition of the American political community."  800 F. Supp. 2d at 286.  On that question, *Bluman* followed a "straightforward principle":  it is "fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government." *Id*. at 288.  *Bluman* then explained that, if democratic self-government includes "functions as unrelated to the electoral process as teaching in public schools and serving as police and probation officers," it follows "almost *a fortiori*" that the First Amendment permits laws restricting foreign citizens from "spending money to influence voters and finance campaigns."  *Id*. at 288–89.

The District Court ignored *Bluman's* logic and attempted to distinguish the cases *Bluman* summarized because those cases applied the Equal Protection Clause, not

the First Amendment. R.32, PageID#1166–67. That is exactly backwards. Supreme Court cases involving aliens not lawfully present afford those aliens greater protection under the Equal Protection Clause than under the First Amendment. *Compare, e.g., Plyler v. Doe*, 457 U.S. 202, 210 (1982), *with, e.g., United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904). The Supreme Court's Equal Protection cases about non-citizens are highly instructive here, and the District Court was wrong to set them aside. That is, the District Court "focused too narrowly on a comparison," *Cabell*, 454 U.S. at 444, to the exact facts in *Bluman*, rather than reading the case for the principles it confirmed.

The District Court's conclusion that Ohio's law is not appropriately tailored fails as well. (Recall that Ohio preserves the argument that the First Amendment does not apply or that it requires only intermediate scrutiny.) After establishing that Ohio has a compelling government interest in "defining their political community," the District Court concluded that the Ohio law is not properly tailored because it (1) does not actually advance the state's interest to a significant extent; (2) sweeps too broadly; and (3) leaves significant influences bearing on the interest unregulated. R.32, PageID#1171, 1177–78. Take each conclusion in turn.

The District Court believed that Ohio has not shown that "prohibiting [lawful permanent resident]s' political speech" will "prevent[] foreign influence." R.32,

42

PageID#1178.  But the link is not hard to fathom.  The stay-stage panel thought the connection "obvious" and detected no need for "official findings of facts that we already know to be true."  *OPAWL*, 118 F.4th at 782.  And the only reason Ohio could not make findings about whether non-citizens, including lawful permanent residents, were spending money in its elections is that, before the newly passed law, Ohio had no tools to investigate dark-money spent in its elections.  *See id.* at 781 (citing affidavit of Ohio Secretary of State investigator).  If Ohio is going to keep foreign money out of its elections, it needs to draw the line at citizenship.  And it had reason to believe that non-citizens were spending significant money to influence Ohio elections.

The District Court simply disagrees that lawful permanent residents pose the same risk of foreign influence as other non-citizens.  While the District Court is no doubt correct that lawful permanent residents have more ties to the nation than other foreign nationals—they may reside in the United States indefinitely, may serve in the military, and pay income tax, R.32, PageID#1181—that greater link does not bar Ohio from distinguishing them from citizens for purposes of influence on its elections.  The Supreme Court's cases about various occupations draw the line at citizenship, not at lawful permanent residence.  *See* above at 17–18.  And because the links of selective-service registration or tax payment do not confer citizenship, those

43

links do not "detract" from Ohio's compelling interest in limiting political participation to citizens. *OPAWL*, 118 F. 4th at 779. What is more, Ohio's ban is a prophylactic against foreign individuals and corporations pouring money into Ohio's campaigns. "[F]oreign organizations operating abroad … possess no rights under the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020); *see Moody*, 144 S. Ct. at 2410 (Barrett, J., concurring). Ohio's ban cuts off at least one easy circumvention of prohibiting those entities from influencing Ohio elections—channeling foreign organizational money to affiliates who are lawful permanent residents.

The District Court also faulted Ohio's law because it "sweeps in U.S. citizens who share finances with noncitizens," R.32, PageID#1182, but, respectfully, that concern misreads Subsection C of the law. The law does not bar a citizen from making expenditures or contributions from an account shared with a lawful permanent resident. Ohio regulations already explain that contributions made from joint accounts are, "[a]bsent evidence to the contrary," treated as contribution "by the person signing or endorsing the joint check or other written instrument." Ohio Adm. Code 111:2-4-14.

At bottom, the District Court faulted the logical syllogism of Ohio's law: Ohio has a compelling interest in preventing non-citizens from pouring money into Ohio's

elections; lawful permanent residents are non-citizens; therefore, Ohio's law could not be tailored any other way to effectively achieve its purpose.

**B.    The District Court's defense of its overbroad injunction does not hold water.**

The District Court thought its injunction displayed judicial restraint, but it did the opposite. The District Court said it "nullifie[d]" the "definition of foreign national individuals" because it declared the law unconstitutional as applied to lawful permanent residents. R.32, PageID#1187–89. That was error because courts do not nullify laws. *California v. Texas*, 593 U.S. at 672.

The District Court reasoned that the law must be read as if it did not reach "an[y] individual who is not a United States citizen or national," Ohio Rev. Code §3517.121(A)(2)(a), because that definition includes (what the District Court viewed as) an unconstitutional application to lawful permanent residents. *See* R.32, PageID#1188. That led the court to enjoin Ohio from enforcing the law against any foreign-national individual, lawful permanent resident "or otherwise." *Id.* at PageID#1189. That means Ohio cannot enforce any of the law's substantive restrictions against non-citizen individuals. *See* Ohio Rev. Code §3517.121(B)–(D).

The District Court thought that any narrower injunction, such as enjoining enforcement "against only [lawful permanent residents] would" be to "effectively re-write the statute." R.32, PageID#1190. To the District Court's eye, because the

statute defines "foreign nationals" without mentioning lawful permanent residents specifically, the court had to issue the broader injunction. *See id.* at PageID#1190. That logic falls into the trap of viewing the remedy as deciding what words to expurgate from the statute. But courts "do not change statutes," *Lindenbaum v. Realgy, LLC*, 13 F.4th 524, 528 (6th Cir. 2021), although they (sometimes) enjoin their enforcement. Under Article III, an injunction is proper only "insofar as it prohibits unconstitutional applications of the statute." *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 517 (6th Cir. 2006); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006).

The District Court's constitutional conclusions should have led it to enjoin only enforcement against lawful permanent residents. As the court acknowledged, it enjoined likely constitutional applications of the law. R.32, PageID#1190. In taking a "provisions-over-applications" approach to injunctive relief, R.40, PageID#1271, the Court misapprehended its power and duty to enjoin only the unconstitutional applications of a statute while leaving the many constitutional applications in force. Therefore, as an alternative to fully reversing the injunction, the Court should vacate the injunction insofar as it applies to foreign nationals other than lawful permanent residents. The District Court purported to deploy "the narrowest remedy available," R.32, PageID#1189, but the injunction instead works a "'wholesale

destruction' of a statut[e]." *Norton Outdoor Adver., Inc. v. Vill. of St. Bernard, Ohio*, 99 F.4th 840, 852 (6th Cir. 2024) (quotation omitted).

When Ohio sought a stay of this overbroad injunction, the District Court doubled down on its approach. In that opinion, the District Court explained that it was "sever[ing] and strik[ing]" the law's coverage of *all* foreign-national individuals because the *definition* of foreign nationals is overbroad. R.40, PageID#1270–71; *see also* R.32 at PageID#1188 (Ohio law "is overbroad insofar as it sweeps in" lawful permanent residents). But overbreadth doctrine operates at the level of the "law['s] full range of applications," *Moody*, 144 S. Ct. at 2398, not an isolated application. The District Court's misconception on that score led it to choose a remedy that consciously erases the law rather than merely enjoins the application it thought unlawful. And the District Court's reliance on *United States v. Stevens* is misplaced because the law in that case was facially overbroad, 559 U.S. 460, 482 (2010), whereas this law is not.

Finally, the District Court offered no explanation for enjoining the Ohio law as to non-parties. That too is an error that this Court should correct by vacating the injunction insofar as it reaches non-parties.

## CONCLUSION

For these reasons, this Court should reverse the district court's injunction.  In the alternative, it should modify the injunction by limiting it to any unconstitutional applications and limiting it to the party plaintiffs.

<div style="margin-left: 40%;">

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
  *\*Counsel of Record*
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
KATIE ROSE TALLEY
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Appellants/Cross-Appellees*
  *Ohio Attorney General Dave Yost and*
  *Ohio Secretary of State Frank LaRose*

</div>

**CERTIFICATE OF COMPLIANCE**

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 10,288 words.  *See* Fed. R. App. P. 32(a)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2024, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## DESIGNATION OF DISTRICT COURT RECORD

Defendant-Appellants/Cross-Appellees, pursuant to Sixth Circuit Rule 30(g),

designate the following filings from the district court's electronic records:

### *OPAWL v. Yost*, Case No. 2:24-cv-3495

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 6/27/2024 | R. 1; 6, 8–9, 33–47 | Complaint |
| 6/28/2024 | R. 16-2; 111 | Declaration of Chris Knestrick |
| 7/26/2024 | R. 29-3; 1092–95 | Declaration of Brian Katz |
| 8/31/2024 | R. 32; 1166–71, 1177–82, 1187–90 | Opinion and Order |
| 9/2/2024 | R. 33; 1192–93 | Notice of Appeal |
| 9/12/2024 | R. 40; 1259, 1270–71, 1276 | Opinion and Order |
| 9/13/2024 | R. 42; 1285–86 | Notice of Appeal |