No. 24-3768 / 24-3818

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| OPAWL – Building AAPI Feminist Leadership, Northeast Ohio Coalition for the Homeless, Elisa Bredendiek, Peter Quilligan, and John Gerrath,<br><br>    Appellees/Cross-Appellants,<br><br>  v.<br>Dave Yost, in his official capacity as Ohio Attorney General, and Frank LaRose, in his official capacity as Ohio Secretary of State,<br><br>    Appellants/Cross-Appellees. | On Appeal from the<br>United States District Court<br>for the Southern District of Ohio<br><br>*District Court Case No. 24-3495* |

## BRIEF OF APPELLEES/CROSS-APPELLANTS

Elisabeth C. Frost
Jyoti Jasrasaria
Melinda K. Johnson
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: 202-968-4490
efrost@elias.law
jjasrasaria@elias.law
mjohnson@elias.law

C. Benjamin Cooper
Kaela King
COOPER ELLIOTT
305 West Nationwide Blvd
Columbus, OH 43215
Telephone: 614-481-6000
benc@cooperelliott.com
kaelak@cooperelliott.com

*Counsel for Appellees/Cross-Appellants*
OPAWL – Building AAPI Feminist Leadership, Northeast Ohio Coalition for the Homeless, Elisa Bredendiek, Peter Quilligan, and John Gerrath

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the Federal Rules of Appellate Procedure and Sixth Circuit Rule 26.1, counsel for Plaintiffs-Appellees/Cross-Appellants certifies that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation that is not a party to this appeal has a financial interest in its outcome.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ......................................... xi

STATEMENT OF JURISDICTION.......................................................... xii

STATEMENT OF ISSUES ON APPEAL .............................................. xiii

STATEMENT OF ISSUES ON CROSS-APPEAL ............................................ xiii

INTRODUCTION .............................................................................1

STATEMENT OF THE CASE...............................................................4

I.    Background................................................................................4

II.   Procedural History .....................................................................7

SUMMARY OF THE ARGUMENT .....................................................9

STANDARD OF REVIEW .................................................................12

ARGUMENT ....................................................................................13

I.    The district court's injunction should be affirmed. .........................13

   A.   Section 121's prohibition on LPR spending impedes core First Amendment speech and is subject to heightened scrutiny. ...................13

   B.   Section 121 is not narrowly tailored to advance a compelling or sufficiently important state interest.........................................15

   C.   The LPR spending ban is not "analogous" to laws the Supreme Court has upheld. ...........................................................................25

   D.   Ohio's arguments that this Court should apply a lower level of scrutiny are meritless. ...........................................................................28

      1.   Section 121 restricts the speech of citizens as well as noncitizens. ...................................................................28

      2.   At a minimum, the First Amendment protects the political speech rights of LPRs. ...........................................................30

   E.   Neither the district court nor this Court may rewrite Section 121 to apply only to non-LPRs. .........................................................35

   F.   The district court did not err in issuing an injunction that applied beyond the parties. ...................................................................40

   G.   The Court may affirm the district court's same preliminary injunction based on Plaintiffs' equal protection claim. .........................................42

H.   The district court did not abuse its discretion in weighing the remaining factors for preliminary injunctive relief. ................................................. 44

II.   In the alternative, the Court should remand for issuance of an injunction based on Plaintiffs' other claims. ................................................. 47

A.   Section 121's prohibition on ballot-issue spending violates the First Amendment. ................................................. 47

1.   Section 121's prohibition on ballot-issue spending is subject to heightened scrutiny. ................................................. 47

2.   Section 121's restrictions on ballot-issue spending cannot survive heightened scrutiny. ................................................. 49

a.   There is no compelling interest in banning noncitizens from engaging in ballot-issue advocacy. ................................................. 49

i.   The district court's reasoning on this score was fundamentally flawed. ................................................. 50

ii.   Ohio's justifications are without merit. ................................................. 53

b.   Section 121's prohibition on noncitizen ballot-issue advocacy is not sufficiently tailored. ................................................. 55

B.   Section 121 is void for vagueness. ................................................. 57

C.   Section 121 is unconstitutionally overbroad. ................................................. 61

CONCLUSION ................................................. 62

CERTIFICATE OF COMPLIANCE ................................................. 63

CERTIFICATE OF SERVICE ................................................. 64

DESIGNATION OF DISTRICT COURT RECORD ................................................. 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
   585 U.S. 579 (2018) ............................................................................46

*Ambach v. Norwick*,
   441 U.S. 68 (1979) ..............................................................................33

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021) .......................................................................15, 18

*Arizona v. Biden*,
   31 F.4th 469 (6th Cir. 2022) ...............................................................39

*Austin v. Mich. Chamber of Com.*,
   494 U.S. 652 (1990) ............................................................................53

*Ayotte v. Planned Parenthood of N. New England*,
   546 U.S. 320 (2006) .......................................................................36, 57

*Bernal v. Fainter*,
   467 U.S. 216 (1984) .......................................................................42, 43

*Bluman v. FEC*,
   800 F. Supp. 2d 281 (D.D.C. 2011),
   *aff'd*, 565 U.S. 1104 (2012) ........2, 3, 9, 14, 17, 18, 28, 30, 31, 33, 50, 51, 54-56

*Boone Cnty. Republican Party Exec. Comm. v. Wallace*,
   116 F.4th 586 (6th Cir. 2024) ..................................................12, 21, 59

*Boos v. Barry*,
   485 U.S. 312 (1988) ............................................................................39

*Branti v. Finkel*,
   445 U.S. 507 (1980) ............................................................................33

*Bridges v. Wixon*,
   326 U.S. 135 (1945) ............................................................................30

*Brown v. Yost*,
    No. 24-3354, 2024 WL 4847401 (6th Cir. Nov. 21, 2024)...............2, 13, 33, 51

*Buckley v. Valeo*,
    424 U.S. 1 (1976)................................................................9, 13, 14, 32

*Burson v. Freeman*,
    504 U.S. 191 (1992)...................................................................25, 26

*Byrd v. Tenn. Wine & Spirits Retailers Ass'n*,
    883 F.3d 608 (6th Cir. 2018) ...............................................................38

*Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics &*
    *Election Pracs.*,
    No. 23-cv-00450, 2024 WL 866367 (D. Me. Feb. 29, 2024)...........................22

*Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*,
    753 F.2d 1354 (6th Cir. 1985) .........................................................11, 12

*Cincinnati Women's Servs., Inc. v. Taft*,
    468 F.3d 361 (6th Cir. 2006) ...............................................................38

*Citizens Against Rent Control/Coal. For Fair Hous. v. City of Berkeley*,
    454 U.S. 290 (1981)..................................................................11, 48, 50

*Citizens United v. FEC*,
    558 U.S. 310 (2010).........................13, 23, 25, 27, 30, 31, 34, 40, 45, 52–54, 56

*Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trustees*,
    411 F.3d 777 (6th Cir. 2005) .............................................................16

*Eubanks v. Wilkinson*,
    937 F.2d 1118 (6th Cir. 1991) .......................................................10, 38

*FEC v. Beaumont*,
    539 U.S. 146 (2003)...........................................................................33

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978)..................................................3, 14, 30, 48, 51, 52

*Foley v. Connelie*,
    435 U.S. 291 (1978)...........................................................................19

*Gill v. Whitford*,
585 U.S. 48 (2018) ............................................................... 39

*Glenn v. Holder*,
690 F.3d 417 (6th Cir. 2012) ............................................... 41

*Gooding v. Wilson*,
405 U.S. 518 (1972) ............................................................. 61

*Graham v. Richardson*,
403 U.S. 365 (1971) ............................................................. 43

*Graveline v. Johnson*,
747 F. App'x 408 (6th Cir. 2018) ........................................ 46

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................. 61

*In re Griffiths*,
413 U.S. 717 (1973) ............................................................. 17

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ............................................................. 40

*Hill v. Colorado*,
530 U.S. 703 (2000) ....................................................... 11, 58

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ........................................................... 26, 27

*Kohls v. Bonta*,
No. 2:24-CV-02527 JAM-CKD, 2024 WL 4374134 (E.D.
Cal. Oct. 2, 2024) ............................................................... 22

*Labrador v. Poe by & through Poe*,
144 S. Ct. 921 (2024) ........................................................... 39

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich.
Gaming Control Bd.*,
172 F.3d 397 (6th Cir. 1999) ............................................... 13

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965) ............................................................. 29

*League of United Latin Am. Citizens v. Bredesen*,
    500 F.3d 523 (6th Cir. 2007) .......................................................9, 18, 19, 43, 44

*LeClerc v. Webb*,
    419 F.3d 405 (5th Cir. 2005) ..............................................................................19

*Lindsey v. Whitmer*,
    No. 24-1413, 2024 WL 5182650 (6th Cir. Dec. 20, 2024) ................................37

*Martin v. City of Struthers*,
    319 U.S. 141 (1943).............................................................................................29

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923).............................................................................................40

*McCullen v. Coakley*,
    573 U.S. 464 (2014).............................................................................................19

*McCutcheon v. FEC*,
    572 U.S. 185 (2014).............................................................................................53

*Meyer v. Grant*,
    486 U.S. 414 (1988).............................................................................................16

*Mich. State Chamber of Com. v. Austin*,
    832 F.2d 947 (6th Cir. 1987) .........................................................14, 48, 50, 52

*Miller v. City of Cincinnati*,
    622 F.3d 524 (6th Cir. 2010) ..............................................................................42

*Minn. Chamber of Com. v. Choi*,
    707 F. Supp. 3d 846 (D. Minn. 2023)................................................................22

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024).................................................................................38, 61, 62

*N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018).............................................................................................39

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)...............................................................................................3

*NAACP v. Button*,
371 U.S. 415 (1963).................................................................54, 58

*Nat'l Commodity & Barter Ass'n v. Archer*,
31 F.3d 1521 (10th Cir. 1994) ...................................................21, 60

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000).............................................................16, 17, 54

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost*,
118 F.4th 770 (6th Cir. 2024) ..............8, 9, 13, 14, 16 –18, 21–24, 41, 44, 46, 60

*Oregon v. Mitchell*,
400 U.S. 112 (1970).........................................................................31

*Police Dep't of City of Chi. v. Mosley*,
408 U.S. 92 (1972)...........................................................................35

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)..............................................................................54

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................................................................13, 14

*Regan v. Tax'n With Representation of Wash.*,
461 U.S. 540 (1983).........................................................................34

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
860 F.3d 844 (6th Cir. 2017) ............................................................12

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020).........................................................................39

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991).........................................................................20

*Speet v. Schuette*,
726 F.3d 867 (6th Cir. 2013) ......................................................40, 41

*Susan B. Anthony List v. Driehaus*,
814 F.3d 466 (6th Cir. 2016) ............................................................13

*Suster v. Marshall*,
    149 F.3d 523 (6th Cir. 1998) ............................................................... 3

*Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*,
    759 F.3d 522 (6th Cir. 2014) ...............................................19, 35, 40

*Thompson v. Hebdon*,
    7 F.4th 811 (9th Cir. 2021) ................................................................ 31

*TikTok Inc. v. Garland*,
    No. 24-1113, 2024 WL 4996719 (D.C. Cir. Dec. 6, 2024) ................ 29

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    413 U.S. 548 (1973) ........................................................................... 33

*United States v. Alvarez*,
    567 U.S. 709 (2012) ........................................................................... 15

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ............................................................................... 38

*United States v. Neal*,
    577 F. App'x 434 (6th Cir. 2014) ...................................................... 41

*United States v. Raines*,
    362 U.S. 17 (1960) ............................................................................. 40

*United States v. Williams*,
    553 U.S. 285 (2008) .....................................................................12, 61

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976) ............................................................................. 3

*Vidal v. Elster*,
    602 U.S. 286 (2024) ........................................................................... 34

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ........................................................................... 58

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) .......................................................21, 60

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015) ........................................................................27

*Williamson v. Recovery Ltd. P'ship*,
  826 F.3d 297 (6th Cir. 2016) ...........................................................42

*Ex parte Young*,
  209 U.S. 123 (1908) ..........................................................................7

**Constitutions and Statutes**

U.S. Const. amend. XIV .......................................................................42

52 U.S.C. § 30121(b) ...........................................................................18

Ohio Rev. Code § 3517.13(W) ................................................4, 12, 36, 61

Ohio Rev. Code § 3517.121 .......................... 1, 6, 7, 19, 21, 23, 25, 36, 59

**Other Authorities**

Fed. R. Evid. 201 .................................................................................41

Ohio Admin. Code 111:2-4-14 .............................................................45

Sarah Miller & Bryan Baker, *Estimates of the Lawful Permanent
  Resident Population in the United States and the Subpopulation
  Eligible to Naturalize: 2023*, Off. of Homeland Sec. Stats. (Oct.
  2023), https://perma.cc/GG76-A67P ...............................................41

U.S. Dep't of State, *Guidelines for Expeditious Naturalization*,
  https://perma.cc/877P-ZKZY (last accessed Dec. 12, 2024) .............46

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

OPAWL – Building AAPI Feminist Leadership, Northeast Ohio Coalition for the Homeless, Elisa Bredendiek, Peter Quilligan, and John Gerrath respectfully request oral argument pursuant to the Federal Rules of Appellate Procedure and Sixth Circuit Rule 34(a). This case presents issues of exceptional constitutional importance, including the right of noncitizens who are lawful permanent residents of the United States to speak and try to persuade others of their views about issues that directly impact them, their families, and the communities where they live, work, and are raising families. It also impacts the right of domestic organizations to engage in bedrock constitutional speech about issues of public importance. The four judges to have considered the issues thus far in these proceedings have come to divergent conclusions. Oral argument would be beneficial to and aid the Court in properly addressing the issues.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because the complaint raises federal questions. The district court issued a preliminary injunction on August 31, 2024. Prelim. Inj. Order, R.32, PageID#1139–91. Defendants timely filed their notice of appeal on September 2, 2024, Notice of Appeal, R.33, PageID#1192–93, and Plaintiffs timely filed their notice of cross-appeal on September 13, 2024, Notice of Appeal, R.42, PageID#1284; Fed. R. App. P. 4(a). *See* Fed. R. App. P. 4(a). This Court has jurisdiction because the appeal and cross-appeal are from an interlocutory order granting an injunction in part. *See* 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES ON APPEAL

1. Did the district court abuse its discretion in preliminarily enjoining Defendants from enforcing Section 121 based on the statute's definition of individual foreign national, which the legislature purposefully enacted to include lawful permanent residents?

2. In the alternative, should the Court affirm the district court's preliminary injunction because Section 121 unjustifiably discriminates against noncitizens in violation of the Equal Protection Clause?

## STATEMENT OF ISSUES ON CROSS-APPEAL

1. Did the district court err in concluding that Plaintiffs were not likely to succeed on their claim that Section 121's prohibition on ballot-issue spending violate the First Amendment, and should this Court remand to the district court to issue a preliminary injunction based on that claim?

2. Are Plaintiffs likely to succeed on their Fourteenth Amendment challenge to Section 121 because several essential provisions of the law are unconstitutionally vague and invite arbitrary enforcement, and should this Court remand to the district court to issue a preliminary injunction based on that claim?

3. Are Plaintiffs likely to succeed on their overbreadth challenge, and should this Court remand to the district court to issue a preliminary injunction based on that claim?

## INTRODUCTION

It is well established that lawful permanent residents ("LPRs") are entitled to First Amendment protection, including for their political speech. And the Supreme Court has long held that spending to promote or oppose direct democracy measures is core First Amendment expression. Nevertheless, earlier this year, Ohio enacted Ohio Revised Code § 3517.121 ("Section 121"), making it a crime for *any* noncitizen—including LPRs—to engage in *any* political spending.[1]

Section 121's broad prohibitions reach every conceivable type of spending, from direct contributions to independent expenditures, whether made "directly or indirectly through any person or entity," and apply even to spending "in support of or opposition to a statewide ballot issue or question, regardless of whether the ballot issue or question has yet been certified to appear on the ballot." *Id*. § 3517.121(B)(2). At the same time, Section 121 invites political weaponization, mandating that the Attorney General investigate any alleged violation made by any Ohio elector. *Id*. § 3517.121(G)(2)(a). The law's sheer breadth, lack of tailoring, and threat of

---

[1] Section 121 also prohibits such spending by: "[a] government of a foreign country or of a political subdivision of a foreign country;" "[a] foreign political party;" and any entity "organized under the laws of," or that has "its principal place of business in, a foreign country." *Id*. §§ 3517.121(A)(2)(b)-(d). Plaintiffs' challenge is concerned with the political spending of individuals reached by the law's definition of "foreign national" in § 3517.121(A)(2)(a): "In the case of an individual, an individual who is not a United States citizen or national." Plaintiffs do not challenge the enforcement of Section 121 based on the other definitions of "foreign national."

unrestrained investigations threaten and will chill the core First Amendment activity of not just noncitizens, but also citizens and domestic organizations who take donations from noncitizens or involve noncitizen decisionmakers.

No other state has a law like this, for good reason—it is utterly unconstitutional. Yet Ohio insists it is allowed to broadly muzzle this core First Amendment-protected activity, contending that Section 121 survives heightened scrutiny based on generalized concerns about "foreign money" "influencing" Ohio elections. In the alternative, Ohio argues the Court need not consider the First Amendment at all, claiming that there is a "categorical exclusion" for noncitizen speech that relates to "the mechanics of self-government," State Br. 29, a term it defines to swallow up even speech by LPRs who seek to persuade their fellow Ohioans on pure policy issues that may be on the ballot. *But see Brown v. Yost*, No. 24-3354, 2024 WL 4847401, at *5 (6th Cir. Nov. 21, 2024) (Thapar, J., concurring) (recognizing "a state's efforts to limit private expression by those trying to convince others to vote a certain way likely raises serious First Amendment problems").

In support, Ohio relies overwhelmingly on a reading of *Bluman v. Federal Election Commission*, 800 F. Supp. 2d 281, 288 n.3 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012), that is at odds with the decision itself. *Bluman* held that Congress may constitutionally prohibit ***foreign citizens other than LPRs*** from ***directly contributing to candidates or to expressly advocate for the election or defeat of a***

2

*candidate*, but in writing for that court, then-Judge Kavanaugh repeatedly cautioned that restrictions on political spending *by LPRs* or *for issue advocacy* would raise substantial constitutional questions. *See, e.g.*, *id.* at 292 (making explicit court was *not* deciding whether Congress could extend ban to LPRs or restrict noncitizens engaging in "issue advocacy and speaking out on issues of public policy," warning its holding "should not be read to support such bans").

The *Bluman* court was right to be concerned—and this Court should be, too, now that Ohio has enacted such a ban. At the heart of the First Amendment is a sacrosanct protection of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Ohio may not interfere merely because it fears advocacy may persuade the electorate. This is particularly so when it comes to ballot issues, where "the direct participation of the people . . . increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 n.29 (1978) (cleaned up). That view further reflects the fact that, at stake are not only the rights of the speakers, but the listeners, too, who have a First Amendment "right to receive information and ideas." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 757 (1976) (quotation omitted); *see also Suster v. Marshall*, 149 F.3d 523, 533 (6th Cir. 1998).

3

Before Section 121 took effect, the district court issued the narrowest possible preliminary injunction. That injunction, now stayed, prohibited the enforcement of Section 121 based on its definition of individual noncitizen and was entirely proper in scope. Indeed, the district court could have issued an injunction under any number of theories, including some that it did not reach because the remedy that it issued sufficed to protect Plaintiffs from irreparable harm. This Court should affirm the preliminary injunction entered by the district court. In the alternative, it should find that Section 121 is constitutionally infirm on one or more of the other grounds pressed by Plaintiffs and remand for entry of an appropriate injunction.

## STATEMENT OF THE CASE

## I.    Background

Section 121 was enacted in June 2024. It modifies Ohio's previously existing restrictions on political spending by foreign nationals in two major ways. First, it expands the definition of individual "foreign national" to include LPRs. As under federal law, Ohio had previously exempted LPRs from its noncitizen political spending prohibitions.[2] With Section 121's enactment, LPRs are banned from effectively all political spending in Ohio. Second, Section 121 prohibits spending or

---

[2] Consistent with federal law, Ohio prohibited noncitizens—but not LPRs—from contributing or making express-advocacy expenditures in support of or opposition to the election of candidates, and prohibited candidates, campaign committees, and political parties from accepting the same. *See* Ohio Rev. Code § 3517.13(W). Those prohibitions remain in effect and are not at issue in this case.

receiving any noncitizen funds for ballot-issue advocacy. Before Section 121's enactment (and consistent with federal law), Ohio's prohibitions on non-LPR noncitizen spending were restricted to candidate-related spending. The district court found Plaintiffs were likely to prove Section 121 unconstitutional based on its inclusion of LPRs; that is the subject of Ohio's appeal. Although recognizing it was a "close question," the district court found that Section 121's restrictions on ballot-issue advocacy were likely to survive scrutiny; that issue forms the primary basis of Plaintiffs' cross-appeal.

Plaintiffs are two LPRs who are long-time Ohio residents, a U.S. citizen married to an LPR, and two domestic Ohio-based nonprofits—OPAWL – Building AAPI Feminist Leadership ("OPAWL") and Northeast Ohio Coalition for the Homeless ("NEOCH"). Compl., R.1, PageID#6–11. OPAWL has more than 350 Ohio members, including noncitizens or persons with noncitizen family members, many of whom donate to support OPAWL's ballot-issue advocacy. Decl. of Jona Hilario, R.16-1, PageID#102–05 ("Hilario (OPAWL) Decl."). NEOCH is a Cleveland-based charitable organization that advocates to eliminate the root causes of homelessness, including through contributions to ballot-issue committees and spending to advocate for or against ballot issues. Decl. of Chris Knestrick, R.16-2, PageID#109–10 ("Knestrick (NEOCH) Decl."). Both organizations are funded by grants and donations, and neither asks about the citizenship of donors nor requires

donors do so before issuing grants. Hilario (OPAWL) Decl., R.16-1, PageID#105; Knestrick (NEOCH) Decl., R.16-2, PageID#110–11. Each Plaintiff—and in the case of OPAWL, its individual members—participates in issue advocacy in Ohio and will have their speech and associational rights chilled by Section 121's broad prohibitions. *See* Hilario (NEOCH) Decl., R.16-1, PageID#107; Knestrick (NEOCH) Decl., R.16-2, PageID#113; Decl. of John Gerrath, R.16-3, PageID#119–20 ("Gerrath Decl."); Decl. of Elisa Bredendiek, R.16-4, PageID#123–24 ("Bredendiek Decl."); Decl. of Peter Quilligan, R.16-5, PageID#128–29 ("Quilligan Decl."); Decl. of Sarah Imran, R.16-6, PageID#131–34.

Section 121 restricts ballot-issue advocacy in Ohio from three directions:

- Division (B) prohibits any "foreign national," including LPRs, from "directly or indirectly" making any "contribution, expenditure, or independent expenditure in support of or opposition to a statewide ballot issue or question," regardless of whether it "has yet been certified to appear on the ballot"; making any "contribution . . . to any committee created to support or oppose a ballot issue or question, or, to the maximum extent permitted by law and by the [U.S. and Ohio] constitutions . . . to a continuing association"; or making a "[p]romise, either expressly or implicitly, to" engage in any of the spending prohibited in division (B). Ohio Rev. Code §§ 3517.121(B), (B)(2), (B)(4), (B)(5).

- Division (C) prohibits "solicit[ing], accept[ing], or receiv[ing] any funds from a foreign national for any purpose described in division (B)," *id.* §§ 3517.121(C), (C)(1), or "mak[ing] a contribution, expenditure, or independent expenditure using any funds the person knows were received from a foreign national for any purpose described in division (B)," *id.* § 3517.121(C)(2).

- Division (D) prohibits anyone from "knowingly aid[ing] or facilitat[ing] a violation of division (B) or (C)." *Id.* § 3517.121(D).

Violations are a misdemeanor for a first offense and a felony for subsequent offenses, and are subject to mandatory fines up to "three times the amount involved in the violation or ten thousand dollars, whichever amount is greater." *Id.* § 3517.121(F). The Attorney General has exclusive enforcement authority and is required to investigate alleged violations (in consultation with the Secretary of State) on a complaint from the Governor, Secretary of State, General Assembly, Ohio Elections Commission, or any Ohio elector. *Id.* §§ 3517.121(G)(1), (2).

## II. Procedural History

Plaintiffs filed suit shortly after the Governor signed Section 121, challenging it under the First and Fourteenth Amendments, and sought a preliminary injunction before the law would take effect on September 1, 2024. Pls.' Mot. for Prelim. Inj., R.16, PageID#79 ("PI Mot.").

The district court granted that motion in part on August 31, enjoining Ohio from enforcing Section 121 based on the definition of individual "foreign national" in Section 3517.121(A)(2)(a).[3] Prelim. Inj. Order, R.32, PageID#1189–91 ("PI Order"). This allowed Ohio to continue enforcing Section 121 as to foreign governments, foreign political parties, and entities organized under foreign law or

---

[3] Defendants are Ohio Secretary of State Frank LaRose and Ohio Attorney General Dave Yost, both of whom have enforcement authority for Section 121 and are sued in their official capacities. *Ex parte Young*, 209 U.S. 123, 155–56 (1908). This brief refers to Defendants as "Ohio."

with their principal place of business in a foreign country. *See* Stay Order, R.40, PageID#1273–74 & n.13.

Ohio filed a motion to stay, which the district court denied in a carefully considered opinion. *Id.* at PageID#1256–78. Ohio then sought an emergency stay from this Court, Defs.' Mot. for Stay Pending Appeal, Doc. 15 ("State Stay Mot."), a request a divided panel ultimately granted. *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 773 (6th Cir. 2024). In that opinion and order, the majority agreed that "contributions and expenditures are speech," *id.* at 776; that LPRs "have First Amendment rights," *id.*; and that "Section 121 triggers First Amendment scrutiny," *id*. It nevertheless stayed the injunction pending the outcome of this appeal based on its conclusion that "Ohio has demonstrated a sufficient evidentiary link between its restriction on the political speech of [LPRs] and its compelling interest in preventing foreign influence in elections." *Id*. at 780. It did not address Plaintiffs' separate void-for-vagueness or equal protection arguments.

Judge Davis dissented, concluding that "§ 121 is unlikely to pass constitutional muster applying either strict or intermediate scrutiny." *Id.* at 786 (Davis, J., dissenting). Judge Davis found "it is unlikely that a full bar against protected political speech of the sort restricted by § 121 is sufficiently tailored to serve the general aims of the state's interest." *Id*. at 788. Judge Davis detailed "LPRs'[] distinct status" in the context of "their First Amendment protected speech

8

rights" and found Section 121 "unnecessarily expands First Amendment burdens to domestic advocacy organizations and nonprofits" as well as citizens. *Id*. at 789–91. Judge Davis further found that "the interest of limiting foreign influence in Ohio's political process can be met without abridging the rights of an entire category of right-holders," *id.* at 793, and would have denied the stay motion, *id.* at 794.

## SUMMARY OF THE ARGUMENT

This Court should affirm the preliminary injunction. In the alternative, it should find that Plaintiffs are likely to succeed on their other constitutional challenges and remand for entry of a preliminary injunction consistent with the same.

I.     The district court correctly found that Plaintiffs were likely to succeed in proving that Section 121's definition of individual "foreign national" violates the First Amendment because it restricts LPR political spending. Because the law targets core political speech, it is subject to heightened scrutiny. *See Buckley v. Valeo*, 424 U.S. 1, 14–17 (1976). It cannot survive.

Courts have long recognized that LPRs have more in common with citizens than other noncitizens when it comes to their integration in American society and their stake in its policies. *See, e.g.*, *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523 (6th Cir. 2007) ("*LULAC*"); *Bluman*, 800 F. Supp. 2d at 287. Moreover, because Section 121's prohibition on LPR spending also threatens U.S.

citizens and entities, and sweeps in even small-dollar expenditures, it is overinclusive. Ohio's arguments to the contrary lack merit.

The district court granted a preliminary injunction on the narrowest possible terms—restricting Ohio only from enforcing Section 121's definition of individual "foreign national." That injunction left Ohio free to enforce Section 121's restrictions as to all of its other definitions of "foreign national," including foreign governments, foreign political parties, and entities organized under the laws of or that have their principal place of business in a foreign country.

The district court properly concluded that it could not rewrite Section 121 to apply only to non-LPRs—particularly where the General Assembly rejected the very legislation that Ohio asked the court to impose by judicial fiat. *See Eubanks v. Wilkinson*, 937 F.2d 1118, 1127 (6th Cir. 1991). And Ohio never argued that the injunction should be limited to the parties. That argument is accordingly forfeited. It is also without merit.

Moreover, the district court could have issued—and this Court could affirm—the exact same injunction on the ground that Section 121 unjustifiably discriminates against noncitizens in violation of the Equal Protection Clause. The district court did not reach this argument because its First Amendment conclusions had the same effect.

The district court also did not abuse its discretion when it found the remaining factors favored an injunction. Ohio fails to identify a clearly erroneous fact or an improper application of the law in the court's order that would constitute an abuse of discretion. *See Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985).

II.    If the Court affirms the preliminary injunction on the above grounds, it need go no further. But there are multiple other bases upon which Plaintiffs are likely to prove Section 121 unconstitutional, which the district court did not reach or erroneously rejected. In the alternative, this Court should find that Plaintiffs are likely to succeed on these other grounds and remand for issuance of a preliminary injunction consistent with those findings.

First, Section 121's restrictions on ballot-issue advocacy violate Plaintiffs' First Amendment rights. Ohio must show these restrictions satisfy strict or exacting scrutiny, which it did not and cannot do. In fact, more than 40 years ago, the Supreme Court held that "there is *no significant state or public interest* in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control/Coal. For Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299 (1981) (emphasis added).

Second, Section 121 is unconstitutionally vague, most glaringly in its enforcement provisions, which fail to provide fair notice of what is prohibited and invite arbitrary and discriminatory enforcement. *Hill v. Colorado*, 530 U.S. 703, 732

(2000). As this Court recognized earlier this year in *Boone County Republican Party Executive Committee v. Wallace*, 116 F.4th 586, 595–96 (6th Cir. 2024), even a less restrictive law that "allow[ed] complaints from" the public "create[d] a 'real risk of complaints from . . . opponents,' with an intent to frustrate speech they oppose," posing a serious First Amendment threat. *Id.* at 595 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014)).

Finally, Section 121 is unconstitutionally overbroad because all of its applications (aside from those that are duplicative of Ohio Revised Code § 3517.13(W)) are unconstitutional; simply put, it has no "legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008).

## STANDARD OF REVIEW

The district court's decision to grant a motion for preliminary injunction is reviewed for abuse of discretion. *Christian Schmidt Brewing Co.*, 753 F.2d at 1356. Its legal conclusions are reviewed *de novo*, and its factual findings for clear error. *See S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).

# ARGUMENT

## I.    The district court's injunction should be affirmed.

### A.    Section 121's prohibition on LPR spending impedes core First Amendment speech and is subject to heightened scrutiny.

Political expenditures and contributions are political speech entitled to vigorous First Amendment protection. *See Buckley*, 424 U.S. at 14–17; *see also OPAWL*, 118 F.4th at 776 ("To be sure, contributions and expenditures are speech."); *Brown*, 2024 WL 4847401, at *11 (Thapar, J., concurring) (explaining a provision "regulate[s] political expression" if, under it, would-be speakers are not "free to make the same amount of political expression, using the same methods, as they would be able to make without the [] provision"). Courts "consistently err[]" toward "permitting more political speech than less," *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016), recognizing the "risk that parties will self-censor, thereby chilling speech[]" and impeding their "ability . . . to take a particular political position freely," *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 407 (6th Cir. 1999).

"Laws that burden political speech are subject to strict scrutiny." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (quotation marks and citation omitted). Because expenditures are "core" political expression, laws that limit them are reviewed under strict scrutiny, requiring the state to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*

*v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (cleaned up); *see also Buckley*, 424 U.S. at 25. Courts review contribution restrictions under "exacting scrutiny," requiring the state show "a sufficiently important [state] interest and employ[] means closely drawn to avoid unnecessary abridgment of [First Amendment] freedoms." *Buckley*, 424 U.S. at 25; *see also Mich. State Chamber of Com. v. Austin*, 832 F.2d 947, 949–50 (6th Cir. 1987).[4]

Section 121 is also separately subject to strict scrutiny because its political spending restrictions are content-based, "dictating the subjects about which persons may speak and the speakers who may address a public issue." *Bellotti*, 435 U.S. at 784–85; *see also Reed*, 576 U.S. at 163 ("Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").

---

[4] Although the stay majority wrote that *Bluman* "suggests that a lesser level of scrutiny could apply to § 121 than with traditional campaign finance regulations," *OPAWL*, 118 F.4th at 777, the *Bluman* opinion does not support that assertion. Immediately after stating that "foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government," *Bluman* explains: "It follows, therefore, that the United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." 800 F. Supp. 2d at 288. Thus, this language simply identifies the compelling interest the United States had in the law at issue. *See* Stay Order, R.40, PageID#1260. And *Bluman* goes on to carefully apply strict scrutiny to that law. *See* 800 F. Supp. 2d at 285.

Ohio has failed to carry its burden under either strict or exacting scrutiny.

**B.    Section 121 is not narrowly tailored to advance a compelling or sufficiently important state interest.**

Setting aside whether Ohio has a compelling or important interest in preventing foreign spending on ballot-issue advocacy (discussed *infra* at Argument II.A.2.a), the district court correctly concluded that Section 121's inclusion of LPRs cannot survive constitutional scrutiny because it is not sufficiently tailored to Ohio's purported interest in preventing foreign influence in its elections. This is both because the prohibition on LPR spending does not advance the state's asserted interest, and because it is overinclusive. *See* PI Order, R.32, PageID#1177–83.

For a court to find that a law advances a state interest, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." *United States v. Alvarez*, 567 U.S. 709, 725 (2012); *see also Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021) ("[E]xacting scrutiny . . . require[s] that [challenged laws] be narrowly tailored to the government's asserted interest."). Here, that means Ohio must link prohibiting LPRs' political speech to preventing foreign influence in its elections. It has not done so, either in this litigation or during the legislative process itself. Indeed, "no legislator. . . discussed any actual evidence of undue foreign influence from LPRs." PI Order, R.32, PageID#1180.

That complete lack of evidence is fatal: Because Section 121 "trenches upon an area in which the importance of First Amendment protections is 'at its zenith,'"

Ohio has a heavy burden to justify it. *Meyer v. Grant*, 486 U.S. 414, 425–26 (1988) (finding proffered interest of preventing circulator misconduct insufficient where "[n]o evidence" was "offered to support that speculation," and Court was "not prepared to assume" it); *see also Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 804 (6th Cir. 2005) (Clay, J., concurring) (explaining in First Amendment context state bears burden of proffering evidence that law is narrowly tailored).

Ohio's failure is even more notable in light of Section 121's novelty. *See Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 378–79 (2000) (noting the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny" varies "up or down with the novelty and plausibility of the justification raised"); *see also OPAWL*, 118 F.4th at 782 n.3 (characterizing law as "novel[]"). Unlike in *Nixon*, there is no evidentiary record from an analogous spending limit challenge, no legislative affidavit, no newspaper account, and no academic study supporting Section 121's restrictions. 528 U.S. at 391–97 (detailing extensive evidence in support of challenged contribution limit).[5] And, on this issue, Ohio is unique among states. *See OPAWL*, 118 F.4th at 782 n.3 (acknowledging "Ohio is the first state to include

---

[5] Although the stay majority attempted to offer examples where Ohio did not, *OPAWL*, 118 F.4th at 777, none involve LPRs' political spending and thus fail to evidence the required link. *See id.* at 790 (Davis, J., dissenting) (noting the examples either implicate political spending or LPRs but not both).

[LPRs] in its definition of foreign nationals" and that "a regulation's novelty can sometimes serve as circumstantial evidence of its unconstitutionality" (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505–06 (2010))).

Instead of acting based on evidence, Ohio appears to have acted based on pure conjecture. *See* State Stay Mot. 13 ("Ohio deserves the benefit of the doubt."); *OPAWL*, 118 F.4th at 781 ("[Foreign] money may have been flowing from [LPRs]; it may not have. Ohio couldn't tell."). But courts "have never accepted mere conjecture as adequate to carry a First Amendment burden," *Nixon*, 528 U.S. at 392. What's more, there is significant evidence "to cast doubt on" Ohio's justification here. *Id.* at 394. As then-Judge Kavanaugh explained in *Bluman*, "[LPRs] can be viewed as more similar to citizens than they are to temporary visitors": They "have a long-term stake in the flourishing of American society" and "share important rights and obligations with citizens," including that they "may—and do, in large numbers" serve in the military. 800 F. Supp. 2d at 290–91; *see also In re Griffiths*, 413 U.S. 717, 722 (1973) ("Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society."); PI Order, R.32, PageID#1182 ("[I]f the U.S. Federal Government trusts LPRs to put U.S. interests first in the military (of all places), how could this Court hold that it does not trust them to promote U.S. interests in their political spending? It cannot.").

Reflecting their unique position, LPRs are exempt from the federal statute that prohibits other foreign nationals from making campaign contributions directly to *candidates*. 52 U.S.C. § 30121(b). In upholding that statute, moreover, then-Judge Kavanaugh suggested that "Congress's carve-out for [LPRs] makes the statute more narrowly tailored to the precise interest that it is designed to serve—namely, minimizing *foreign* participation in and influence over American self-government." *Bluman*, 800 F. Supp. 2d at 291. And, as Judge Davis underscored in dissenting from the stay panel majority opinion, LPRs also may make expenditure and contribution decisions for domestic corporations with foreign parent companies, unlike other noncitizens. *OPAWL*, 118 F.4th at 791 (Davis, J., dissenting) (citing *Citizens United*, 558 U.S. at 365; 11 C.F.R. § 110.20). These exceptions for LPRs in federal law show that less burdensome alternatives to Section 121's broad prohibition exist. *See Bonta*, 594 U.S. at 613 (requiring state to show "its need for [the challenged regime] in light of any less intrusive alternatives" under exacting scrutiny).

This Court has also recognized that "[t]here are abundant good reasons, both legal and pragmatic," to treat LPRs differently than other noncitizens. *LULAC*, 500 F.3d at 533. Namely, "permanent resident aliens are 'virtual citizens' who are 'legally entrenched in society.'" *Id.* (quoting *LeClerc v. Webb*, 419 F.3d 405, 417 (5th Cir. 2005)); *see also* Gerrath Decl., R.16-3, PageID#116–17; Bredendiek Decl., R.16-4, PageID#122–23. But their inability to vote makes them unable "to exert

18

political power in their own interest," *LeClerc*, 419 F.3d at 417; *see also LULAC*, 500 F.3d at 533 (adopting *LeClerc*'s analysis). Accordingly, even though LPRs "have no direct voice in the political processes," *Foley v. Connelie*, 435 U.S. 291, 294 (1978), their interest in U.S. federal, state, and local policies and policymakers is significant and deeply personal. *LeClerc*, 419 F.3d at 417; *see also* Gerrath Decl., R.16-3, PageID#117–18; Bredendiek Decl., R.16-4, PageID#123–24. For Ohio to assume, without evidence, that LPRs' political spending—which provides a rare avenue for these virtual citizens to advocate for or against policies that impact them—is a conduit of foreign influence, simply does not make sense.

Ohio's assertion that Section 121 is a "prophylactic against foreign . . . corporations operating abroad" "pouring money into Ohio's campaigns," State Br. 44, is neither properly before the Court nor well founded. Ohio baldly asserts that it would be "easy" for these entities to influence Ohio elections by "channeling foreign organizational money to affiliates who are [LPRs]." *Id.* But this argument was not raised below and was accordingly forfeited. *See, e.g.*, *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 528 (6th Cir. 2014). Moreover, Ohio's purported goal in avoiding contributions by foreign entities is prohibited by other provisions of Section 121 that are not enjoined, including for contributions made "indirectly." Ohio Rev. Code § 3517.121(B); *see also, e.g.*, *McCullen v. Coakley*,

573 U.S. 464, 478, 492 (2014) (finding statute not narrowly tailored where state's purported interest "can readily be addressed through existing" ordinances).

Although the lack of any link between Ohio's interest and Section 121's ban on LPR spending is alone sufficient to affirm the injunction, the district court also correctly found that Section 121 is overinclusive, another reason it is not closely drawn. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 122 n.* (1991). By its plain terms, Section 121 sweeps in U.S. citizens—both individuals and domestic organizations—as well as small-dollar expenditures that are incidental to even the "communication channels" that Ohio and the stay majority endorse. *See* State Br. 24 (asserting that "Ohio's law leaves unblocked many communication channels").

Take U.S. citizen Plaintiff Peter Quilligan. The district court correctly found that Section 121 puts him at risk of being investigated and prosecuted for making expenditures and contributions from bank accounts he shares with LPR family members. Quilligan Decl., R.16-5, PageID#128–29; PI Order, R.32, PageID#1182–83. In response, Ohio claims that state regulations "explain that contributions made from joint accounts are, '[a]bsent evidence to the contrary,' treated as contribution [sic] 'by the person signing or endorsing the joint check or other written instrument." State Br. 44 (quoting Ohio Admin. Code 111:2-4-14, a reporting regulation).

Ohio far overstates the impact of this regulation, which simply addresses how campaign treasurers should report direct contributions to campaigns made on written instruments from joint accounts. It does nothing to restrain the application of Section 121, much less create an exception to its expansive enforcement provisions, which *require* the Attorney General to investigate any allegations of violations made by the Governor, Secretary of State, General Assembly, Elections Commission, or *any* Ohio elector. Ohio Rev. Code § 3517.121(G)(2)(a) (stating Attorney General "shall" investigate a written request alleging a violation from any of the foregoing); *see also OPAWL*, 118 F.4th at 793 (Davis, J., dissenting) (noting "how a contribution may be reported for administrative purposes does not directly address whether the contribution is lawful").[6]

Section 121's broad mandatory enforcement provisions alone raise a serious threat to Plaintiffs' First Amendment rights. *See, e.g.*, *Boone Cnty. Republican Party*, 116 F.4th at 595–96; *White v. Lee*, 227 F.3d 1214, 1226 (9th Cir. 2000); *Nat'l*

---

[6] Ohio's reliance on this regulation, moreover, ignores the sheer sweep of Section 121's restrictions, which apply not only to contributions to campaign committees made through written instruments, but to *all* political spending. And, as Judge Davis noted, the regulation's inclusion of the phrase "[a]bsent evidence to the contrary" "leaves open the possibility that Ohio will rigorously question the authenticity and accurateness of checks from joint accounts. Accordingly, citizens could be pursued civilly or criminally for exercising their First Amendment rights to political speech." *OPAWL*, 118 F.4th at 793 (Davis, J., dissenting). Nor has Ohio ever asserted that criminal liability under Section 121 could not possibly apply to spending from joint accounts. *But see OPAWL*, 118 F.4th at 783 (majority op.).

*Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1530 (10th Cir. 1994). This is all the more so because Section 121 suppresses speech in a "political context," where such laws can be especially "perilous" because they "open[] the door for the state to use its power for political ends.'" *Kohls v. Bonta*, No. 2:24-CV-02527 JAM-CKD, 2024 WL 4374134, at *5 (E.D. Cal. Oct. 2, 2024) (quoting *Alvarez*, 567 U.S. at 852 (Alito, J., dissenting)).

Section 121 is also overinclusive because it sweeps in domestic advocacy organizations and nonprofits by restricting their ability to spend money in the political arena, including on issue advocacy, if they receive even small amounts of revenue or funding in any form from LPR members or supporters. *See* Hilario (OPAWL) Decl., R.16-1, PageID#107; Knestrick (NEOCH) Decl., R.16-2, PageID#113. Courts have enjoined laws that regulate the political spending of domestic corporations with minimal foreign ownership because they would deprive U.S. citizen shareholders of their rights. *See, e.g.*, *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, No. 23-cv-00450, 2024 WL 866367 (D. Me. Feb. 29, 2024); *Minn. Chamber of Com. v. Choi*, 707 F. Supp. 3d 846 (D. Minn. 2023). That logic applies equally here.[7]

---

[7] Plaintiffs agree that *Citizens United* likely "jeopardizes potential prohibitions on speech by certain foreign-owned corporations." *OPAWL*, 118 F.4th at 785. While Section 121 may not be underinclusive by way of its failure to regulate such corporations, *but see* PI Order, R.32, PageID#1183-85, the Court's logic in *Citizens*

Any argument that domestic organizations may simply segregate contributions from LPRs (or other foreign nationals), *see OPAWL*, 118 F.4th at 784, runs headlong into the Supreme Court's decision in *Citizens United*, which found that the existence of a "burdensome alternative[]" that is "expensive to administer," like establishing a political action committee or, here, segregating funds, "does not alleviate the First Amendment problems" with the challenged regime. 558 U.S. at 337. Indeed, Plaintiffs OPAWL and NEOCH have explained how "onerous" it would be to develop the necessary systems to segregate funds. Hilario (OPAWL) Decl., R.16-1, PageID#105–07; Knestrick (NEOCH) Decl., R.16-2, PageID#111–13. This is especially true where Section 121 appears to be backward-looking: Division (C)(2) appears to criminalize the use of noncitizen funds that were "received" *prior* to Section 121 taking effect. Ohio Rev. Code § 3517.121(C)(2).

Section 121 is also overinclusive because its sweeping text prohibits even small-dollar expenditures that are incidental to non-monetary advocacy. Although Ohio contends that "[n]othing prevents foreign nationals from speaking, marching lawfully and peacefully, publishing editorials, or posting political arguments on the

---

*United* would seem to apply to Section 121's treatment of nonprofit organizations, providing further evidence the law violates the First Amendment. *See OPAWL*, 118 F.4th at 791–92 (Davis, J., dissenting).

internet," State Br. 24, Section 121 criminalizes even independent expenditures of nominal value, many of which are inherent in *any* form of speech.

For example, Plaintiff Elisa Bredendiek is now "wary of attending protests or rallies, because [she] ha[s] to make small expenditures for gas, parking, and supplies in order to participate in them," which she fears could violate Section 121's ban on noncitizens making "independent expenditure[s] in support of or opposition to a statewide ballot issue or question," especially since the ban applies to issues "regardless of whether [they] ha[ve] yet been certified to appear on the ballot." Bredendiek Decl., R.16-4, PageID#124 (quoting Ohio Rev. Code § 3517.121(B)(2)). Ohio has never disputed this reading of Section 121. Nor has it denied that it could reach a student who spends gift money from their noncitizen grandfather on markers and signs to protest for their rights. *See* Ex. L, R.16-7, PageID#893–94.[8]

Ohio's only argument as to why Section 121 is not overinclusive is that its goal is "to block the reality and perception of foreign money being spent on Ohio elections." State Br. 24. But the Supreme Court rejected this justification as inadequate to support restrictions on speech in *Citizens United*, where it found: "The

---

[8] For the same reasons, the stay majority's conclusion that noncitizens could still create "homemade yard-signs," *OPAWL*, 118 F.4th at 783, is at odds with the plain text of Section 121. That kind of expression, too, requires some expenditure of funds (e.g., for posterboard and markers), and no one has disputed that the purchase of such materials to engage in the political advocacy targeted by Section 121 would fall within its broad and unrestricted ambit. *See* Ex. L, R.16-7, PageID#893-94.

appearance of influence or access [] will not cause the electorate to lose faith in our democracy." 558 U.S. at 360. "The fact that . . . any [] speaker[] is willing to spend money to try to persuade voters presupposes that the [voters] have the ultimate influence over [their elections]. This is inconsistent with any suggestion that the electorate will refuse to take part in democratic governance because of additional political speech made by a corporation or any other speaker." *Id.* (quotation omitted).

### C. The LPR spending ban is not "analogous" to laws the Supreme Court has upheld.

Each of the cases that Ohio relies upon to claim that Section 121 can survive strict scrutiny are inapposite.

*Burson v. Freeman*, 504 U.S. 191 (1992), concerned a challenge to Tennessee statutes prohibiting solicitation of voters and display of campaign materials within 100 feet of a polling place on election day. The Court upheld the laws because the "minor geographic limitation [they] prescribed" did not constitute a "significant impingement" on First Amendment rights. *Id.* at 210 (acknowledging "[a]t some measurable distance from the polls, of course, governmental regulation of vote solicitation could effectively become an impermissible burden"). In contrast, Section 121 is virtually limitless in scope: It prohibits all noncitizen election-related spending—even small-dollar independent expenditures to support an issue that may never actually appear on the ballot. *See* Ohio Rev. Code § 3517.121(B)(2). *Burson* moreover relied on "[a] long history, a substantial consensus, and simple common

sense," 504 U.S. at 211—with an emphasis on the first two. The Court spent pages examining "the evolution of election reform, both in this country and abroad," *id.* at 200, and noted that "all 50 States limit access to the areas in or around polling places," *id.* at 206. Here, Ohio is undisputedly an outlier, and there is no similar support for broadly restricting LPR spending the way Section 121 does. *See supra* Argument I.B.

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the plaintiffs sought to "provide material support to [foreign terrorist organizations] in the form of speech," in violation of a U.S. statute. *Id.* at 28. In holding that the statute survived strict scrutiny, *Holder* emphasized that "Congress made specific findings regarding the serious threat posed by international terrorism," including about "[w]hether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism." *Id.* at 29. The Court's decision was thus based on "inferences drawn from the record evidence," Congress's findings, and "an affidavit stating the Executive Branch's conclusion," *id.* at 33, none of which Ohio has here, *see supra* Argument I.B. And Section 121 sweeps far more broadly than the statute at issue in *Holder*, which "displayed a careful balancing of interests in creating limited exceptions to the ban." 561 U.S. at 36.[9] "[M]ost importantly,

---

[9] In attempting to analogize Section 121 and the federal law at issue in *Holder*, Ohio also ignores that "the considered judgment of Congress and the Executive"—unlike

Congress [] avoided any restriction on independent advocacy," *id.*—a far cry from Section 121's ban on independent expenditures.

Likewise, the rule at issue in *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015), which prohibited judicial candidates from personally soliciting campaign funds, is drastically more tailored than Section 121. Judicial candidates remained free to discuss any issue and use any means of contacting supporters and promoting their campaigns; they were only restricted from making the direct ask of, "Please give me money," but they were free to "direct their campaign committees to do so." *Id.* at 452. Furthermore, in that case, the Supreme Court made clear that judicial elections and political elections are different in kind, such that precedents in one context "have little bearing" on the other. *Id.* at 446–47.

Ohio's citation to *Citizens United* is likewise misplaced. It did not reach the question of whether "the Government has a compelling interest in limiting foreign influence over our political process;" in fact, the only foreign spending restrictions it references expressly exclude LPRs. 558 U.S. at 362.

Finally, Ohio's reliance on *Bluman* is fatally flawed. *See* Stay Order, R.40, PageID#1258 ("Defendants' interpretation of *Bluman* relies on two things: out-of-context cases and an out-of-context quotation."). As Ohio acknowledges, *Bluman*

---

that of a state legislature—"is entitled to significant weight . . . [g]iven the sensitive interests in national security and foreign affairs at stake." 561 U.S. at 36.

considered a markedly different law that expressly exempted LPRs from its political-spending restrictions. State Br. 21. That is a critical difference. Indeed, the *Bluman* court suggested that the "carve-out for [LPRs]" made that statute "*more narrowly tailored to the precise interest that it is designed to serve—namely, minimizing* foreign *participation in and influence over American self-government*." 800 F. Supp. 2d at 291 (emphasis added). Ohio seeks to turn *Bluman* on its head, enacting a *far* broader law and then arguing that it is narrowly tailored. This is plainly wrong. *See* PI Order, R.32, PageID#1180–81; Stay Order, R.40, PageID#1266.

> ### D.    Ohio's arguments that this Court should apply a lower level of scrutiny are meritless.

After spending pages attempting to justify Section 121 under strict scrutiny, Ohio expresses its "view"—which predominated in its briefing below—that the Court need not bother with the First Amendment at all, claiming there is a "categorical exclusion" from the right of free speech for all noncitizens on any subject that may be characterized as relating to "the mechanics of self-government." State Br. 29. At the very least, Ohio now posits for the first time, the Court should apply "intermediate scrutiny." *Id*. at 33. Neither contention has merit.

> #### 1.    Section 121 restricts the speech of citizens as well as noncitizens.

As a threshold matter, Section 121 may have been meant to target noncitizens, but its broad provisions also reach the First Amendment activities of U.S. citizens,

28

making it subject to heightened scrutiny on that basis alone. *See TikTok Inc. v. Garland*, No. 24-1113, 2024 WL 4996719, at *11 (D.C. Cir. Dec. 6, 2024) (rejecting argument that foreign-owned company has no First Amendment rights because "at least some of the regulated speech involves [that company's] U.S. entities").

First, Section 121's plain language puts at risk of criminal investigation and prosecution citizens and domestic organizations who share finances with or receive even small-dollar funds from noncitizens. *See supra* at 20–23. Second, it infringes on citizens' First Amendment "right to receive" speech. *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943); *see also* PI Order, R.32, PageID#1164–65 (noting the Supreme Court struck down corporate expenditure limits in *Citizens United* in part because they would "prevent[] their voices and viewpoints from reaching the public and advising voters" (citation omitted)).

The right to receive speech is not limited to situations where the speaker is a U.S. citizen: Nearly 60 years ago, the Supreme Court held that a statute requiring the destruction of foreign political propaganda absent the recipient's express consent to receive it was an unconstitutional limitation "on the unfettered exercise of the addressees First Amendment rights," "at war with the uninhibited, robust, and wide-open debate and discussion that are contemplated by the First Amendment." *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 305 (1965) (citation omitted). The same is true here.

### 2. At a minimum, the First Amendment protects the political speech rights of LPRs.

None of the four judges to have considered it have agreed with Ohio's argument that the First Amendment does not protect LPRs' political speech at all. For good reason. It is at odds with Supreme Court precedent holding the right to free speech is not dependent upon citizenship, *see Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("[f]reedom of speech and of press is accorded aliens residing in this country"); it is at odds with *Citizens United*, which applied strict scrutiny to impediments to corporate political speech, even when the corporations had some foreign ownership or control, 558 U.S. at 340, 362; it is at odds with *Bluman*, which applied strict scrutiny to a law that exempted LPRs from its restrictions on direct contributions to candidates and express advocacy to elect the same, *see* 800 F. Supp. 2d at 290 (recognizing "many groups of people who are not entitled to vote may nonetheless make contributions and expenditures related to elections"); and it is antithetical to the fundamental precept of the First Amendment, which vigorously protects free and unfettered debate on matters of public interest, as well as the right of the public to hear the "voices and viewpoints" of all kinds of speakers, *Citizens United*, 558 U.S. at 354; *see also Bellotti*, 435 U.S. at 777 ("The inherent worth of

the speech in terms of its capacity for informing the public does not depend on the identity of its source.").[10]

Thus, Ohio's argument that, because LPRs cannot vote, the state may prohibit them from engaging in political advocacy, *see, e.g.*, State Br. 29–31, is easily rejected. *See Citizens United*, 558 U.S. at 342–43; *Bluman*, 800 F. Supp. 2d at 290; *see also Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021) (holding state's contribution limit for nonresidents violated First Amendment). The same is true of Ohio's attempt to analogize to a state's right to decide who is qualified to vote in its elections. Here, Ohio cites *Oregon v. Mitchell*, 400 U.S. 112 (1970), which concerned federal and state authority to lower the voting age. But in that decision Justice Black confirmed that, in regulating the franchise, "Congress has no power . . . to undermine th[e] protections of the Bill of Rights which we have held the Fourteenth Amendment made applicable to the States." *Id*. at 128 & n.11 (citing First Amendment cases). Ohio is similarly constrained. *Id.*

---

[10] Or, as the district court succinctly put it: "Regulations barring certain foreign speakers from sharing their 'voices and viewpoints' distorts 'the open marketplace of ideas' much like barring corporate voices. . . . And just as corporations might nonetheless 'possess valuable expertise' in their areas, so too might foreign nationals have valuable perspectives stemming from their familiarity with different political communities." PI Order, R.32, PageID#1165 (quoting *Citizens United*, 558 U.S. at 356, 364).

31

Ohio's attempt to create a First Amendment exception based on the political function cases brought under the Equal Protection Clause, not the First Amendment, likewise misses the mark. As the district court correctly noted, "[t]hat difference matters." PI Order, R.32, PageID#1167. "The Equal Protection Clause . . . does not establish an affirmative right" to any specific form of employment; "it establishes a right not to be discriminated against based on citizenship." *Id.* The "'political function' exception lowers the standard of review" for very specific types of equal protection claims for certain government and policy positions. *Id*. In contrast, there is *a fundamental right* to engage in political speech under the First Amendment, which the Supreme Court has held protects (at a minimum) resident foreign nationals and includes a corresponding right to *hear* that speech. *See id*. at PageID#1163–65; *see also* Stay Order, R.40, PageID#1259. Laws that implicate that fundamental right trigger strict scrutiny. *See generally Buckley*, 424 U.S. at 14–17.

Similarly, when the Supreme Court spoke of the "power" of states "to preserve the basic conception of a political community," State Br. 17 (quoting *Ambach v. Norwick*, 441 U.S. 68, 74 (1979)), that power was limited to, "in an appropriately defined class of positions, requir[ing] citizenship as a qualification for office." And when the Court spoke of the "'unequivocal legal bond' between the citizen and the State," State Br. 18 (quoting *Ambach*, 441 U.S. at 75), it again made clear that it was focused on the "special significance of citizenship" when it comes

to "*exercising the functions of government*." *Ambach*, 441 U.S. at 75 (emphasis added). Speech about the political process is neither a "function[] of government," nor equivalent with the political process itself. *Cf. Brown*, 2024 WL 4847401, at *13 (Thapar, J., concurring) (drawing distinction between private "speech within the initiative process" and the government function of "structur[ing] and limit[ing] what laws and amendments citizens can enact by direct democracy").[11]

The other cases Ohio cites only undermine its position. In each, the Court conducted the relevant constitutional analyses; it did not announce that public employees or corporations lack a First Amendment right to engage in certain speech. *See, e.g.*, *FEC v. Beaumont*, 539 U.S. 146, 161 (2003) (finding campaign contribution limit constitutional because closely drawn to a sufficiently important interest); *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 577–81 (1973) (upholding Hatch Act after conducting overbreadth and vagueness analysis); *Branti v. Finkel*, 445 U.S. 507, 518–19 (1980) (applying framework from *Elrod v. Burns* and concluding First Amendment protected public

---

[11] Although *Bluman* discussed the political function exception cases in its decision on candidate-related spending, it acknowledged that none answered the precise question at issue. 800 F. Supp. 2d at 287–89. Moreover, it expressly carved LPRs *out* of its analysis of these cases' relevance in the candidate spending context, writing that "[i]t follows that the government may bar foreign citizens *(at least those who are not [LPRs] of the United States)* from participating in the campaign process" for candidate elections. *Id*. at 288 (emphasis added).

defender from discharge based on political affiliation). Indeed, in discussing cases like *National Association of Letter Carriers* about public employee speech, the Supreme Court has specifically held that they are "based on an interest in allowing governmental entities to perform their functions" and are thus "inapposite" to the political spending context, where "it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes." *Citizens United*, 558 U.S. at 899.

Ohio's reliance on *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), is also misguided. That case held that the challenged statute did not "infringe[] any First Amendment rights or regulate[] any First Amendment activity" at all, *id.* at 546—not because corporate entities did not enjoy the same right to lobby as individuals, but because the statute in question did not regulate any entity's ability to engage in lobbying. *Id.* It simply denied tax exempt status to nonprofit organizations that engage in substantial lobbying activities. *Id.* ("We again reject the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." (quotation omitted)). The same goes for Ohio's citation to *Vidal v. Elster*, 602 U.S. 286 (2024), which involved a First Amendment challenge to content-based trademark regulations. *See* State Br. 30–31. There, the legislative history was relevant to the appropriate level of scrutiny in the "unique context" of trademarks. *Vidal*, 602 U.S. at 299. The same is simply not true here.

34

As for Ohio's final alternative scrutiny argument—asserting that Section 121 might be reviewed under "intermediate scrutiny"—it was never raised below and is accordingly forfeited on appeal. *See, e.g.*, *Thomas M. Cooley L. Sch.*, 759 F.3d at 528. In any event, here, again, Ohio ignores key differences between the Equal Protection Clause and the First Amendment—including that the latter confers an affirmative and fiercely protected right to engage in free speech and association. *See supra* at 32. Not surprisingly, Ohio has no case that supports its new argument, and its reference to *Police Department of City of Chicago v. Mosley*, 408 U.S. 92 (1972), is perplexing. In that case, the Supreme Court made clear that it is inappropriate under *both* the Equal Protection Clause and the First Amendment to "discriminat[e] among different users for the same medium for expression" because there is an "equality of status in the field of ideas." *Id*. at 96. Section 121 similarly runs afoul of both the First and Fourteenth Amendments in its discrimination against noncitizens in political spending, which is why Plaintiffs bring both First Amendment and equal protection challenges. *See infra* Argument I.G (discussing Plaintiffs' equal protection claim).

### E.    Neither the district court nor this Court may rewrite Section 121 to apply only to non-LPRs.

The parties agree: Federal courts must resolve litigants' actual cases or controversies, and they may enjoin enforcement of state laws (or clearly and properly severable portions of laws) but may not revise the laws themselves. *See*

State Br. 37–39. The district court carefully hewed to these important guardrails in granting the narrow preliminary injunction it issued in this case, in which it ordered that "Defendants, in their official capacities . . . are enjoined from pursuing civil or criminal liability for any alleged violations of Ohio Rev. Code § 3517.121 based on the definition of a 'foreign national,' in Division (A)(2)(a)." PI Order, R.32, PageID#1191.[12]

Nevertheless, Ohio insists that the district court should have limited its preliminary injunction only to Section 121's application to LPRs.[13] But the district court heeded the principles articulated in *Ayotte v. Planned Parenthood of North New England*, 546 U.S. 320 (2006), including "that 'partial, rather than facial, invalidation is the required course,'" *id*. at 328–29 (citation omitted); that courts must "restrain [them]selves from 'rewrit[ing] state law to conform it to constitutional requirements' even as [they] strive to salvage it," *id.* at 329 (citation omitted); and that "the touchstone for any decision about remedy is legislative intent, for a court

---

[12] Any inexact language elsewhere in the district court's opinion—that it "nullifies" or "strike[s]" the unconstitutional portion of Section 121—is not evidence that it erred. The court was innocuously doing what Ohio acknowledges as a norm: "When federal courts speak of 'invalidating' a statute, they [may] mean it as shorthand for enjoining its application." State Br. 37.

[13] Of course, non-LPR noncitizens are still prohibited from candidate-related spending under Ohio Revised Code § 3517.13(W).

cannot 'use its remedial powers to circumvent the intent of the legislature,'" *id*. at 330 (citation omitted).

On this last point in particular, the district court would have had to rewrite the law to excise LPRs from the definition of individual foreign national that the General Assembly enacted, and replace it with a version that legislative body *rejected*. *See* Stay Order, R.40, PageID#1269 (citing *Virginia v. Am. Booksellers Assn.*, 484 U.S. 383, 397 (1988)). Ohio does not dispute the district court's findings that there was debate on this exact issue, and the legislature affirmatively chose to ensure that LPRs were covered by the law. PI Order, R.32, PageID#1178–80.

There is no indication that there was political support for a narrower version of the law, and to impose this modification by court order would go far beyond the proper role of the judiciary. *See* Stay Order, R.40, at PageID#1271–73 (recognizing it could not properly guess where the legislature would "draw the line," and particularly, here, where legislators raised concerns about the inclusion of LPRs that were dismissed, "courts have reason to be anxious about whether the Ohio Legislature has enough 'incentive to draft a narrowly tailored law in the first place'" (quoting *Osborne v. Ohio*, 495 U.S. 103, 121 (1990)); *cf. Lindsey v. Whitmer*, No. 24-1413, 2024 WL 5182650, at *3 (6th Cir. Dec. 20, 2024) (noting courts' reluctance to find individual legislators have Article III standing based on concern about allowing "political losers to sidestep their colleagues and run to a sympathetic court

for a do-over") (quotation marks and citation omitted). Accordingly, it is Ohio's proposal—not the district court's injunction—that would mean taking "a blue pencil to the law," State Br. 39 (quotation omitted). *But see Eubanks*, 937 F.2d at 1127 (explaining federal court may not "assume the task of making . . . choices for the state legislature").

The district court's approach also considered "[w]hether a portion of" the statue was severable under Ohio law, *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018) (citation omitted), which asks three questions:

> (1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?

*Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 371 (6th Cir. 2006). This standard does not allow for what Ohio demands: inserting words or terms into the definition of foreign national to separate and exclude LPRs from the restrictions that the law currently imposes on all individual noncitizens.

None of the cases Ohio cites suggests otherwise. In *Moody v. NetChoice, LLC*, 603 U.S. 707, 743–44 (2024), the Supreme Court held that courts must evaluate the full scope of a law's coverage even in the First Amendment context, which Ohio acknowledges the district court did. *See* State Br. 38. *United States v. Arthrex, Inc.*,

594 U.S. 1, 23–24 (2021), involved federal court review of a federal statute as applied to an individual federal government official; it is thus inapposite here, where the district court was faced with a challenge to a state statute and was accordingly limited by principles of federalism and state sovereignty. *See Boos v. Barry*, 485 U.S. 312, 330 (1988) (holding federal courts reviewing state laws cannot "adopt a narrowing construction . . . unless such a construction is reasonable and readily apparent"). Justice Thomas's concurrences in *New Jersey Thoroughbred Horsemen's Association v. National Collegiate Athletic Association*, 584 U.S. 453, 488 (2018), and *Seila L. LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 253 (2020), underscore that severability is in tension with traditional limits on judicial authority and thus do not help Ohio here. And the other non-controlling opinions Ohio cites do not reflect the current status of the law. *See* State Br. 37–38 (citing *United States v. Sineneng-Smith*, 590 U.S. 371, 387 (2020) (Thomas, J., concurring and writing separately to urge the Court to "consider revisiting [the overbreadth] doctrine in an appropriate case")); *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring and discussing three justices' disfavoring of universal injunctions); *Arizona v. Biden*, 31 F.4th 469, 483 (6th Cir. 2022) (Sutton, J., concurring) (similar).[14]

---

[14] Ohio's additional authority is similarly inapposite. In *Gill v. Whitford*, 585 U.S. 48, 66 (2018), the Court found that amending the boundaries of a single district as

**F.    The district court did not err in issuing an injunction that applied beyond the parties.**

Ohio also argues that the district court erred in failing to limit its injunction to the parties. State Br. 39–40. But because it never raised this argument below, it is forfeited. *See, e.g.*, *Thomas M. Cooley L. Sch.*, 759 F.3d at 528. It is also wrong as a matter of law.

The Supreme Court has been clear that "a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated." *Citizens United*, 558 U.S. at 336. This Court has emphasized the same. *Speet v. Schuette*, 726 F.3d 867, 871–73 (6th Cir. 2013). Here, the district court issued the narrowest possible injunction in order to address what it found facially unconstitutional: Section 121's prohibition on LPR political spending and the risk it would chill citizen speech. *See supra* Argument I.E. Accordingly, *all* of its applications to the approximately 160,000 LPRs living in Ohio and the U.S. citizens and organizations

---

opposed to the entire map was appropriate relief in a vote dilution case. In *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc*., 527 U.S. 308, 333 (1999), the Court declined to find that courts have the power to issue injunctions to prevent the disposal of assets during contract disputes, finding Congress must decide the power over debtors. In *United States v. Raines*, 362 U.S. 17, 80 (1960), the Court held that the district court could not reject a complaint brought under the Civil Rights Act based on its view that the Act was unconstitutional in a separate application. And *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923), was a case about Article III standing, which is not at issue here.

that associate with them are unconstitutional; there is *no* "legitimate sweep" to Section 121's restrictions on LPRs.[15]

Plaintiffs have thus exceeded their burden "to demonstrate that a 'substantial number of instances exist in which the law cannot be applied constitutionally.'" *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012) (quoting *Richland Bookmart, Inc. v. Knox Cnty.*, 555 F.3d 512, 532 (6th Cir. 2009)). The "record in this case bolsters [any] 'judicial prediction' that 'the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Speet*, 726 F.3d at 878 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).

On this point, the stay majority appears to have misunderstood the nature of the district court's analysis. *See OPAWL*, 118 F.4th at 775–76 (characterizing district court as finding in favor of Plaintiffs' overbreadth claim). Although the district court did ultimately enjoin enforcement of Section 121's definition of individual foreign national (and not just the law as applied to LPRs), it did so because there was no readily apparent narrowing construction for the definition of foreign national as written, as discussed in the section above. PI Order, R.32, PageID#1186–90.

---

[15] Sarah Miller & Bryan Baker, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2023* at 4, Off. of Homeland Sec. Stats. (Oct. 2023), https://perma.cc/GG76-A67P. "[C]ourts may take judicial notice of government statistics," *United States v. Neal*, 577 F. App'x 434, 452 n.11 (6th Cir. 2014); *see also* Fed. R. Evid. 201.

**G.    The Court may affirm the district court's same preliminary injunction based on Plaintiffs' equal protection claim.**

This Court "may affirm the [district] court's order on any ground that is supported by the record." *Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 302 (6th Cir. 2016). In this case, the Court could affirm the exact preliminary injunction entered by the district court on the ground that Plaintiffs are likely to succeed on their claim that Section 121 unjustifiably discriminates against individual noncitizens in violation of the Equal Protection Clause—a claim the district court did not reach in light of its conclusion that Plaintiffs were likely to succeed under the First Amendment. PI Order, R.32, PageID#1141 n.2.

The Equal Protection Clause prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Courts apply strict scrutiny when "a classification infringes on a class of people's fundamental rights or targets a . . . suspect class." *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010) (cleaned up). Section 121 does both: For all the reasons already discussed, it burdens fundamental rights. It also targets a suspect class—specifically, noncitizens based on their alienage.

The Supreme Court has consistently held that "[a]s a general matter, a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). The Court has recognized that "[a]liens as a class are a prime example of a 'discrete and

insular' minority for whom such heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 376 (1971) (citation omitted). Here, Section 121 facially discriminates based on citizenship status, broadly prohibiting all noncitizens from engaging in core protected First Amendment activity for no other reason than their citizenship, and thus strict scrutiny applies.[16] And because Section 121's prohibitions on all noncitizens (including LPRs) cannot withstand strict scrutiny, *see supra* Argument I.B, its broad definition of individual foreign national must be enjoined.

In briefing below, Ohio argued that noncitizens and citizens are not "similarly situated" for purposes of Plaintiffs' equal protection claim. Defs.' Opp'n to PI Mot., R.29, PageID#1075 ("PI Opp'n"). But this misunderstands the "relevant respects" on which the two groups must be compared. *Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). The correct question is whether noncitizens and citizens are similarly situated to make contributions or expenditures related to ballot issues, not whether they are similarly situated "for purposes of democratic self-government"

---

[16] This differentiates Section 121 from the law at issue in *LULAC*, which regulated a subgroup of noncitizens. 500 F.3d at 526–27. Some courts, including this Court in *LULAC*, have applied a lower level of scrutiny to laws that concern noncitizens other than LPRs. But when laws speak in terms of foreign nationals or noncitizens as a monolith, strict scrutiny remains the appropriate standard; no court has applied a lower level of scrutiny to noncitizen classifications that include LPRs, nor could they under relevant Supreme Court precedent. *See, e.g.*, *Bernal*, 467 U.S. at 219.

such as voting. *Id*. Indeed, the Sixth Circuit has recognized that LPRs "are similarly situated to citizens in economic, social, and civic conditions," *LULAC*, 500 F.3d at 533, a universe that necessarily encompasses political spending.

### H. The district court did not abuse its discretion in weighing the remaining factors for preliminary injunctive relief.

Ohio spends little time attempting to argue that the district court abused its discretion in applying the rest of the injunction factors, and this issue need not detain the Court long.

It is well established that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *OPAWL*, 118 F.4th at 785 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Ohio does not deny this; it merely falls back on its argument that LPRs "lack a First Amendment right" to engage in political speech at all. State Br. 34. For the reasons discussed, this is wrong. *See supra* Argument I.D.2. The record also strongly supports the district court's finding that, absent an injunction, Plaintiffs will suffer irreparable harm. Ohio fails to identify any clear error by the district court, and its myopic nit-picking of the factual record misrepresents it.

Once again, Ohio insists that the law only reaches noncitizens, but, in fact, the majority of the Plaintiffs are U.S. citizens or domestic organizations that have specifically detailed the many ways that Section 121 chills or threatens their core

protected First Amendment activity.[17] In an attempt to minimize these injuries, Ohio mischaracterizes NEOCH's harm, selectively quoting a single line from Mr. Knestrick's declaration while ignoring his assertions that "noncitizens . . . have made contributions . . . to NEOCH in the past" and the organization has "no system to segregate funds received from noncitizens," Knestrick (NEOCH) Decl., R.16-2, PageID#111, such that Section 121 will cause it to halt or significantly curtail its ballot-issue spending and advocacy, *see id.* at PageID#113. As the Supreme Court has recognized, this in and of itself is a First Amendment injury. *See Citizens United*, 558 U.S. at 337. As for OPAWL, Ohio completely ignores the harms that it and its members will suffer because of Section 121. *But see, e.g.*, Hilario (OPAWL) Decl., R.16-1, PageID#107. And Ohio's insistence that Plaintiff Quilligan, a lifelong U.S. citizen married to an LPR, has nothing to worry about because Ohio Administrative Code 111:2-4-14 tells campaign treasurers to report direct contributions made on joint checking accounts as coming from the signer "[a]bsent evidence to the contrary," far overstates that narrow regulation, as explained *supra* at 20–21.

As for the non-citizen LPR Plaintiffs, Ohio focuses narrowly on the fact that one of them—John Gerrath—intends to become a citizen in the future. But this intent does nothing to negate the harm he is currently suffering. Furthermore, Ohio simply

---

[17] *See*, *e.g.*, Hilario (OPAWL) Decl., R.16-1, PageID#107; Knestrick (NEOCH) Decl., R.16-2, PageID#113; Quilligan Decl., R.16-5, PageID#128–29.

ignores that, like Plaintiff Gerrath, LPR Plaintiff Bredendiek is also chilled from supporting causes she cares about through ballot-issue spending as a direct result of Section 121. Gerrath Decl., R.16-3, PageID#119–20; Bredendiek Decl., R.16-4, PageID#123–24.[18]

The remaining factors—injury to other parties and the public interest—merge when the government is a party. *OPAWL*, 118 F.4th at 785 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And it is always in the public interest to protect constitutional rights. *Id.* (citing *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)). Although Ohio may have an interest in enforcing laws "absent constitutional infirmity," State Br. 35, it has no interest in enforcing laws that violate the Constitution. *Abbott v. Perez*, 585 U.S. 579, 602–03 (2018) (recognizing injunction could not harm state if the statute is unconstitutional); *see also Graveline v. Johnson*, 747 F. App'x 408, 415 (6th Cir. 2018) (denying stay motion where appellants "articulated no irreparable harm that will befall [them] in the absence of a stay, excepting the general harm of being enjoined from effectuating its statutes").

---

[18] As the U.S. Department of State Guidelines make clear, adjustment of status can take a significant amount of time. *See* U.S. Dep't of State, *Guidelines for Expeditious Naturalization*, https://www.state.gov/global-community-liaison-office/naturalization-of-foreign-born-spouses/guidelines-for-expeditious-naturalization/ [https://perma.cc/877P-ZKZY] (last accessed Dec. 12, 2024). Moreover, as of today's filing, Plaintiff Gerrath remains a noncitizen.

In sum, the district court did not abuse its discretion in finding the remaining preliminary injunction factors weighed in favor of granting relief.

## II.   In the alternative, the Court should remand for issuance of an injunction based on Plaintiffs' other claims.

Because the preliminary injunction that the district court issued functionally addresses Plaintiffs' harms, if this Court affirms it need not consider whether Plaintiffs are likely to succeed on their other challenges to the law. But if this Court were to find that the injunction issued below was in error (either on the merits or in scope), it should find that a preliminary injunction would be appropriate based on one or more of the alternative grounds discussed below.

### A.   Section 121's prohibition on ballot-issue spending violates the First Amendment.

Although the district court recognized that "[t]he constitutional propriety of banning any Non-LPR Foreign National political spending on ballot measure advocacy is a close question," PI Order, R.32, PageID#1174, it wrongly concluded that Plaintiffs were not likely to succeed on this claim. Should it reach the issue, this Court should reverse and remand, directing the district court to issue a preliminary injunction on this alternative ground.

#### 1.   Section 121's prohibition on ballot-issue spending is subject to heightened scrutiny.

The Supreme Court and this Court have been unequivocal that spending to advocate for or against direct democracy measures is core First Amendment speech.

This conclusion is mandated by the Supreme Court's decision nearly 50 years ago in *First National Bank of Boston v. Bellotti*, where it applied strict scrutiny to strike down a criminal statute prohibiting corporations from making contributions or expenditures to influence the outcome of a vote on certain questions submitted to voters, holding that spending to promote or oppose ballot issues is expression at the very heart of the First Amendment. 435 U.S. at 776.

The Court reaffirmed this conclusion in *Citizens Against Rent Control/Coalition For Fair Housing v. City of Berkeley*, applying strict scrutiny to strike down an ordinance that imposed a limit on direct ballot-issue committee contributions, finding it violated the First Amendment rights of freedom of speech and association. 454 U.S. at 300. While the Court has at times wrestled with where to draw the line with candidate-related spending, it has found ballot-issue advocacy presents a far easier case: As it emphasized in *Citizens Against Rent Control*, "there is *no significant state or public interest* in curtailing debate and discussion of a ballot measure." *Id.* at 299 (emphasis added).

This Court applied those decisions in *Michigan State Chamber of Commerce v. Austin*, when it found that a Michigan law that limited corporate contributions to ballot-issue committees to $40,000 could not survive. 832 F.2d at 949.

Indeed, even Ohio does not dispute that ballot-issue spending is speech under the First Amendment. *See, e.g.*, PI Opp'n, R.29, PageID#1064 (acknowledging the

48

"rich tradition of federal courts recognizing that spending money on ballot issues *is* core political speech"). Instead, the question is whether noncitizens present a special case when it comes to ballot-issue advocacy. For the reasons discussed below, they do not.

### 2. Section 121's restrictions on ballot-issue spending cannot survive heightened scrutiny.

While recognizing that it was a "close question," the district court found that Ohio could constitutionally ban at least non-LPR spending on ballot-issue advocacy. PI Order, R.32, PageID#1172–77. It did so based on conclusions that banning such speech furthered the state's compelling interest in avoiding foreign influence in its "democratic self-government," and that Section 121's ballot-issue spending restrictions—*as the district court narrowly construed them*—were sufficiently tailored. *Id*. The district court's conclusion was characterized by several errors of law, each requiring reversal.

### a. There is no compelling interest in banning noncitizens from engaging in ballot-issue advocacy.

Ohio misleadingly implies that the district court fully endorsed its contention that the state has a compelling interest in "excluding foreign dollars from its elections," based on "three sets of Supreme Court precedents" involving (1) citizenship requirements for certain specific roles (e.g., police officers, jury duty), (2) "voters' perceptions that the voting process is fair," and (3) citizenship

requirements to vote. State Br. 17–22. In fact, after acknowledging that it was a "close question," the district court concluded that Ohio had a compelling interest in "preventing undue foreign influence" in elections involving ballot issues, but it rested that holding almost entirely on its reading of *Bluman*—which it candidly acknowledged did not answer at least two important questions posed by this case. PI Order, R.32, PageID#1170–72. Both the district court's application of that case—and Ohio's attempt to rationalize that application—miss the mark.

### i.    The district court's reasoning on this score was fundamentally flawed.

As noted, *Bluman* repeatedly emphasized that it was reading the law before it to reach *only* candidate-related spending—*not* issue spending. 800 F. Supp. 2d at 290 ("Notably, [the law] as we interpret it . . . does not restrain foreign nationals from speaking out about issues or spending money to advocate their views about issues. It restrains them only from . . . providing money for a candidate or political party or spending money in order to expressly advocate for or against the election of a candidate."). It was also explicit that it was *not* deciding whether Congress could impose restrictions on noncitizens engaging in "issue advocacy and speaking out on issues of public policy," warning its holding "should not be read to support such bans." *Id.* at 292; *see also, e.g.*, *Citizens Against Rent Control*, 454 U.S. at 299 (finding "there is *no significant state or public interest* in curtailing debate and discussion of a ballot measure" (emphasis added)); *Austin*, 832 F.2d at 949–50

50

(finding there is not even a *legitimate or important* interest in restricting contributions to ballot-issue committees); *Bluman*, 800 F. Supp. 2d at 290 (citing *Bellotti*, 435 U.S. at 788 n.26 ("speak[ing] on issues of general public interest" is a "quite different context" from "participation in a political campaign for election to public office")).

In contrast, this case squarely presents the question of the propriety of such restrictions. The district court described the essential question as "whether ballot initiatives 'constitute part of the process of democratic self-government'" that *Bluman* found gave the United States a compelling interest in limiting the participation of non-LPRs in narrow and specific types of candidate-related spending. PI Order, R.32, PageID#1172. The district court's conclusion that Ohio similarly has a compelling interest in restricting the ballot-issue speech of noncitizens was wrong.

First, the district court (and the stay majority) had it backwards in concluding that there was a *heightened* interest in restricting ballot-issue speech as compared to candidate-related speech. The Supreme Court held the exact opposite in *Bellotti*, concluding that "the direct participation of the people . . . if anything, *increases the need for the widest possible dissemination of information from diverse and antagonistic sources*." 435 U.S. at 790 n.29 (cleaned up) (emphasis added); *see also Brown*, 2024 WL 4847401, at *5 (Thapar, J., concurring) ("When it comes to

'interactive communication concerning political change,' First Amendment protections are at their 'zenith.'" (quoting *Buckley*, 525 U.S. at 186–87)). To conclude otherwise is to endorse a "highly paternalistic" view that "restrict[s] what the people may hear," which the First Amendment does not allow. *Bellotti*, 435 U.S. at 791 n.31.[19]

Next, the district court simply concluded that a foreign national could "buy influence over or access to elected officials" by "spending unlimited amounts of money on hotly contested partisan ballot initiatives," PI Order, R.32, PageID#1176 & n.23 (cleaned up), but this assertion is unsupported by any evidence. It is also contrary to Supreme Court and Sixth Circuit precedent holding otherwise. *Bellotti*, 435 U.S. at 787–88; *Austin*, 832 F.2d at 949–50. Indeed, taking the district court's reasoning to its logical conclusion would mean that states could also restrict spending on pure issue advocacy on hot-button issues like gun rights or climate change, simply because such issues have partisan support. This, of course, would be entirely antithetical to the First Amendment.

---

[19] In addition, in *Citizens United*, the Court appeared to recognize the difference between speech about an election and the act of democratic governance itself, understanding the latter to be the voting process, not the speech to persuade the voters. *See* 558 U.S. at 360 ("The fact that . . . any [] speaker[] is willing to spend money to try to persuade voters presupposes that the [voters] have the ultimate influence over [their elections]. This is inconsistent with any suggestion that the electorate *will refuse to take part in democratic governance* because of additional political speech made by a corporation or any other speaker." (emphasis added)).

As for the district court's conclusion that individual foreign national spending could otherwise "distort" Ohio politics, PI Order, R.32, PageID#1171–72 n.18, it cites the Supreme Court's decision in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 660 (1990), but that case has been overruled specifically as to its anti-distortion rationale. *Citizens United*, 558 U.S. at 365. The Supreme Court has since made clear that such concerns are not a justifiable reason for the government to restrict core political speech. *See, e.g.*, *McCutcheon v. FEC*, 572 U.S. 185, 207–08 (2014) (holding "[s]pending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties" is not a basis to restrict it).

### ii.    Ohio's justifications are without merit.

Ohio's attempt to rationalize the district court's conclusion only further undermines it. Take first Ohio's reliance on Supreme Court cases upholding state laws that exclude noncitizens from certain types of government employment and jury duty. State Br. 17, 21 (citing political function exception cases). As explained, those were equal protection cases, not First Amendment cases, and that difference is essential. *See supra* at 32.

Second, Ohio claims that an interest in "protecting voters' perceptions that the voting process is fair" supports finding it has a compelling interest in excluding noncitizens from spending to support ballot-issue-related advocacy. State Br. 18–19.

However, most of these cases concerned restrictions on public employees' speech—decisions that the Supreme Court has declared "inapposite" in the political spending context. *Citizens United*, 558 U.S. at 899; *see also supra* at 34. Decisions about judicial or military partisanship are similarly irrelevant. And in the remaining "voters' perception" cases, including *Purcell v. Gonzalez*, 549 U.S. 1 (2006), and *Nixon*, courts "have never accepted mere conjecture as adequate to carry a First Amendment burden," 528 U.S. at 392. *See supra* at 17. States cannot defend laws that limit speech as prophylactic measures to promote voter confidence. *See NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect.").

Third, Ohio claims that "citizenship requirements for elections" support its compelling interest argument. State Br. 20. This assertion is confusing, not least because it cites *Bluman*, which had nothing to do with a citizenship requirement for elections and, in fact, affirmed a law that allowed LPRs to make *direct contributions to candidates*—despite being unable to vote themselves. *See* 800 F. Supp. 2d at 290 (expressly recognizing that "many groups of people who are not entitled to vote may nonetheless make contributions and expenditures related to elections"). The same is true of the Court's decisions protecting corporate political speech. *Cf.* PI Order, R.32, PageID#1165 (noting "foreign speakers occupy a similar spot in the marketplace [of ideas] as corporations" and that like corporations, "so too might

foreign nationals have valuable perspectives" (citing *Citizens United*, 558 U.S. at 356, 364)).

### b. Section 121's prohibition on noncitizen ballot-issue advocacy is not sufficiently tailored.

The district court erred in concluding that Section 121's prohibition on noncitizen spending in the ballot-issue context was sufficiently tailored.

First, the record is devoid of any evidence that could support a link between spending by individual noncitizens in support of or against ballot issues (or incipient ballot issues) and preventing foreign influence in Ohio's elections. As with Section 121's regulation of LPRs, *see supra* Argument I.B, neither the General Assembly nor Defendants offered any evidence as to how noncitizen spending on ballot issues has exerted "foreign influence" over Ohio's elections.

Indeed, none of Section 121's supporters could explain what was so threatening about spending that simply facilitates more speech on issues that Ohio voters and non-voters care about. *See generally* Exs. G-M, R.16-7, PageID#552–1014; *see also Bluman*, 800 F. Supp. 2d at 291 ("Congress's determination that foreign contributions and expenditures pose a greater risk in relation to candidate elections than such activities pose in relation to ballot initiatives is a sensible one."); PI Order, R.32, PageID#1175 ("That the risk of foreign influence may be at its lowest in the ballot initiative context is also the most forceful thrust of Plaintiffs' argument on narrow tailoring.").

And although there is evidence that noncitizens contributed to ballot issues in 2023, the leading proponent of the restriction in the Ohio Senate admitted that noncitizen spending probably did not ultimately affect ballot-issue election results in 2023. Ex. H, R.16-7, PageID#634–35. As the Supreme Court recognized, "[t]he fact that . . . any [] speaker[] is willing to spend money to try to persuade voters presupposes that the [voters] have the ultimate influence over [their elections]." *Citizens United*, 558 U.S. at 360.

Second, none of the cases that the district court cited in its analysis on this point actually supports its conclusion that banning non-LPR noncitizens from ballot-issue speech is likely narrowly tailored. Here, the court primarily relied on *Bluman*, but, as discussed, that decision expressly disavowed any such conclusion. 800 F. Supp. 2d at 291.

Finally, the district court effectively acknowledged that, as written, Section 121's restrictions on ballot-issue spending cannot pass constitutional muster. Specifically, it emphasized that its conclusion that the law is narrowly tailored "comes with an important caveat"—that it was construing Section 121's ban on ballot-issue spending "*as a ban on only express advocacy, not a ban on issue advocacy.*" PI Order, R.32, PageID#1177.

In other words, the district court found that the law could pass constitutional muster *only if* it was limited specifically to ban "spending . . . susceptible of no

56

reasonable interpretation other than as an [express] appeal to enact or defeat a certain ballot initiative." *Id.* (cleaned up) (citations omitted). In doing so, the district court claimed it was following *Bluman*, which construed the federal statute at issue there narrowly to reach only express advocacy for or against the election of candidates. *Id.* (citing *Bluman*, 800 F. Supp. 2d at 284–85).

The problem is that federal courts *cannot* "construe" state laws to say anything other than what is undeniably obvious from their text. *See Ayotte*, 546 U.S. at 328–29. The district court recognized this when it declined to rewrite the definition of individual "foreign national" to carve out LPRs. *Supra* Argument I.E; *see also* PI Order, R.32, PageID#1189–90; Stay Order, R.40, PageID#1268–75. But it failed to honor this principle when it concluded that Section 121's restrictions on ballot-issue spending are sufficiently narrowly tailored to survive constitutional challenge. Thus, the district court's conclusion that that the only way that these restrictions survive constitutional scrutiny is if they are narrowly restrained in ways that their text simply does not provide, is an acknowledgment that Section 121 is constitutionally infirm.

For each of these reasons, should it reach this issue, this Court should reverse and remand with directions to the district court to enter a preliminary injunction forbidding Ohio from enforcing Section 121's ballot-issue spending restrictions.

## B.  Section 121 is void for vagueness.

Plaintiffs are also likely to succeed on their claim that Section 121 is

unconstitutionally vague. A statute is vague "for either of two independent reasons": if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. Section 121 does both. Moreover, where laws "interfere[] with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also Button*, 371 U.S. at 432 (same).

Chief among Plaintiffs' vagueness arguments is that Section 121 "allows any member of the voting-eligible public to initiate an enforcement action by filing a complaint with the attorney general, who 'shall investigate' that complaint." PI Order, R.32, PageID#1159 (quoting Ohio Rev. Code § 3517.121(G)(2)(b)). And "[b]ecause the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents." *Id*. at PageID#1160 (quoting *Driehaus*, 573 U.S. at 164).

This by itself raises a clear and unacceptable risk of arbitrary and discriminatory enforcement in violation of the First and Fourteenth Amendments, making the law void for vagueness. As this Court recognized just months ago when it issued an injunction pending appeal in another political spending case, even a less

restrictive law that "allow[ed] complaints from members of the public create[d] a real risk of complaints from . . . opponents, with an intent to frustrate speech they oppose." *Boone Cnty. Republican Party*, 116 F.4th at 595–96 (cleaned up).

And several of Section 121's provisions fail to provide people of ordinary intelligence notice of what is prohibited—only increasing the likelihood of baseless complaints. For example, it is unclear what division (B)(4) and the parallel receipt provisions in division (C)—which prohibit noncitizens from contributing to continuing associations "*to the maximum extent permitted by law and by the constitutions of the United States and of this state*," Ohio Rev. Code § 3517.121(B)(4)—mean. Although Ohio now touts Section 121's regulation of contributing association contributions, State Br. 7–8, even Section 121's chief sponsor seemed unsure of what it meant, as there was "some residual question as to [] the General Assembly's power to regulate this aspect of a continuing association's activities," Ex. L, R.16-7, PageID#885; *see also* Ex. K, R.16-7, PageID#860–62. And the prohibition on ballot-issue spending "regardless of whether the ballot issue or question has yet been certified to appear on the ballot," Ohio Rev. Code § 3517.121(B)(2), makes it impossible for people of ordinary intelligence to know when they need to stop advocating for issues that may someday be on the ballot. Division (B)'s prohibition on noncitizens making any "promise, *either expressly or implicitly*," to engage in any of the spending that Section 121 prohibits, *id.*

§ 3517.121(B)(5) (emphasis added), is also unclear. Indeed, even a statement like "I will support your work" could be deemed an "implicit[]" "promise" to violate Section 121. *See also* PI Motion, R.16, PageID#93–96 (detailing Section 121's vague provisions).

Although issued on other grounds, the district court's preliminary injunction protected Plaintiffs against injuries arising from Section 121's vague provisions, because it rendered unenforceable the individual "foreign national" definition that threatens Plaintiffs. But if this Court were to revise or reverse the injunction, it would revive the threat of arbitrary and discriminatory enforcement inherent in Section 121's vague text, including its requirement that investigations must follow from any complaint, filed by any elector, without any threshold basis of proof.

The threat would follow not only to noncitizens other than LPRs, but to citizens and LPRs who could be accused of violating Section 121 in myriad ways involving receipt or facilitation of noncitizen spending—all without requiring any showing of any evidence of an actual violation. As courts have recognized, the mere threat of an investigation is, on its own, a constitutional injury. *See, e.g.*, *White*, 227 F.3d at 1226; *Nat'l Commodity & Barter Ass'n*, 31 F.3d at 1530. The stay majority's attempt to analogize an elector's Section 121 complaint to "a prank 911 call" simply misses this critical point. *OPAWL*, 118 F.4th at 784.

### C.   Section 121 is unconstitutionally overbroad.

Finally, Section 121 is also unconstitutional because it is facially overbroad. First Amendment "freedoms need breathing space to survive" because "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521–22 (1972) (quoting *Button*, 371 U.S. at 433). Even "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

The overbreadth doctrine asks the Court to consider whether the "overbreadth" of the challenged law's language "is substantial, not only in an absolute sense, but also relative to the statute's [] legitimate sweep." *Williams*, 553 U.S. at 292. Here, it is undisputed that Section 121's effects are to "expand Ohio's [campaign finance] prohibitions" on foreign nationals to LPRs and to ballot issues. State Br. 7–8. Accordingly, Plaintiffs have shown that *all* the applications that Section 121 adds to Ohio's campaign finance law are overbroad. Section 121's "legitimate sweep" is simply those applications that are already codified in Ohio Revised Code § 3517.13(W); they would be unaffected by any invalidation of Section 121 and therefore have no practical effect on "[w]hat activities, by what actors, [] the law[] prohibit[s] or otherwise regulate[s]." *NetChoice*, 603 U.S. at 724;

61

*see also id.* (characterizing the "requisite inquiry" as "how a law works"). Section 121 is an unnecessarily blunt instrument that criminalizes issue advocacy, and its overbreadth renders it invalid in its entirety.

## CONCLUSION

Plaintiffs-Appellees respectfully request that the Court affirm the district court's preliminary injunction or, alternatively, remand with instructions to issue a preliminary injunction consistent with finding that Plaintiffs are likely to succeed on their other constitutional claims.

Date: December 26, 2024

C. Benjamin Cooper
Kaela King
COOPER ELLIOTT
305 West Nationwide Blvd
Columbus, OH 43215
Telephone: 614-481-6000
benc@cooperelliott.com
kaelak@cooperelliott.com

Respectfully submitted,

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost
Jyoti Jasrasaria
Melinda K. Johnson
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: 202-968-4490
efrost@elias.law
jjasrasaria@elias.law
mjohnson@elias.law

*Counsel for Appellees/Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this motion complies with the type-volume requirements and contains 15,262 words. *See* Fed. R. App. P. 28.1(e)(2)(B).

I further certify that this motion complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Respectfully submitted,

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost

## CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2024, I electronically filed the above document with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Respectfully submitted,

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost

## DESIGNATION OF DISTRICT COURT RECORD

Plaintiff-Appellees/Cross-Appellants, pursuant to Sixth Circuit Rule 30(g),

designate the following filings from the district court's electronic records:

### *OPAWL v. Yost*, Case No. 2:24-cv-3495 (S.D. Ohio)

| R. No. | Date Filed | Document Description | PageID# |
|--------|-----------|---------------------|---------|
| 1 | 06/27/2024 | Complaint | 1–47 |
| 16 | 06/28/2024 | Plaintiffs' Motion for Prelim. Injunction | 77–100 |
| 16-1 | 06/28/2024 | Declaration of Jona Hilario | 101–07 |
| 16-2 | 06/28/2024 | Declaration of Chris Knestrick | 108–14 |
| 16-3 | 06/28/2024 | Declaration of John Gerrath | 115–20 |
| 16-4 | 06/28/2024 | Declaration of Elisa Bredendiek | 121–25 |
| 16-5 | 06/28/2024 | Declaration of Peter Quilligan | 126–29 |
| 16-6 | 06/28/2024 | Declaration of Sarah Imran | 130–35 |
| 16-7 | 06/28/2024 | Declaration of Jyoti Jasrasaria | 136–1014 |
| 29 | 07/26/2024 | Defendants' Opposition to Motion for Prelim. Injunction | 1056–78 |
| 31 | 08/09/2024 | Plaintiffs' Reply in Support of Motion for Prelim. Injunction | 1115–38 |
| 32 | 08/31/2024 | Opinion and Order on Motion for Prelim. Injunction | 1139–91 |
| 33 | 09/02/2024 | Defendants' Notice of Appeal | 1192–93 |
| 34 | 09/02/2024 | Defendants' Motion for Stay | 1194–1204 |
| 35 | 09/05/2024 | Plaintiffs' Opposition to Motion to Stay | 1205–25 |
| 37 | 09/06/2024 | Defendants' Reply in Support of Motion to Stay | 1229–41 |
| 40 | 09/12/2024 | Opinion and Order on Stay Motion | 1256–78 |
| 42 | 09/13/2024 | Plaintiffs' Notice of Appeal | 1284–86 |