# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | |
|---|---|
| OPAWL – BUILDING AAPI FEMINIST LEADERSHIP, ET AL., Appellees/Cross-Appellants, | : <br> : On Appeal from the <br> : United States District Court <br> : for the Southern District of Ohio |
| v. | : Eastern Division <br> : |
| DAVE YOST, ET AL., Appellants/Cross-Appellees. | : District Court Case No. <br> : 2:24-cv-3495 <br> : |

---

## COMBINED REPLY AND RESPONSE BRIEF OF
## APPELLANTS/CROSS-APPELLEES
## (THIRD BRIEF)

---

DAVE YOST
Attorney General of Ohio

T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
KATIE ROSE TALLEY
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Appellants/Cross-Appellees*
  *Ohio Attorney General Dave Yost and*
  *Ohio Secretary of State Frank LaRose*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................. iii

STATEMENT REGARDING ORAL ARGUMENT .......................... ix

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES ON REPLY .................................... 2

STATEMENT OF THE ISSUE ON CROSS APPEAL ........................ 2

INTRODUCTION .............................................................................. 3

ARGUMENT IN REPLY ON OHIO'S APPEAL ............................... 6

SUMMARY OF THE ARGUMENT .................................................. 6

ARGUMENT ..................................................................................... 9

    I.    Ohio's law fits exactly the problem it is designed to combat.................. 10

        A.    Ohio's law is appropriately tailored to address the full scope of the problem it aims to redress. ............... 10

        B.    OPAWL has no answer for the Supreme Court precedents that confirm the law's proper tailoring. .................. 14

    II.    OPAWL defends the District Court's overbroad injunction with an overbroad view of federal court's equity powers. ................................... 18

        A.    OPAWL's defense of the injunction's substantive overreach wrongly insists that injunctions operate on words rather than officials ......................... 18

        B.    OPAWL again overclaims federal court's power when it insists that the injunction can reach non-parties. ................ 20

    III.    OPAWL's equal-protection arguments duplicate the First Amendment analysis, and therefore should meet the same fate. ............ 22

IV. OPAWL's analysis of the other injunction factors undersells Ohio's sovereign interests and oversells the harm that would flow from rejecting this facial challenge. .................................................. 23

OHIO'S BRIEF IN OPAWL'S CROSS-APPEAL ............................... 24

SUMMARY OF THE ARGUMENT ................................. 24

ARGUMENT ........................................................ 26

I. The District Court had no power to enjoin Ohio law on the basis that all foreigners have a right to spend money on Ohio ballot measures. ...... 26

II. Ohio's law suffers no unconstitutional vagueness by telling non-citizens not to spend money in Ohio elections. ...................................... 30

III. Ohio's law, which legitimately reaches billions of non-citizens, entails no unconstitutional overbreadth. ........................................... 32

IV. The Ohio Education Association Amicus offers no reason to stray from the stay panel's analysis. ........................................ 33

CONCLUSION ............................................... 35

CERTIFICATE OF COMPLIANCE ................................. 37

CERTIFICATE OF SERVICE ..................................... 38

DESIGNATION OF DISTRICT COURT RECORD ........................... 39

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*303 Creative LLC v. Elenis*,
  6 F.4th 1160 (10th Cir. 2021) ...................................................31

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  591 U.S. 430 (2020) ................................................... 24, 28

*Ambach v. Norwick*,
  441 U.S. 68 (1979) ......................................................... 10

*Arizona v. Biden*,
  31 F.4th 469 (6th Cir. 2022) ............................................ 21

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ............................................ 3

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
  570 U.S. 1 (2013) .......................................................... 30

*Arizonans for Off. Eng. v. Arizona*,
  520 U.S. 43 (1997) ......................................................... 30

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020) ...................................................19, 20

*Bluman v. Fed. Election Comm'n*,
  565 U.S. 1104 (2012) ....................................... 7, 14, 16, 17

*Bluman v. Fed. Election Comm'n*,
  800 F. Supp. 2d 281 (D. D.C. 2011) ..................................16

*Boone Cnty. Republican Party Exec. Comm. v. Wallace*,
  116 F.4th 586 (6th Cir. 2024) ......................................... 35

*Burson v. Freeman*,
  504 U.S. 191 (1992) ....................................................... 14

*Cabell v. Chavez-Salido*,
  454 U.S. 432 (1982) ....................................................... 10

*Cameron v. EMW Women's Surgical Ctr., PSC,*
595 U.S. 267 (2022) ...................................................19

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) .............................................. *passim*

*Clements v. Fashing,*
457 U.S. 957 (1982) .............................................. 8, 22

*Egbert v. Boule,*
596 U.S. 482 (2022) .................................................. 18

*Esshaki v. Whitmer,*
813 F. App'x 170 (6th Cir. 2020) ............................... 20

*Fed. Election Comm'n v. Mass. Citizens for Life, Inc.,*
479 U.S. 238 (1986) .................................................. 35

*First Choice Chiropractic, LLC v. DeWine,*
969 F.3d 675 (6th Cir. 2020) ............................... 23, 30

*First Nat'l Bank of Boston v. Belotti,*
435 U.S. 765 (1978) .................................................. 27

*Foley v. Connelie,*
435 U.S. 291 (1978) .................................................. 10

*Franchise Tax Bd. v. Hyatt,*
587 U.S. 230 (2019) .................................................. 18

*Frisby v. Schultz,*
487 U.S. 474 (1988) .................................................. 30

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) ............................................. 15, 33

*Groch v. Gen. Motors Corp.,*
117 Ohio St. 3d 192 (2008) ...................................... 20

*Holder v. Humanitarian L. Project,*
561 U.S. 1 (2010) ..................................................... 14

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
567 U.S. 298 (2012) ................................................... 34

*L. W. v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ...............................8, 21

*Lamont v. Postmaster Gen. of U. S.*,
381 U.S. 301 (1965) ...................................................15

*League of Women Voters of Ohio v. LaRose*,
741 F. Supp. 3d 694 (N.D. Ohio 2024) ........................ 20

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ...................................................19

*A.M. ex rel. McAllum v. Cash*,
585 F.3d 214 (5th Cir. 2009) ...................................... 22

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ..............................................29, 31

*Moore v. United States*,
602 U.S. 572 (2024) ...................................................15

*State ex rel. Ohioans United for Reproductive Rights v. Ohio Ballot Bd.*,
174 Ohio St. 3d 285 (2023)................................... 29, 32

*State ex rel. One Pers. One Vote v. LaRose*,
175 Ohio St. 3d 320 (2023) ........................................ 29

*Online Merchants Guild v. Cameron*,
995 F.3d 540 (6th Cir. 2021) ...................................... 26

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost*,
118 F.4th 770 (6th Cir. 2024) ...............................*passim*

*Perkins v. Smith*,
370 F. Supp. 134 (D. Md. 1974) ................................. 10

*Planned Parenthood Sw. Ohio Region v. DeWine*,
931 F.3d 530 (6th Cir. 2019)...................................19

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ........................................................ 22

*Regan v. Taxation With Representation of Wash.*,
    461 U.S. 540 (1983) ................................................... 15, 33

*Rosaura Bldg. Corp. v. Municipality of Mayaguez*,
    778 F.3d 55 (1st Cir. 2015) ......................................... 23

*State v. Casillas*,
    952 N.W.2d 629 (Minn. 2020) ................................... 32

*State v. Miree*,
    ____ Ohio St. 3d ____, 2024-Ohio-5714 .................... 12

*Thomas v. Chicago Park Dist.*,
    534 U.S. 316 (2002) ................................................... 31, 33

*TikTok Inc. v. Garland*,
    145 S. Ct. 57 (2025) ..................................................... 28

*Towerco 2013, LLC v. Berlin Twp. Bd. of Trustees*,
    110 F.4th 870 (6th Cir. 2024) ....................................... 3

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,
    413 U.S. 548 (1973) ..................................................... 14

*Union Home Mortg. Corp. v. Cromer*,
    31 F.4th 356 (6th Cir. 2022) ...................................... 26

*United States v. Hansen*,
    599 U.S. 762 (2023) ................................................... 30, 33

*United States v. Sineneng-Smith*,
    590 U.S. 371 (2020) ..................................................... 19

*United States v. Stevens*,
    559 U.S. 460 (2010) ..................................................... 32

*United States v. Texas*,
    599 U.S. 670 (2023) ..................................................... 21

*United States v. West*,
70 F.4th 341 (6th Cir. 2023) ................................................. 3

*Virginia v. Hicks*,
539 U.S. 113 (2003) .............................................................. 33

*Wagner v. Fed. Election Comm'n*,
793 F.3d 1 (D.C. Cir. 2015) (en banc) ................................. 23

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ....................................................... *passim*

*Yee v. City of Escondido, Cal.*,
503 U.S. 519 (1992) .............................................................. 18

**Statutes and Constitutional Provisions**

28 U.S.C. §1292 ...................................................................... 1

28 U.S.C. §1331 ...................................................................... 1

52 U.S.C. §30101 .................................................................. 34

52 U.S.C. §30121 .................................................................. 34

Mich. Comp. Laws Ann. §37.2602 ...................................... 31

Mo. Rev. Stat. §105.957 ....................................................... 31

Ohio Rev. Code §3517.121 ................................................... 31

Ohio Rev. Code §3519.01 ..................................................... 32

Ohio Rev. Code §4117.09 ..................................................... 34

**Other Authorities**

11 C.F.R. §110.20 ................................................................. 34

Act Blue Donation Page ....................................................... 12

Biden Fund Donation Page ................................................... 12

National Republican Senate Republicans Donation Page........................................ 12

Rotunda & Nowak, *Treatise on Constitutional Law: Substance and Procedure* (4th ed. 2008) .................................................................... 22

## STATEMENT REGARDING ORAL ARGUMENT

The State defendants believe that this case merits oral argument.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the District Court's preliminary injunction under 28 U.S.C. §1292(a)(1). The District Court had jurisdiction over the complaint under 28 U.S.C. §1331.

## STATEMENT OF THE ISSUES ON REPLY

1. Whether the District Court erred in preliminarily enjoining Ohio's law restricting campaign spending by foreign nationals as inconsistent with the First Amendment.

2. Whether the District Court erred in preliminarily enjoining Ohio's law as to all foreign nationals despite concluding that the law transgresses the Constitution only as to lawful permanent residents.

3. Whether the District Court erred by not limiting its preliminary injunction of Ohio's law to the party plaintiffs.

4. Whether the District Court's injunction could be alternatively justified by a holding that the Ohio law violates the Equal Protection Clause.

## STATEMENT OF THE ISSUE ON CROSS APPEAL

1. Whether the District Court erred in refusing to enjoin the Ohio law as vague or overbroad?

**INTRODUCTION**

After putting down the Second Brief, a reader may be forgiven for forgetting that a panel of this Court has already done the hard legal work at the heart of this appeal. The Second Brief's 62 pages say almost nothing about that opinion and the legal conclusions it reaches favoring Ohio in this case. The brief refers to the opinion barely a handful of times, often in footnotes. So at the outset it is worth a few paragraphs about what this Court has already held. After all, stay opinions often light the way to reversing a District Court's erroneous judgment. *See, e.g.*, *Towerco 2013, LLC v. Berlin Twp. Bd. of Trustees*, 110 F.4th 870, 879 (6th Cir. 2024); *United States v. West*, 70 F.4th 341, 346 (6th Cir. 2023); *Arizona v. Biden*, 40 F.4th 375, 380 (6th Cir. 2022).

Perhaps most relevant here, the stay panel explained the "substantial overlap" between the factors that it analyzed for the stay and the factors relevant to any preliminary injunction. *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 774 (6th Cir. 2024). In other words, the stay panel's legal analysis examines and answers the very same questions that this panel faces in grading the preliminary injunction.

On that legal analysis, the stay panel started by rejecting the claim that Ohio's law suffers unconditional overbreadth. The reason: The Ohio law reaches millions of

non-citizens who are not lawful-permanent residents, and the law is plainly constitutional as to them. *See id.* at 776.

Next, the panel assumed the Ohio law faces strict-scrutiny review, and explained that it survives. The stay panel reasoned that the "Supreme Court has repeatedly instructed that states have significant leeway in protecting their democratic processes from the influence of noncitizens" and that "[s]pending money to influence voters and finance campaigns is at least as (and probably far more) closely related to democratic self-government" than the laws the Supreme Court has upheld. *Id.* at 777–78 (quotation omitted). That rationale, the panel elaborated, had even greater force for the part of Ohio law related to the initiative and referendum because "advocacy around ballot initiatives is even more connected to the democratic process than advocacy for or against a candidate." *Id.* at 778.

Drilling down to the components of strict-scrutiny analysis, the stay panel measured Ohio's law against Supreme Court precedent for both a compelling interest and narrow tailoring. It explained first that the "compelling interest identified by the Supreme Court amounts to preventing influence by all those without American citizenship, including lawful permanent residents." *Id.* This compelling interest, the panel continued, "has a strong pedigree in American political history," and therefore Ohio need not offer "abundant 'proof by documentary record.'" *Id.* at 781–82

(quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 447 (2015)). Second, the stay panel held that no law with a "goal …to prevent foreign influence" "could be more narrowly tailored." *Id.* at 783–84. As far as alleged overinclusion, the panel went so far as to say that "Ohio would be judicially estopped" from backtracking on its concession that the law does not reach citizen-spouse spending when the other spouse is covered by the law. *Id.* at 783. As for alleged under-inclusion, the stay panel described why *Citizens United* justified Ohio in not extending its law to "certain foreign-owned corporations." *Id.* at 785.

The stay opinion's bottom line perhaps says it best: "The Supreme Court has repeatedly instructed that states have significant leeway in protecting their democratic processes from the influence of noncitizens." *Id.* at 777.

OPAWL's response to all this is surprisingly incomplete. It never engages with the stay panel's core insight: that Supreme Court precedent allowing States to exclude lawful-permanent residents from the democratic process resolves this case. And on cross-appeal, OPAWL largely recycles the same arguments in new doctrinal robes. If the cowl does not make the monk, doctrinal labels do not make substantive argument. The cross-appeal falls short as well.

# ARGUMENT IN REPLY ON OHIO'S APPEAL

## SUMMARY OF THE ARGUMENT

I. Ohio's law is properly tailored to the problem it targets—foreign money in Ohio elections. Ohio's law aligns with several Supreme Court cases that affirm States' power to exclude non-citizens from participating in democratic self-government. That alignment means that Ohio need not prove its law's constitutionality "'by documentary record.'" *OPAWL,* 118 F. 4th at 781–82 (quoting *Williams-Yulee*, 575 U.S. at 447).

Ohio's law will not, as OPAWL fears, restrict citizen-spouse campaign spending or dramatically restrict organizational campaign spending. As to spouses, Ohio is estopped from claiming that the law reaches citizen spouses who sign donation checks from a joint account shared with a non-citizen. As to organizations, they may spend freely so long as they take the simple step of telling any potential donors to affirm that they are citizens. Campaigns and organizations routinely use a similar warning to comply with federal law.

Nor is Ohio's law overinclusive. The law combats voter perceptions about foreign spending in Ohio elections. *Citizens United* should not be read to say that voter perceptions can never justify campaign regulations. After *Citizens United*, the Court upheld a Florida campaign restriction based on the "public confidence" the

restriction engendered. *Willaims-Yulee*, 575 U.S. at 446. If OPAWL's reading of *Citizens United* were right, then restrictions on government employees' campaign donations would be unconstitutional. Those restrictions—much like Ohio's—rest in part on public confidence in government.

OPAWL barely engages with the cases in which the Supreme Court upheld laws against First-Amendment strict scrutiny, choosing instead to propose a sweeping right-to-hear theory of the First Amendment that would demolish many laws. OPAWL's linchpin case for this argument unsurprisingly enjoined enforcement of a law that discriminated based on viewpoint, but never set off a wave of holdings that a listener's right to hear speech washed away laws restricting, for example, a public employee's or a judicial candidate's speech.

OPAWL similarly cannot get out from under the Supreme Court's cases upholding speech restrictions linked to the speaker's status. OPAWL proposes that these speaker-status cases do not hold that the speakers lacked a "right to engage in certain speech." Br. at 33. But that is exactly what they hold. *Bluman*, for example, holds that non-citizen speakers covered by the federal law challenged there had no First Amendment right to make campaign donations. The broad statements in *Citizens United v. Federal Election Commission* (decided before *Bluman*) about "disfavored speakers," 558 U.S. at 341, must be read in light of *Bluman's* holding.

II. OPAWL's defense of the District Court's overbroad injunction falters as well. All agree that the injunction prohibits Ohio from enforcing its law in situations where the Constitution permits enforcement. OPAWL nevertheless contends that the District Court had to enjoin these applications to avoid rewriting Ohio's law. But that misconceives what courts do when they conclude that a law is unconstitutional. In those circumstances, courts prevent state officials from enforcing the law; they do not strike down or rewrite anything.

OPAWL has also failed to justify the District Court extending the injunction to non-parties. An injunction "that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *L. W. v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023). That describes the injunction here, which should be narrowed if it survives at all.

III. OPAWL's switch to an Equal Protection theory serves it no better in justifying the injunction. Generally, review for First Amendment strict scrutiny should "dispose[] of" any parallel equal-protection argument. *Clements v. Fashing*, 457 U.S. 957, 971 (1982). That is especially true where, as here, the key Supreme Court cases about excluding citizens from democratic self-government are equal-protection cases, not First Amendment cases.

IV.    OPAWL offers nothing new as to the remaining stay factors.  Its chief con-

cern—that the Ohio law will dramatically impede organizational campaign spend-

ing—has already been discussed.  *See* above at 6.

## ARGUMENT

OPAWL never gets out from under the shadow of the stay panel's logic.  It cannot

fairly distinguish the Supreme Court's cases that show why Ohio's law is appropri-

ately tailored.  Nor can it justify the overbroad injunction, or save the injunction by

switching to an equal-protection argument.  Finally, it does not explain why the other

stay factors support the injunction.

One preliminary point:  OPAWL begins its defense of the preliminary injunction

with a request for strict scrutiny.  This is common ground with the stay panel, but

OPAWL also believes the Ohio law must be reviewed under strict scrutiny because

it is "content[ ]based."  Br. at 14.  Ohio's law, however, is not content-based.  It

plainly targets the source of money, not the message that money might support.  Per-

haps that is why OPAWL offers nothing by way of argument on this point.  So it

should not sidetrack the straightforward analysis in the stay panel's opinion:  the

Ohio law satisfies strict scrutiny because Ohio has a compelling interest in excluding

foreign money from its political process.   Nothing about that interest turns on the

content of whatever message that money might support.  OPAWL fails to rebut the

stay panel's conclusion that the Ohio law satisfies strict scrutiny because it is narrowly tailored.

## I. Ohio's law fits exactly the problem it is designed to combat.

OPAWL ducks the stay panel's thorough rendering of the Ohio law's narrow tailoring. And OPAWL can run no course through the Supreme Court precedent that dooms the preliminary injunction.

### A. Ohio's law is appropriately tailored to address the full scope of the problem it aims to redress.

Start with the back half of the strict-scrutiny test, as OPAWL makes no argument in the response portion of its brief that the Ohio law lacks a compelling interest. OPAWL contests Ohio's "evidence" that its law serves the purposes of fencing out foreign money in Ohio elections. Br. at 15–16. As the stay panel detailed, that link enjoys "a strong pedigree in American political history" and Ohio need not put on testimony or "'proof by documentary record.'" *OPAWL,* 118 F.4th at 781–82 (quoting *Williams-Yulee*, 575 U.S. at 447). The stay panel's holding is well-grounded in the Supreme Court's cases upholding state laws that excluded lawful-permanent residents from various jobs as a means of "preserv[ing] the basic conception of a political community." *Ambach v. Norwick*, 441 U.S. 68, 74 (1979) (quotations omitted); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 437, 441, 444 (1982); *Foley v. Connelie*, 435 U.S. 291, 299 (1978); *Perkins v. Smith*, 370 F. Supp. 134, 138 (D. Md.

1974), *sum. aff'd*, 426 U.S. 913 (1976).  OPAWL's concern that the Ohio law assumes "without evidence" that lawful-permanent-resident spending could influence Ohio elections could equally be lodged against the various laws the Supreme Court upheld limiting such residents from roles as police officers and teachers.  Br. at 15.  The question is not a matter of courtroom evidence, but a question of Ohio's power to define and protect its political community.  The Supreme Court and the stay panel confirm Ohio's right to define that community by excluding all non-citizens.  And Ohio has that right without a federal judge taking testimony about exactly how much money lawful-permanent residents spend on Ohio elections.

OPAWL further stretches its argument that the Ohio law fails narrow-tailoring by again dodging what the stay panel said.  OPAWL paints Ohio's law as overinclusive for including U.S. citizens and "small-dollar expenditures."  Br. at 20.  OPAWL fears that a citizen spouse of a non-citizen might fall within the Ohio law's reach.  But the stay panel has already announced that Ohio is "judicially estopped" from enforcing its law in the exact way OPAWL fears.  118 F.4th at 783.  OPAWL simply whistles past this roadblock to any argument that citizen will be snared in Ohio's law aimed at non-citizens.

OPAWL continues to sidestep the stay panel's analysis when it raises the specter of restricting non-profits' capacity to donate money for campaigns.  Br. at 22; *see also*

OEA Am. Br. at 14–15. The stay panel explained why non-profit organizations are not the same as corporations because corporations cannot "cordon off non-citizen shareholders," while non-profits can quite easily exclude non-citizen contributions. 118 F.4th at 785 n.5. Indeed, political campaigns have stock language to do just that. They ask donors to affirm that they are "a U.S. citizen or lawfully admitted permanent resident" before making a donation. *See, e.g.*, Act Blue Donation Page [https://perma.cc/Z5Q4-PYWX]; National Republican Senate Republicans Donation Page [https://secure.winred.com/nrsc/home-page/]; Biden Fund Donation Page [https://perma.cc/7BQN-9S2A]. The organizational plaintiffs could do the same here. Adding that language to any solicitation is no "onerous" task, as every national campaign in the country does it now to comply with federal law (with the difference that federal law *permits* lawful-permanent residents to donate). Br. at 23.

OPAWL's rejoinder that the organizational plaintiffs might already possess funds from prohibited sources overlooks that Ohio laws—including this one—do not operate retroactively unless its General Assembly specifies backward-looking operation. In Ohio, "[r]etroactivity is not to be inferred." *See State v. Miree*, ____ Ohio St. 3d ____, 2024-Ohio-5714, ¶7 (quotation omitted). As with its fear about citizens, OPAWL cannot legitimately fear the law reaching donations that predate the law's effective date. As to both, Ohio disclaims that the law reaches that far.

OPAWL also believes it has uncovered unconstitutional over-inclusiveness, suggesting that Ohio's law might outlaw a non-citizen buying markers to draw a protest sign. Br. at 24 n.8. OPAWLS's argument illustrates the problem with pre-enforcement facial challenges, and their tendency "to summon forth an endless stream of fanciful hypotheticals," *United States v. Williams*, 553 U.S. 285, 301 (2008). Here, of course, the stay panel specifically rejected this argument and declined to go down OPAWL's rabbit hole: "Ohio's law still allows homemade yard-signs. And it allows a non-citizen to receive a yard-sign and place it on his lawn. At bottom, Ohio set out to prevent foreign influence in state elections by preventing foreign influence in state elections. Nothing could be more narrowly tailored." *OPAWL*, 118 F.4th at 783.

OPAWL closes out its argument that Ohio's law overreaches by overreading a passage from *Citizens United*. One passage of that opinion downplays regulators' interests in combating voter perceptions of corruption. OPAWL reads this to say that voter perceptions can never justify campaign regulations. Br. at 25. *Citizens United* is not so categorical. Five years after that decision, the Court upheld a Florida campaign restriction based on the "public confidence" the restriction engendered. *Willaims-Yulee*, 575 U.S. at 446. And the stay panel reasoned that Ohio could assuage voters by combating a "perception of foreign interference." 118 F.4th at 782. *Citizens United* holds that Congress may not pass a "categorical ban[]" that is

"asymmetric[] to preventing *quid pro quo* corruption." 558 U.S. at 361. But that hardly answers the question whether Congress or a State can fight the perception that some speakers—who can be banned from donating to campaigns—are influencing elections. Think of it this way: if OPAWL is right, then restrictions on government employees' campaign donations would be unconstitutional. Those restrictions—much like Ohio's—rest in part on public "confidence in the system of representative government." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 565 (1973).

### B. OPAWL has no answer for the Supreme Court precedents that confirm the law's proper tailoring.

Switching to precedent, OPAWL spends a few pages disputing how closely four Supreme Court holdings track this case. Br. at 25–28 (discussing *Williams-Yulee*, 575 U.S. 433; *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010); *Burson v. Freeman*, 504 U.S. 191 (1992); *Bluman v. Fed. Election Comm'n*, 565 U.S. 1104 (2012)). These pages make the uncontroversial point that the Supreme Court has not directly answered the question posed here. But OPAWL offers nothing to dispute what these cases show: that the Court has upheld speech restrictions under strict scrutiny in a variety of contexts.

When OPAWL confronts Ohio's argument for review under other-than-strict scrutiny, it largely recycles its earlier arguments. That includes repeating the already

debunked arguments that Ohio's law restricts U.S. Citizens.  Br. at 28 (see above at 5, 6, 11).  OPAWL also presses a broad right-to-receive argument that pins the First Amendment harm to U.S. citizens' rights to accept foreign money.  The First Amendment contains no categorical right to receive.  If it did, the Court's many cases upholding speech restrictions could not stand.  If the right to receive operated as OPAWL suggests, landmark Supreme Court cases would have come out the other way.  Why, after all, do lawyers not enjoy the right to receive judges' personal solicitations?  *Contra Williams-Yulee*, 575 U.S. 433.  What about citizens' rights to hear a prosecutor's criticism of his office?  *Contra Garcetti v. Ceballos*, 547 U.S. 410, 413, 425 (2006).  And surely some lawmakers would want to hear the lobby pitches of non-profits.  *Contra Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983).  Many First Amendment cases would flip outcomes if OPAWL is right that a broad right to listen defined the relevant inquiry for measuring statutes' constitutional compliance.  OPAWL has not (and could not) defended "the blast radius of [this] legal theory."  *Moore v. United States*, 602 U.S. 572, 592 (2024).

The key case OPAWL cites does not stand for this broad idea.  While *Lamont* discussed citizens' rights to receive material printed abroad, it is no shock that the Court invalidated a viewpoint-based law that required citizens to reveal that they held views the government disliked.  *See Lamont v. Postmaster Gen. of U. S.*, 381 U.S.

301, 307 (1965). And *Lamont's* holding sparked no revolution in First Amendment doctrine such that any citizen's right to hear the speech would invalidate a law justified under traditional inquiries such as speaker-based limits like those that apply to public employees or democracy-enhancing limits like those that allow restrictions on judicial campaign speech.

When OPAWL addresses the key precedents, it dramatically underreads them. OPAWL thinks the Supreme Court's cases affirming the States' power to define political participation do not extend to the political process of campaign speech. Br. at 32–33. That move runs headlong into *Bluman*. To be sure, *Bluman v. Federal Election Commission* did not consider a law that regulates lawful-permanent residents, but it quite explicitly drew on the political-function cases to uphold a limit on campaign spending. 800 F. Supp. 2d 281, 287 (D. D.C. 2011) (Kavanaugh, J.). OPAWL can fairly say that *Bluman* did not address a law that covers lawful-permanent residents, but it cannot fairly say that the Supreme Court's political-function cases say nothing about campaign speech because the Supreme Court had already affirmed that they do.

OPAWL attempts to cast aside the Supreme Court's many cases that use speaker status to reject First Amendment claims, but its efforts fail. According to OPAWL, these cases do not reveal that the plaintiff "lack[ed] a First Amendment right to

engage in certain speech." Br. at 33. Then what exactly do they hold? The losing plaintiffs in those cases certainly did not win a judgment *vindicating* or *announcing* a constitutional right. So what Ohio noted in its opening brief holds true—a plaintiff's status as a public employee, for example, deprives them of a First Amendment right they would possess if they were a private citizen. Ohio. Br. at 32.

OPAWL's retort on this point once again overreads a passage in *Citizens United*. The Court there, while addressing a restriction on a domestic corporation's speech, posited that the First Amendment blocks "restrictions on certain disfavored speakers." 558 U.S. at 341. That rhetoric, though, must be read in the context of the case, which also suggested that the First Amendment tolerates bans on foreign speakers donating to domestic political campaigns. *Id.* at 362. If the categorical statement that the First Amendment tolerates no speaker discrimination were true, the Court could not have summarily affirmed the federal ban on foreign campaign donations only two years after *Citizens United*. *See Bluman*, 565 U.S. 1104.

OPAWL concludes its discussion of precedent by asking the court to treat as waived Ohio's argument that its law should be judged by intermediate scrutiny. Br. at 33–34. But Ohio has said all along that its law survives "any level of scrutiny," including rational-basis review. R.29, Opp. to Mot. Prelim. Inj., PageID#1062–63. Regardless, litigants can ordinarily bring "any argument they like[] in support of" a

consistent claim. *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 535 (1992); *see also*

*Egbert v. Boule*, 596 U.S. 482, 497 n.3 (2022); *Franchise Tax Bd. v. Hyatt*, 587 U.S.

230, 235 n.1 (2019).

## II. OPAWL defends the District Court's overbroad injunction with an overbroad view of federal court's equity powers.

OPAWL has no solid grounds to defend the District Court's doubly overbroad

injunction, which both restrained admittedly lawful applications and reached non-

parties.

### A. OPAWL's defense of the injunction's substantive overreach wrongly insists that injunctions operate on words rather than officials

OPAWL's defense of the District Court's injunction against concededly consti-

tutional applications, Br. at 36–37, is a trip back in time to an era when courts viewed

their task as striking down unconstitutional laws, rather than merely enjoining exec-

utive officials' enforcement of those laws. OPAWL insists that the District Court

could not have entered an injunction narrowly tailored to shield lawful permanent

residents from the Ohio law because such an injunction would "rewrite the law." *Id.*

at 37. But courts are not writing or rewriting law when they enter injunctions, they

are merely restraining the law's application where the Constitution displaces the law.

That is why the Supreme Court has long said that the judicial power "amounts to

little more than the negative power to disregard an unconstitutional enactment."

*Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). Courts simply "have no authority to erase a duly enacted law from the statute books." *United States v. Sineneng-Smith*, 590 U.S. 371, 387 (2020) (Thomas, J., concurring). When courts enforce the Constitution, there is no legislative writing or rewriting involved.

OPAWL's concern that the federal courts should not "rewrite" the Ohio law as somehow respecting Ohio's sovereignty is exactly upside down. Br. at 35–36. Respect for Ohio law means restraining as little of it as possible. Any argument that a federal court must enjoin even lawful applications of a State's law to avoid "rewriting" the law badly undervalues the States' role in our federal system and is incompatible with the Supreme Court's reminder that federal court must "respect … the place of the States in our federal system," *Cameron v. EMW Women's Surgical Ctr., PSC*, 595 U.S. 267, 277 (2022) (quotation omitted).

Contrary to OPAWL's suggestion, "it is fairly unusual for the remainder of a law not to be operative" even when some provisions cannot be enforced. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 628 (2020) (plurality op.). OPAWL therefore has no reason worry that the District Court had to pick up the legislative pen to protect lawful permanent residents (and no others). Federal courts frequently enjoin state laws' application "in certain circumstances" without rewriting the law. *Planned Parenthood Sw. Ohio Region v. DeWine*, 931 F.3d 530, 538 (6th Cir. 2019); *see*

*also, e.g.*, *Esshaki v. Whitmer*, 813 F. App'x 170, 171–72 (6th Cir. 2020) (order); *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 726 (N.D. Ohio 2024). Ohio courts do the same thing. *See, e.g.*, *Groch v. Gen. Motors Corp.*, 117 Ohio St. 3d 192, 226 (2008). None of those injunctions rewrote anything. They simply refused to apply the law when the Constitution (or a federal law) put up a yield sign.

In a final bid to salvage the District Court's injunction of concededly lawful applications, OPAWL insists that the court should probe the minds of Ohio's legislators. But even on OPAWL's misguided quest to divine whether there was "political support for a narrower version of the law," Br. 37, the argument fails. "[E]xperience shows" that this search "often leads to an analytical dead end … because courts are not well equipped to imaginatively reconstruct" alternate legislative universes, including figuring out what the legislator and the Governor "would have wanted if one provision of a law were later declared unconstitutional." *Barr*, 591 U.S. at 625 (plurality op.).

### B. OPAWL again overclaims federal court's power when it insists that the injunction can reach non-parties.

OPAWL again reaches for the waiver argument when it asks the court to ignore the injunction's overinclusion of non-parties. Br. at 40. Ohio has said all along that an injunction like that entered is overbroad. R.29, Opp. to Prelim. Inj., PageID#1059; R.34, Mot. to Stay, PageID#1201. Regardless, federal courts should

be ever vigilant against overbroad injunctions, as a "court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *L. W.*, 83 F.4th at 490. That vigilance means that appellate courts reviewing injunctions should ask "whether party-specific relief can adequately protect the plaintiff's interests," and "[i]f so, an appellate court should not hesitate to hold that broader relief is an abuse of discretion." *United States v. Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring). If the norms of judicial power mean respecting the limits of judicial power, a court should always "ask what controversy remains for a court to adjudicate or remedy" after "a court has remedied a claimant's injury." *Arizona v. Biden*, 31 F.4th 469, 483 (6th Cir. 2022) (Sutton, C.J., concurring). If this court affirms any part of the injunction, it should assure itself that the injunction remains within the limits of judicial power.

\*

Whatever else might be said of the District Court's injunction, it cannot fairly be labeled the "narrowest possible preliminary injunction." Br. at 4. The injunction—if there is one at all—could be narrowed to only lawful permanent residents or limited only to the party plaintiffs.

**III.  OPAWL's equal-protection arguments duplicate the First Amendment analysis, and therefore should meet the same fate.**

OPAWL switches to an equal-protection theory to round out the response part of its brief.  The switch in doctrine does not change the landscape.  The First Amendment analysis above should "dispose[] of this argument."  *Clements*, 457 U.S. at 971 (1982)  (equal-protection holding resolved First Amendment challenge); *cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 n.4 (1992).  "'It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights.  Laws which classify persons in their exercise of these rights will have to meet strict tests for constitutionality without need to resort to the equal protection clause.  Should the laws survive substantive review under the specific guarantees they are also likely to be upheld under an equal protection analysis.'"  *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 226 n.9 (5th Cir. 2009) (quoting 4 Rotunda & Nowak, *Treatise on Constitutional Law: Substance and Procedure* §18.40 (4th ed. 2008)); *see also, e.g., First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 684 (6th Cir. 2020); *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 68 (1st Cir. 2015).  OPAWL's effort to justify the injunction under the Equal Protection Clause even if not under the First Amendment is a "doctrinal gambit" that should fail.  *Wagner v. Fed. Election*

*Comm'n*, 793 F.3d 1, 32 (D.C. Cir. 2015) (en banc).  Indeed, the Supreme Court's most relevant cases about non-citizen participation in democratic self-government are equal-protection cases.  *See* above at 10–11; Ohio Br. at 17–18.  As explained in Ohio's opening brief, these cases justify Ohio's law against a First Amendment challenge, so they certainly answer any *equal-protection* challenge.

## IV.  OPAWL's analysis of the other injunction factors undersells Ohio's sovereign interests and oversells the harm that would flow from rejecting this facial challenge.

When OPAWL turns to the other preliminary-injunction factors, it says nothing that has not been said already.  It continues to sidestep Ohio's concession (and estoppel-triggering) explanation that the law does not reach joint accounts held by a citizen and a non-citizen when the citizen signs the checks.  *OPAWL*, 118 F.4th at 783.  It points to nothing that distinguishes the burdens the organizational plaintiffs would face under the Ohio law distinct from the organizational burdens they already face to assure that they are not using money lawfully restricted under federal campaign laws.  And it continues to undervalue Ohio's sovereign interest in assuring its millions of voters that money spent on Ohio elections is free of the reality and appearance of non-citizens pouring money into elections about Ohio's fundamental charter.

## OHIO'S BRIEF IN OPAWL'S CROSS-APPEAL

## SUMMARY OF THE ARGUMENT

OPAWL's cross-appeal reads like a series of arguments to affirm on alternate grounds. None moves the needle.

I. OPAWL argues first that the injunction (at least as to issue campaigns) can be justified as to all speakers, not just lawful permanent residents, because such campaigns lie at the First Amendment's core. The response here will sound familiar—speaker status matters. Even *Citizens United* "assumed … a compelling interest in limiting foreign influence over our political process." 558 U.S. at 362. But OPAWL's view would permit even foreign citizens living abroad to flood Ohio elections with foreign money. Nothing in Supreme Court precedent suggests that result. Indeed it runs up against the Court's holding that "foreign organizations operating abroad … possess no rights under the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020). OPAWL's absolutist argument gives no regard for Ohio's concern about confidence in its elections, including elections to amend its own Constitution.

One plank of OPAWL's absolutist argument about issue spending insists that the District Court read Ohio law too narrowly. And while it is odd for a free-speech proponent to insist that the law should restrict more speech, OPAWL never explains

the error of the District's Court's interpretation. Nor does OPAWL recognize that principles of constitutional avoidance buttress the District Court' interpretation.

II.  OPAWL's vagueness arguments never take flight.  The Ohio law is hardly vague merely because it includes a citizen-complaint component.  An enforcement mechanism does not introduce vagueness as it is simply irrelevant to the law's content.  Nor do OPAWL's concerns about the law's prohibitions show uncertainty about its reach.  Like this law, many laws say that they extend to a constitutional limit.  And the law's restrictions about issue campaigns is firmly grounded in concrete deadlines for the process of putting a question on the ballot.  Finally, Ohio disclaims that the law reaches vague statements like "I will support your work."

III.  OPAWL's overbreadth arguments likewise remain grounded.  Those arguments rest on the false premise that a law is overbroad if it reaches conduct that some other law also permits.  The Supreme Court has not applied the doctrine that way, and has implicitly rejected the premise.

IV.  An amicus supporting OPAWL doubles down on the unfounded concern about restricting the organization's campaign spending.  A union protests that its ability to spend on Ohio issue campaigns will require drastic reordering of its affairs. The argument hits two roadblocks.  For one, the First Amendment does not guarantee frictionless speech as it tolerates conditions on speaking in many contexts.  For

another, the simple steps a union could take to comply with the Ohio law pale in comparison to the accounting a union must do under existing law.

## ARGUMENT

OPAWL makes several arguments on cross-appeal that the District Court could have imposed an injunction identical to the one it entered by using a different rationale. Br. 47–61. At least that is what Ohio takes OPAWL to mean when it argues that this Court should direct the District Court to issue an injunction on an "alternative ground." Br. 47.

Before tackling these alternate-ground arguments, Ohio suggests that the Court might best leave them for the District Court in the first instance. Remanding to do so would preserve this court's role of review, not first view. *See, e.g.*, *Online Merchants Guild v. Cameron*, 995 F.3d 540, 560 (6th Cir. 2021); *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 365 (6th Cir. 2022). But if the Court chooses to entertain these arguments, it should reject them just as it should reject OPAWL's other efforts to prop up the District Court's injunction.

**I.     The District Court had no power to enjoin Ohio law on the basis that all foreigners have a right to spend money on Ohio ballot measures.**

OPAWL first claims that the District Court should have issued the same injunction (limited, Ohio takes it, to issue campaigns) on the alternative ground that Ohio law may not ban even non-resident foreign nationals from ballot-issue spending. Br.

at 47. It is hard to see how this changes the analysis. OPAWL's several pages on this score reduce to two points: (1) that the analysis should ignore the Supreme Court's cases about political-participation and voter perception, and (2) Ohio's statute must be read more expansively than the District Court read it.

OPAWL's argument places unwarranted stock in the distinction between candidate spending and issue spending. Br. at 51–52. It is true that the Supreme Court recognizes that, for citizens, issue campaigns trigger the peak "need for the widest possible dissemination of information from diverse and antagonistic sources." *First Nat'l Bank of Boston v. Belotti*, 435 U.S. 765, 790 n.29 (1978) (quotation omitted). But that hardly means that state or federal law could not restrict foreign governments from unlimited spending on issue campaigns. Speaker identity still matters. In *Citizens United*, the Court explicitly "assumed … a compelling interest in limiting foreign influence over our political process." *Citizens United*, 558 U.S. at 362; *cf. Tik-Tok Inc. v. Garland,* 145 S. Ct. 57, 67 (2025) (content-neutral speaker-based restriction does not demand strict scrutiny). And speaker identity matters even more because the Supreme Court's cases excluding non-citizens from the political process take on increased salience for issue campaigns, which are "even more connected to the democratic process than advocacy for or against a candidate." *OPAWL*, 118 F.4th at 778.

On this point, OPAWL brushes aside the Supreme Court's cases upholding state laws that excluded lawful permanent residents from roles such as teachers or parole officers as mere "equal protection cases." Br. at 53. OPAWL continues to fall down in explaining why the doctrinal box saps these cases of their essential lesson—States may exclude non-citizens from self-government. If States may do so for lawful permanent residents, they may plainly do so for foreigners without such status, including those who have never set foot in the country. Indeed, it is hard to see how OPAWL's unqualified argument that "ballot-issue spending is speech," Br. at 48, would permit Ohio (or even the federal government) to block foreign *governments* from spending unlimited money on U.S. ballot-issue elections. That, of course, is flatly inconsistent with the Supreme Court's holding that "foreign organizations operating abroad … possess no rights under the First Amendment." *Agency for Int'l Dev.*, 591 U.S. at 436; *see Moody v. NetChoice, LLC*, 603 U.S. 707, 747 (2024) (Barrett, J., concurring).

OPAWL's absolutist argument for ballot-issue spending is equally dismissive of the Supreme Court's recognition that "public confidence … does not easily reduce to precise definition, nor does it lend itself to proof by documentary record," though "is genuine and compelling" nonetheless. *Williams-Yulee*, 575 U.S. at 447. The Supreme Court made that statement about electing judges, but OPAWL gives no

persuasive reason that it evaporates when citizens are asked to vote directly on proposed law, including the language of the Ohio Constitution. Unlike electing a judge to a six-year term, a vote about the Ohio Constitution can define—and recently has defined—the scope of highly contested questions like abortion and the mechanics of amending the Ohio Constitution. *See respectively State ex rel. Ohioans United for Reproductive Rights v. Ohio Ballot Bd.*, 174 Ohio St. 3d 285 (2023); *State ex rel. One Pers. One Vote v. LaRose*, 175 Ohio St. 3d 320 (2023). In such votes, public confidence about voting free of foreign influence reaches its zenith.

A final salvo about this alternate path is OPAWL's claim that the District Court wrongly construed the Ohio law to reach only express, not issue advocacy. Br. at 56–57. That is, OPAWL says the District Court erred by reading the Ohio statute to ban less, not more, speech. It is a bit mind-bending for an organization trying to promote its ability to speak to advocate a reading of the law that curbs *more* speech. And while the "tactic is understandable in light of the odd incentives created by the overbreadth doctrine, … it is also wrong. When legislation and the Constitution brush up against each other, [a courts'] task is to seek harmony, not to manufacture conflict." *United States v. Hansen*, 599 U.S. 762, 781 (2023).

While OPAWL is certainly right that a federal court may not read state law to mean the opposite of what is "obvious" in the text, Br. at 57, it never explains why

the District Court's reading is wrong. Nor does it acknowledge that principles of constitutional avoidance required the District Court to interpret the law to stay within constitutional bounds, if that reading "is at least a possible one," though plainly not the best one. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 18 (2013); *see Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 79 (1997); *First Choice Chiropractic*, 969 F.3d at 681. Indeed, the District Court would have erred by taking a "broad reading" of the Ohio law without considering plausible readings that avoided constitutional shoals. *Frisby v. Schultz*, 487 U.S. 474, 483 (1988).

## II. Ohio's law suffers no unconstitutional vagueness by telling non-citizens not to spend money in Ohio elections.

OPAWL's next alternative-basis argument is that the District Court should have invalidated Ohio's law as unconstitutionally vague. Br. 57–60. While Ohio doubts that the federal court "practice of striking down statutes as unconstitutionally vague is consistent with the original meaning of the Due Process Clause," *Moody*, 603 U.S. at 763 (Thomas, J., concurring in the judgment) (quotation omitted), OPAWL's arguments fail anyway. They begin with the concern that any citizen might lodge a complaint under the law. That hardly makes a law vague, and such citizen triggers are common in all kinds of laws, including closely monitored activities such as civil-rights compliance and, as here, campaign spending. *See, e.g.*, Mich. Comp. Laws Ann. §37.2602(c) (civil rights); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1174 (10th

Cir. 2021) (same), *rev'd on other grounds*, 600 U.S. 570 (2023); Mo. Rev. Stat. §105.957 (campaign disclosure). The citizen-complaint provision cannot "by itself," Br. 58, render the law vague. If citizens could file complaints about compliance with the speed limit, that would not make a 65 M.P.H. restriction vague.

OPAWL's three supposed illustrations fare no better. For one, OPAWL wonders what the law means when it prohibits contributions to continuing associations unless permitted by law or the Constitution. Br. 59 (citing Ohio Rev. Code §3517.121(B)(4), (C)). Statutes acknowledging that they reach to the limit of other law or the Constitution are common, even in laws restricting speech. *See, e.g.*, *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 318 n.1 (2002) (permitting law). And when used, this locution plainly means that the law operates unless displaced by a higher law. OPAWL's concern about the meaning of the ballot-issue-spending prohibition is similarly off-base. That limit does extend before the ballot issue is officially certified, but it cannot extend to any time before an issue becomes a *ballot* issue, that is, until some citizens take official steps toward putting an issue on the ballot. In Ohio, that means the earliest the law would apply is when an issue campaign submits a petition to the Attorney General. *See* Ohio Rev. Code §3519.01(A), (B). Ohio's law does not reach issues merely in public discussion. Last, OPAWL's concern that the Ohio law would reach innocuous statements like "I will support your work," Br. 60, is unfounded. The

Ohio law would not touch such a statement, which is a far cry from the prohibitions in the law.

## III. Ohio's law, which legitimately reaches billions of non-citizens, entails no unconstitutional overbreadth.

OPAWL's last stab at justifying an injunction here is the Ohio law's supposed overbreadth. Br. at 60. A law is only unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to … [its] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation omitted). OPAWL's one-page overbreadth argument makes no dent in the Ohio law. For one thing, "an overbreadth analysis is needlessly redundant if a statute has already survived strict scrutiny review." *State v. Casillas*, 952 N.W.2d 629, 646 (Minn. 2020). For another, the argument's key premise is incorrect. OPAWL's brief argument turns on the premise that a law's "plainly legitimate sweep" cannot include anything that might be prohibited by other law. Br. at 60. But the Supreme Court has said otherwise. In a case evaluating the scope of a Virginia ordinance, the Court counted within its legitimate sweep the separate state-law prohibition criminalizing drug dealing. *See Virginia v. Hicks*, 539 U.S. 113, 123 (2003). In short, OPAWL's arguments are "not the stuff of overbreadth—as-applied challenges can take it from here." *Hansen*, 599 U.S. at 785.

**IV. The Ohio Education Association Amicus offers no reason to stray from the stay panel's analysis.**

A coda about the amicus brief of the Ohio Educational Association, which claims a "handful" of lawful-permanent-resident members. Br. at 6. The amicus brief's central premise is that unions may not be "deprived of their ability to make independent expenditures … simply because a single dues-paying member is a non-citizen lawfully working" in the country. Br. at 20. And they are not. All unions or similar organizations must do to retain the same speech rights as any natural citizen is to do the same thing a natural citizen must do—not accept money from non-citizens. In many other areas, the First Amendment allows preconditions to unrestrained speech. Core speech like marching in a park may turn on securing a permit. *Thomas*, 534 U.S. at 317. Core political speech like lobbying may depend on forfeiting tax-exempt status. *Regan*, 461 U.S. 540. And the unrestrained ability to criticize the government may depend on not holding a government job. *Garcetti*, 547 U.S. at 417. The condition that an entity turn away foreign money in order to retain its full right to speak is in line with these many precedents.

The amicus frets about the mechanics of segregating funds, but the task is certainly no more burdensome than the accounting unions have done for years to segregate and account for fair-share fees versus other expenditures. *See Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 302 (2012) (noting accounting unions

must do); Ohio Rev. Code §4117.09(C) (rebate procedure for agency-shop fees if fees are used for "partisan politics or ideological" causes). And under federal law, unions must have processes in places to assure that they do not accept money from foreign nationals. *See* 52 U.S.C. §§30121(a)(2), 30101(11). Federal regulation also bars a union from allowing a foreign national to "participate in the decision-making process" of the union regarding political spending. 11 C.F.R. §110.20(i). All told, unions must comply with a wide array of accounting and other controls apart from any they might implement to comply with the Ohio law. Or it could avoid the headache the way many campaigns do by simply telling non-citizens that they cannot donate to the organization. *See* above at 12. If the amicus has only a "handful," Br. 6, of non-citizen members, such a disclaimer will have no effect on finances and affect very few members.

Still, the amicus protests, the First Amendment sometimes steps in when a speaker would need to take burdensome steps before speaking. Br. at 16–17. True, but those instances involve far more drastic steps than accounting or disclaimers. Nothing about the Ohio law as applied to the amicus, for example, involves an entity "formed for the express purpose of promoting political ideas," or requires creating "a separate association," or a "a separate political issues committee." *See* respectively, *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 263–64

(1986); *Citizens United*, 558 U.S. at 337; *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 116 F.4th 586, 598 (6th Cir. 2024).

\*     \*     \*

There will be a time and a place for challenges if the law transgresses the First Amendment in specific applications.  This is neither.

## CONCLUSION

For these reasons, this Court should reverse the District Court's injunction.  In the alternative, it should modify the injunction by limiting it to any unconstitutional applications and limiting it to the party plaintiffs.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record*
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
KATIE ROSE TALLEY
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Appellants/Cross-Appellees*
  *Ohio Attorney General Dave Yost and*
  *Ohio Secretary of State Frank LaRose*

**CERTIFICATE OF COMPLIANCE**

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 7,624 words. *See* Briefing Schedule., Doc. 43 (October 15, 2024).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2025, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## DESIGNATION OF DISTRICT COURT RECORD

Defendant-Appellants/Cross-Appellees, pursuant to Sixth Circuit Rule 30(g),

designate the following filings from the District Court's electronic records:

### *OPAWL v. Yost*, Case No. 2:24-cv-3495

| Date Filed | R. No.; PageID# | Document Description |
| --- | --- | --- |
| 6/27/2024 | R. 1; 6, 8–9, 33–47 | Complaint |
| 7/26/2024 | R. 29; 1059 | Opposition to Motion for Preliminary Injunction |
| 8/31/2024 | R. 32; 1166–71, 1177–82, 1187–90 | Opinion and Order |
| 9/2/2024 | R. 33; 1192–93 | Notice of Appeal |
| 9/2/2024 | R. 34; 1201 | Motion to Stay Pending Appeal |
| 9/12/2024 | R. 40; 1259, 1270–71, 1276 | Opinion and Order |
| 9/13/2024 | R. 42; 1285–86 | Notice of Appeal |